No. 2012-1452

IN THE

# United States Court of Appeals
### FOR THE FEDERAL CIRCUIT

ST. JUDE MEDICAL, INC. and

ST. JUDE MEDICAL PUERTO RICO, LLC,

*Plaintiffs-Appellees,*

*v.*

ACCESS CLOSURE, INC.,

*Defendant-Appellant.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS IN
CASE NO. 08-CV-4101, JUDGE HARRY F. BARNES

## BRIEF OF DEFENDANT-APPELLANT ACCESS CLOSURE, INC.

CHARLES K. VERHOEVEN
DAVID EISEMAN
MATTHEW D. CANNON
**QUINN EMANUEL URQUHART &
SULLIVAN LLP**
50 California Street, 22nd Floor
San Francisco, CA  94111
(415) 875-6600

JOSEPH R. RE
 *Counsel of Record*
TANYA MAZUR
**KNOBBE MARTENS OLSON &
BEAR LLP**
2040 Main Street, 14th Floor
Irvine, CA 92614
(949) 760-0404

*Attorneys for Defendant-Appellant*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Defendant-Appellant Access Closure, Inc. certifies the following:

1.     The full name of every party represented by me is:

Access Closure, Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None.

3.     All parent corporations and any publicly held companies that own more than 10 percent or more of the stock of the party represented by me are:

None.

4.     The name of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or are expected to appear in this Court are Charles Verhoeven, David Eiseman, Brian C. Cannon, Melissa J. Baily, Linda J. Brewer, Matthew D. Cannon, Cathleen G. Garrigan, Sarah E. Ames, David Pollock of Quinn Emanuel Urquhart & Sullivan LLP, James Haltom, Darby Doan, Morgan Vaughn and Scott Andrews of Haltom & Doan, Joseph R. Re, William G. (Gerard) von Hoffmann III and Tanya Mazur of KNOBBE MARTENS OLSON & BEAR LLP, 2040 Main Street, 14th Floor, Irvine, CA 92614.

Date:  August 13, 2012           By: */s/ Joseph R. Re*_____
                                     Joseph R. Re

                                     *Attorney for Defendant-Appellant*
                                     ACCESS CLOSURE, INC.

# TABLE OF CONTENTS

**Page No.**

TABLE OF AUTHORITIES .................................................................vi

INDEX TO APPENDED MATERIALS ............................................ viii

STATEMENT OF RELATED CASES ..............................................ix

JURISDICTIONAL STATEMENT ...................................................x

STATEMENT OF THE ISSUES...................................................... 1

STATEMENT OF THE CASE.......................................................... 2

STATEMENT OF FACTS ............................................................... 5

I. BACKGROUND OF THE TECHNOLOGY ................................. 5

II. THE PRIMARY PRIOR ART REFERENCES ............................. 5

    A. Takayasu.......................................................................... 6

    B. Smiley.............................................................................. 8

III. THE PATENTS IN SUIT ........................................................... 9

    A. The '439 Patent ............................................................... 10

        1. The Specification ..................................................... 10

        2. The Asserted Claims ................................................ 14

        3. The Restriction Requirements And Elections............. 16

    B. The Fowler Patents........................................................... 19

        1. The Fowler Specification.......................................... 20

        2. The Asserted Claims ................................................ 21

    C. SJM Does Not Practice The Fowler Inventions................. 23

IV. THE ACCUSED DEVICE SOLD BY ACI: THE MYNX®
     DEVICE................................................................................ 23

V. PRIOR PROCEEDINGS ........................................................... 27

    A. Claim Construction .......................................................... 27

    B. The Jury Trial .................................................................. 29

# **TABLE OF CONTENTS**
## *(cont'd)*

**Page No.**

    C.    The Safe-Harbor Proceedings ............................................29

    D.    The District Court's Denial Of ACI's JMOL Motion.........................31

SUMMARY OF THE ARGUMENT ........................................34

ARGUMENT ....................................................................37

I.    THE '439 PATENT IS INVALID FOR OBVIOUSNESS-TYPE DOUBLE PATENTING.................................................37

    A.    Double Patenting And The Safe-Harbor Provision Of § 121 .............37

    B.    The Asserted Claims Of The '439 Patent Are Not Patentably Distinct From Claim 7 Of The '498 Patent.........................................39

    C.    Because The '439 Patent Claims Were Never Subject To A Restriction Requirement, The Safe Harbor Does Not Apply.............40

    D.    The District Court Erred In Holding That The '439 Patent Claims Were Filed "As A Result Of" A Restriction Requirement ...............................................................43

    E.    The Safe Harbor Is Also Inapplicable Because Consonance Was Not Maintained................................................................47

II.    THE DISTRICT COURT ERRED IN CONSTRUING THE "MEANS FOR EJECTING" AND "EJECTING MECHANISM" LIMITATIONS OF THE '439 PATENT. ..........................49

    A.    Because Plug Pusher 69 Does Not Perform The Recited Function, The District Court Erred In Identifying It As Corresponding Structure ........................................................51

    B.    The District Court Erred In Holding That The Corresponding Structure Could Be Any Plug Pusher................................................53

    C.    Because The District Court's Erroneous Construction Prejudiced ACI At Trial, This Court Should Order A New Trial.......54

III.    THE FOWLER CLAIMS ARE INVALID FOR OBVIOUSNESS........................................................................56

    A.    The District Court Erred In Not Making Its Own Conclusion On Obviousness..................................................................57

    B.    The Fowler Claimed Inventions Would Have Been Obvious To A Person Of Ordinary Skill In The Art................................................58

# <u>TABLE OF CONTENTS</u>
## (*cont'd*)

**Page No.**

    C.    Substantial Evidence Does Not Support The District Court's Finding Of A Lack Of Any Reason To Combine The Takayasu And Smiley Prior Art References ........................................................61

IV.    THE DISTRICT COURT'S WILLFULNESS HOLDING, IF APPEALABLE, MUST BE VACATED. ......................................................65

CONCLUSION .........................................................................................67

# TABLE OF AUTHORITIES

**Page No(s).**

*Alcon Research, Ltd. v. Apotex Inc.*,
  No. 2011-1455 (Fed. Cir. Aug. 8, 2012) .......................................................64

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*,
  No. 2010-1510 (Fed. Cir. June 14, 2011).................................................65, 66

*Boehringer Ingelheim Int'l GmbH v. Barr Labs., Inc.*,
  592 F.3d 1340 (Fed. Cir. 2010) ...................................................38, 44, 45, 46

*Boston Sci. Scimed, Inc. v. Cordis Corp.*,
  554 F.3d 982 (Fed. Cir. 2009) ......................................................................57

*Budde v. Harley-Davidson, Inc.*,
  250 F.3d 1369 (Fed. Cir. 2001) ....................................................................49

*Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*,
  15 F.3d 1573 (Fed. Cir. 1993) ......................................................................49

*Cybor. Corp. v. FAS Techs., Inc.*,
  138 F.3d 1448 (Fed. Cir. 1998) (*en banc*)....................................................49

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC*,
  349 F.3d 1373 (Fed. Cir. 2003) .............................................................*passim*

*Gerber Garment Tech. v. Lectra Sys., Inc.*,
  916 F.2d 683 (Fed. Cir. 1990) ...............................................................47, 48

*Graham v. John Deere Co.*
  383 U.S. 1 (1966).......................................................................35, 36, 57, 58

*JVW Enters., Inc. v. Interact Accessories, Inc.*,
  424 F.3d 1324 (Fed. Cir. 2005) ....................................................................49

*In re Longi*,
  759 F.2d 887 (Fed. Cir. 1985) ...............................................................37, 38

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,
  344 F.3d 1205 (Fed. Cir. 2003) ....................................................................51

# TABLE OF AUTHORITIES
### *(cont'd)*

**Page No(s).**

*Newell Cos. v. Kenney Mfg. Co.*,
 864 F.2d 757 (Fed. Cir. 1988) ...............................................57, 64

*Pressure Prods. Med. Supplies v. Greatbatch Ltd.*,
 599 F.3d 1308 (Fed. Cir. 2010) ...................................................56

*In re Seagate Tech., LLC*,
 497 F.3d 1360 (Fed. Cir. 2007) ......................................32, 65, 66

*SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*,
 225 F.3d 1349 (Fed. Cir. 2000) ...................................................64

*Symbol Techs., Inc. v. Opticon, Inc.*,
 935 F.2d 1569 (Fed. Cir. 1991) ............................................46, 47

## OTHER AUTHORITIES

35 U.S.C. § 101 ...........................................................................37

35 U.S.C. § 112 ....................................................................*passim*

35 U.S.C. § 121 ....................................................................*passim*

35 U.S.C. § 154 ...........................................................................38

GATT, Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat.
 4809 (1994)...............................................................................38

37 C.F.R. § 1.142 ..................................................................37, 38

# INDEX TO APPENDED MATERIALS

1.      Claim Construction Order dated July 19, 2010
        (JA1-58)

2.      Findings of Fact and Conclusions of Law dated November 8, 2011
        (JA101-109)

3.      Judgment dated January 23, 2012
        (JA110-112)

4.      Order dated June 4, 2012 (denial of ACI's JMOL motion)
        (JA113-122)

5.      U.S. Patent No. 5,275,616
        (JA144-157)

6.      U.S. Patent No. 5,716,375
        (JA169-180)

7.      U.S. Patent No. 7,008,439
        (JA202-224)

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Federal Circuit Rule 47.5(a), no other appeal in or from the civil action below was previously before this or any other appellate court.  Pursuant to Federal Circuit Rule 47.5(b), counsel is aware of no other pending cases that will directly affect, or will be directly affected by, the Court's decision in this appeal.

# <u>JURISDICTIONAL STATEMENT</u>

The district court had jurisdiction in this patent infringement case under 28 U.S.C. §§ 1331 and 1338.  This Court has jurisdiction over this appeal under 28 U.S.C. §§ 1292(c) and 1295(a)(1).

On June 4, 2012, the district court entered final judgment following a jury trial and a separate bench trial where it denied ACI's motions for judgment as a matter of law and a new trial.  In addition, that day the district court entered a permanent injunction against ACI.  Pursuant to Fed. R. App. P. 4(a)(1)(A), ACI timely filed its amended notice of appeal on June 6, 2012, from this final appealable judgment and injunction.

## <u>STATEMENT OF THE ISSUES</u>

1.     Whether the district court erred in holding that the safe-harbor provision of 35 U.S.C. § 121 protects U.S. Patent No. 7,008,439 to Janzen, et al. ("the '439 patent") from any double-patenting defense, even though the '439 patent claims were not filed as a result of any restriction requirement.

2.     If this Court were to find that the safe harbor applied, whether the district court's erroneous construction of the means-plus-function limitations in Claims 7 and 8 of the '439 patent to cover "plug pushers," even those that do not perform the recited function, broadened the scope of those claims to ACI's prejudice at trial.

3.     Whether the district court's reliance on a single piece of conclusory expert testimony formed an adequate legal determination that the jury properly found that Claim 21 of U.S. Patent No. 5,716,375 to Fowler and Claim 14 of U.S. Patent No. 5,275,616 to Fowler were not invalid for obviousness.

## STATEMENT OF THE CASE

St. Jude Medical, Inc. and St. Jude Medical Puerto Rico, LLC (collectively, "SJM") filed their Complaint in the United States District Court for the Western District of Arkansas on October 22, 2008, alleging Access Closure, Inc. ("ACI") infringed five patents. JA268-78. All five patents relate to methods and devices for closing punctures in blood vessels. After conducting a *Markman* hearing, the district court construed various claim terms in those patents. JA1-58.

Before a jury trial, SJM withdrew its claim based on U.S. Patent No. 5,725,498 ("the '498 patent"). With respect to the patents at issue on this appeal, the jury rendered the following verdict:

U.S. Patent No. 7,008,439 ("the '439 patent"):

- That ACI infringed Claims 7 and 8, but not Claim 9;

- That Claims 7, 8, and 9 were invalid for double patenting in view of Claim 7 of the earlier-issued '498 patent; and

- That the '439 patent was not invalid for obviousness or for failing to name a co-inventor, findings that are not challenged on this appeal.

U.S. Patent Nos. 5,275,616 ("the '616 patent") and 5,716,375 ("the '375 patent"):

- That ACI infringed Claim 14 of the '616 patent and Claim 21 of the '375 patent (collectively, "the Fowler claims"), findings not challenged on appeal;

- That the Fowler claims are not invalid for obviousness;

- That ACI's infringement of the Fowler claims was willful, and;

- That ACI should pay $27.1 million in damages.

JA92-96.

Because the jury's verdict finding double patenting merely decided that the claims of the '439 patent were not patentably distinct from Claim 7 of the '498 patent, the district court conducted a bench trial on the applicability of the safe-harbor provision of 35 U.S.C. § 121. In November, 2011, the district court made findings of fact and conclusions of law that the safe-harbor provision did apply, thus upholding the validity of the '439 patent. *See* JA101-109.

On January 23, 2012, the district court entered judgment on the jury verdict and in accordance with its ruling upholding the applicability of the safe-harbor provision. JA110-12. In that order, the district court deferred making any further rulings pertaining to damages, including whether to enhance based on willfulness, until after any appeal. *Id*. That day, the district court also issued a briefing schedule for all post-trial motions. JA23971-72. Pursuant to that schedule, ACI filed its renewed judgment as a matter of law ("JMOL") motion and a motion for a new trial. JA11977-12040. SJM filed a JMOL motion only on the issue of whether ACI infringed Claim 9 of the '439 patent. JA11910-20. SJM also moved for a permanent injunction. JA12041-43.

On June 4, 2012, the district court denied all post-trial JMOL and new trial motions. JA113-32, JA13697-13700. It also entered final judgment and granted a permanent injunction. JA142-43. The district court stayed the injunction pending a decision on ACI's motion to stay it pending this appeal. JA13705-23, JA13701. ACI also moved to stay execution of the monetary award pending this appeal. JA13724-38. ACI's two stay motions are still pending before the district court.

ACI now appeals the district court's: (1) application of the safe-harbor provision protecting the '439 patent from ACI's double-patenting defense; (2) denial of ACI's JMOL motion that Claims 7 and 8 of the '439 patent are not infringed; and (3) denial of ACI's JMOL motion that the Fowler claims are invalid for obviousness. In addition, because the district court has not yet decided whether to enhance any damages based on the jury's finding of willful infringement, ACI maintains that the denial of its JMOL with respect to willfulness is not yet appealable. If this Court were to decide otherwise, ACI maintains that the denial of its JMOL motion of no willfulness should be vacated. SJM has filed no cross-appeal.

## STATEMENT OF FACTS

### I.  BACKGROUND OF THE TECHNOLOGY

Coronary procedures employing catheters that allow physicians to access, diagnose, and treat cardiac disease are increasingly common as the number of patients requiring cardiac care grows.  Angioplasties, one such means of reducing arterial blockages, involve insertion of a balloon-like device through the femoral artery.  The device is guided to the blockage where it is then expanded to reduce arterial clogging.  After the procedure is complete, the device is removed, leaving behind a hole or puncture in the femoral artery.

The most common method for closing such punctures is by manually applying pressure (which may involve the use of heavy sand bags) on the hole in the artery until the bleeding stops.  This can be a painful process for patients, a time-consuming one for medical professionals, and can extend patients' hospital stays.  The technology at issue in this appeal involves devices designed to stop bleeding from the punctures left in blood vessels following catheterization procedures, such as angioplasties, by use of a plug, eliminating the need for manual compression.  *See, e.g.*, JA175, JA218.

### II.  THE PRIMARY PRIOR ART REFERENCES

ACI relies on two primary references to show the error of the nonobviousness judgment of the Fowler claims:  Takayasu and Smiley.  Both are

directed to methods and devices for achieving hemostasis, or cessation of bleeding, in blood vessels. Neither reference was before the Patent Office when the Fowler claims were examined.

## A.    Takayasu

The 1988 article by Kenichi Takayasu, M.D., et al. entitled "A New Hemostatic Procedure for Percutaneous Transhepatic Portal Vein Catheterization" describes a device and technique for sealing a puncture in a vein of the liver. JA22942-46. Before the technique of using the Takayasu device, patients would internally bleed after, for example, a doctor punctured a vein with a catheter to analyze the anatomy of the venous system. JA22943, JA22945. The bleeding was caused by incomplete closure of the puncture. JA22943. Takayasu observed that such bleeding was not rare and usually occurred when the catheter was removed. JA22945-46.

To avoid such complications, Takayasu determined that the puncture in the vein could be sealed with a compressed gelfoam plug or "gelfoam stick." JA22943. To deliver the gelfoam plug to the proper location, Takayasu employed an angiography catheter to form a cartridge, inside of which he loaded the gelfoam plug. *Id.* Takayasu also used a "stylet" (or plug pusher) and a sheath in his device to position the plug. *Id.*

Once the initial catheterization procedure was complete, Takayasu withdrew the catheter from the vein.  *Id.*  Then Takayasu attached the end of the cartridge to the sheath, through which blood was flowing.  JA22943-44.  Takayasu depicts this procedure in Figure 2A of his article.  JA22944.  Takayasu soaked the gelfoam plug in contrast agent for location-monitoring purposes and loaded the cartridge with the plug.  JA22943.  He then advanced the plug, using the stylet, to block the puncture but not enter the blood vessel.  *Id.*  To ensure the proper placement of the gelfoam plug outside the vein, Takayasu monitored the position of the sheath and plug with x-ray and/or ultrasonic techniques.  *Id.*  If necessary, Takayasu advised that the procedure could be repeated to add a second gelfoam plug.  *Id.*  That plug could be placed after the sheath was partially withdrawn by employing the same procedure.  *Id.*

In the 56 patients that underwent Takayasu's hemostatic procedure, Takayasu explained that none experienced any complications or bleeding. JA22945.  Takayasu further stated that the technique was particularly effective in patients with a tendency to bleed and those having high vein pressure.  JA22946. Takayasu also taught that "this device can shorten the time required for hemostasis, compared to the one used conventionally without a sheath catheter," where the catheter remains in the vein for at least 10 to 20 minutes "for a coagulum to form

for hemostasis." JA22945. Additionally, Takayasu mentioned a device he previously developed for achieving hemostasis after needle biopsies. JA22946.

### B.    Smiley

In March of 1971, Karl Smiley, M.D. published an article entitled "Balloon Catheter Tamponade of Major Vascular Wounds." JA23032-33. In the article, Smiley described a technique for immediate closure or blockage (referred to in medicine as tamponade) of a bleeding vessel implemented in two different patients. JA23032. Vascular injuries can generally be controlled by direct pressure on the injured site and subsequent implementation of vascular clamps, prior to repair. *Id.* Smiley taught, however, that some injuries of major vessels occur where the location of the injury makes such techniques ineffective. *Id.* As such, Smiley described employing a Foley catheter, a balloon-equipped catheter often used to control urine flow, as a means for "immediate tamponade of the bleeding vessel," which provided "an effective and rapid method for initial control of some unusual injuries." *Id.*

Specifically, Smiley described inserting a Foley catheter into the aorta through a hole (from a gunshot wound), inflating the bulb of the catheter, and partially withdrawing the inflated catheter to control the arterial bleeding. *Id.* Once initial hemostasis was achieved, the aortic injury was sutured "with the catheter still in place." *Id.* The same technique was used on an injury to the

inferior vena cava in the same patient. JA23032. The technique was successful, with the patient later recovering and being discharged in good condition. *Id.* Smiley taught that "[i]nitial control of each of the actively bleeding major vessels was facilitated by balloon catheter tamponade," where other techniques would not have been effective. JA23032-33.

Smiley also described the use of the same technique on a different patient where "[c]ontrol of th[e] injury was almost impossible except by balloon catheter tamponade." JA23033. Moreover, in that patient, [b]leeding was controlled completely and sutures were easily placed with the balloon catheter in place." *Id.* Therefore, Smiley concluded that the technique involving partially withdrawing a distended balloon positioned inside a vessel offered "an effective and rapid method for initial control of traumatic hemorrhage" and for "immediate tamponade of a bleeding vessel." *Id.*

## III. THE PATENTS IN SUIT

There are two patent families at issue on this appeal: Janzen and Fowler. All of the asserted patents relate to devices and methods to close punctured blood vessels. *See* JA144-180, JA202-224. The Janzen patents include the '498 and '439 patents, both entitled "Device and Method for Sealing Puncture Wounds." JA181-224. The Fowler patents include the '616 and '375 patents, both entitled

"Insertion Assembly and Method of Inserting a Vessel Plug into the Body of a Patient. JA144-180.

## A.    The '439 Patent

### 1.    The Specification

In 1990, Janzen filed his original application for methods and devices for delivering hemostatic material to the outside of a vessel wall at a puncture. As explained in greater detail below, the '439 patent was filed in March of 1995 as a fourth-generation application. The '439 patent explains that the invention moves beyond traditional manual-compression techniques for sealing punctures made in blood vessels, such as the femoral artery, after cardiac catheterization procedures. JA218 at 1:18-24, 47-64. The patent also explains that compression techniques were painful and often contributed to longer hospital stays, so alternative means of sealing these punctures were desirable. *Id.* at 1:47-64.

The patent further explains that prior art devices attempted to solve the problem of sealing these punctures in arteries by employing a mushroom or umbrella shaped device (as in SJM's Angio-Seal discussed below) to seal the artery from the inside. *Id.* at 2:4-14. The head of these devices was inserted into the artery, and means were used to pull and hold the device in place against the wall of the artery. *Id.* Leaving portions of a device inside an artery, however, posed its own problems, such as facilitating the formation of clots. *Id.*

Janzen sought to overcome these drawbacks through the use of a collagen plug (or other resorbable material) to seal the artery from outside the artery. JA218 at 2:20-24. Janzen disclosed various embodiments of devices intended to deliver a plug to the outside of a punctured blood vessel. *See, e.g.*, JA204-16.

The patent explains generally that after a catheterization procedure is completed, the physician should apply finger pressure to the artery upstream of the wound to prevent the tissue channel from filling with blood. JA219 at 4:18-30, JA221 at 8:27-33. The physician then inserts a guide wire into the artery over which a tissue dilator is advanced either to the artery wall or to within a set distance from the puncture. JA219-20 at 4:48-5:3, JA221 at 8:34-37. The physician uses the dilator to place the sheath until it is positioned in the same location. JA220 at 5:7-15, JA221 at 8:53-56. The physician then withdraws the guide wire and dilator. JA221 at 8:61-63. As shown below in Figures 10 and 17 of the '439 patent, the physician uses piston 49 or a plug pusher (both shown in yellow) to force the plug (shown in green) from the proximal end of the sheath 45 (of sheath assembly 23) (shown in blue) to the distal end of the sheath and against the artery wall. JA220 at 5:31-41, JA 221-22 at 8:65-9:5.

*FIG. 10*



Figure 17

Then the physician may use either the sheath or the plug pusher to secure the plug until hemostasis is achieved. JA220 at 5:57-67, JA222 at 9:6-9. If the physician chooses to leave the sheath in place and removes the plug pusher, the physician may insert a second plug. JA220 at 6:1-8, JA222 at 9:9-16.

In the Figure 2 embodiment shown below, the insertion apparatus is in the form of a "Y," with a common leg 61 (shown in blue), a plug leg 63, and a dilator leg 65 (also shown in blue). JA220 at 6:15-19.



When using that embodiment, the physician uses the plug pusher 69 (shown in yellow), to force the plug (shown in green) to travel along plug leg 63 to the common leg 61, at the base of the "Y." *Id.* at 6:32-37. At that point, the physician uses dilator 17 to force the plug to travel through the remainder of the common leg of sheath 61 to the distal end, arriving at the artery. *Id.* at 6:38-41. Pressure is maintained on dilator 17 while the insertion apparatus is withdrawn, leaving the plug positioned to form a hemostatic seal on the punctured artery. *Id.* at 6:41-50.

The embodiment of Figure 3 of the '439 patent is similar to the one described, but the dilator and plug legs are transposed.  *Id.* at 6:51-55.

### 2.    The Asserted Claims

ACI challenges the infringement ruling with regard to Claims 7 and 8 of the '439 patent, specifically as it pertains to the district court's claim construction of the "means for ejecting" and "ejecting mechanism" limitations.  Claims 7 and 8 are partially reproduced below, with the relevant means-plus-function limitations emphasized.  JA222-23.  Dependent Claim 7 of the '439 patent depends from Claim 1, where Claim 1 recites:

A device for closing a puncture in a wall of an artery comprising:

an elongated member . . .,

separable plug means for plugging said puncture being disposed in said elongated member,

movable guide means . . ., and

***means for ejecting said plug means from said distal end of said elongated member so as to place said plug means in blocking relation with said puncture, so as to seal said puncture***.

Claim 7 recites the additional limitation that the plug has an orifice for the guide means.

Independent Claim 8 of the '439 patent recites:

A device for closing a puncture in a wall of an artery comprising:

an elongated member . . .,

a separable plug means for plugging said puncture being disposed in said elongated member,

a movable guide element . . ., and

***an ejecting mechanism for ejecting said plug member from said distal end of said elongated member so as to place said plug member in  blocking relation with said puncture, so as to seal said puncture.***

The district court construed the corresponding structures for both of the means-plus-function limitations to be plug pushers (33, 69, and 95) and sheaths (23 and 45).  JA32, JA34.  Figures 16, 3, and 4 of the '439 patent, reproduced below with highlighting, show three embodiments that include the three identified plug pushers (in yellow).  JA210, JA204-205, *see* JA14758, JA14771.  The sheaths in those embodiments are shown in blue.  The plugs are shown in green.



**Figure 16**



FIG. 3

FIG. 4

However, only plug pushers 33 and 95 have sufficient length to perform the recited function, as discussed in detail below.

### 3.    The Restriction Requirements And Elections

ACI challenges the district court's application of the safe-harbor provision of § 121 to shield the '439 patent from invalidity due to double patenting.  Because the district court relied upon the restriction requirements imposed during the prosecution of earlier-filed applications, a review of those restrictions and subsequent elections is necessary.

On its face, the '439 patent indicates it is a continuation of U.S. Patent No. 5,830,130 ("the '130 patent" or "the parent"). JA202. The '130 patent indicates it is a divisional of U.S. Patent No. 5,391,183 ("the '183 patent" or "the grandparent"). JA18722, JA18815. Both the '498 patent and the '439 patent indicate they are continuations of the '130 patent. JA181, JA22478, JA202, JA22005. This lineage is depicted below:



During the prosecution of the grandparent patent, the PTO imposed a restriction requirement. *See* JA18556-60, JA18572-75. That restriction required the applicant to elect between claims for devices for sealing a puncture in the wall of a blood vessel or methods for doing the same procedure. JA18557. The applicant elected to prosecute claims directed to the devices. JA18569. Thus the

claims that issued in the grandparent patent were all directed to devices. JA18435-36.

The parent patent was filed as a divisional of the grandparent patent, containing claims directed to both methods and devices. JA18815, JA18767-81. Without reference to the earlier grandparent's restriction requirement, the Examiner issued a new restriction requirement that imposed the same restriction to elect either device or method claims. JA18879-80. The applicant again elected to pursue claims directed to devices, actually showing that the parent was a continuation application of the grandparent. JA18885. All of the claims that issued in the parent were directed to devices. JA18741-42.

On March 7, 1995, the application that issued as the '439 patent was filed. JA202. After filing the application as a continuation of the parent, all of the pending claims were promptly cancelled. JA22005, JA22011, JA22015-22. The cancelled claims were replaced, by preliminary amendment, with new claims that were identical or substantially the same as those in U.S. Patent No. 5,292,332 to Lee, owned by a third party. JA22011-22. As explicitly noted in the file history, the purpose of filing the new claims of the '439 patent was to provoke an interference with the Lee patent. JA22011, JA22015; *see also* JA10956. In that amendment, the applicant requested that the PTO declare the interference, which it did. JA22015, JA22075-83. Ultimately, the applicant prevailed in that

interference.  JA22085-88.  The '439 patent issued on March 7, 2006, with Claims 1-8 directed to devices and Claims 9 and 10 directed to methods, clearly not in compliance with the prior restriction requirements.  JA202, JA222-23.

The application that issued as the '498 patent was filed eighteen months after the '439 patent, on September 12, 1996.  JA181.  It was filed as a continuation of the '130 parent.  JA22478.  By preliminary amendment, the applicant canceled the claims directed to devices and substituted claims directed to methods of sealing a puncture in a blood vessel, specifically claiming methods not elected for prosecution in either the grandparent or parent.  JA22486-90.  As such, no restriction requirement was entered during the prosecution of the '498 patent.  The '498 patent issued on March 10, 1998, and expired on December 27, 2010.  JA181.  In contrast, the earlier filed '439 patent, having no terminal disclaimer, is currently set to expire over 13 years later on March 7, 2023, even though it does not claim inventions patentably distinct from those claimed in the '498 patent, as found by the jury.

## B.    The Fowler Patents

ACI challenges the nonobviousness ruling of the Fowler claims.  The '616 and '375 patents share a common specification, and all citations are to the '375 patent's specification.  JA169-180.

### 1.    The Fowler Specification

As with the '439 patent, the problem addressed by the Fowler patents was achieving hemostasis in punctured vessels. JA175 at 1:23-25. The specification details prior art solutions to this problem, including a patent to Sinofsky (U.S. Pat. No. 4,929,246) that described the use of an inflatable balloon inserted into a puncture to temporarily seal a vessel while laser energy permanently sealed the puncture. *Id.* at 1:43-2:31. The patent also describes Kensey's device for achieving hemostasis in blood vessels (U.S. Pat. Nos. 4,744,364; 4,852,568; and 4,890,612), which used a pusher to move an expandable plug through a sheath to eject the expandable plug and seal the vessel. *Id.* at 2:11-31. This device is very similar to SJM's Angio-Seal, discussed below. In fact, the Angio-Seal is marked with all three of the Kensey patent numbers. JA13007-10.

The Fowler patents purport to move beyond those prior art devices because the claimed devices and methods achieve hemostasis "without extending into the affected blood vessel, duct or lumen." JA175 at 2:32-36. Figure 3 of the Fowler patents, reproduced with highlighting below, describes an embodiment where following an angioplasty or other procedure, the user positions the balloon catheter, shown in yellow, so that its distal end extends into the vessel. JA171, JA176 at 4:44-53.



The user inflates the balloon and positions it adjacent to the puncture along the inside of the vessel. JA176 at 4:60-63. The user then inserts a plug (shown in blue) until the plug contacts the inflated balloon, preventing the plug's entry to the vessel. JA176-77 at 4:64-5:3. Then the user removes the balloon catheter, leaving the plug in place. JA177 at 5:3-7.

### 2. The Asserted Claims

Dependent Claim 14 of the '616 patent depends from Claim 9. JA153, JA157. Claim 9 was reexamined and, to gain allowance, language was added to the claim. Claim 9, with the added language emphasized, recites:

> A method of sealing an incision formed in the body of a patient wherein the incision extends generally from the skin of the patient; through the lumen of a blood vessel and into the blood vessel of a patient, the method including the steps of:
>
> > forming a vessel plug of a material which is absorbable in the body of the patient and wherein the vessel plug is formed to include

distal and proximal ends therein and is dimensioned to be received in the incision; and

positioning the vessel plug in the incision **with an elongate member to position the vessel plug in the incision** such that the distal end of vessel plug is located proximally of the blood vessel **without extending into the blood vessel** to seal the incision from the flow of blood passing through the blood vessel, **such that the blood vessel is free of obstruction**.

Claim 14 recites the additional limitation that requires the step of:

inflating a member on an insertion member to identify the location of the blood vessel adjacent to the incision.

Independent Claim 21 of the '375 patent recites:

An insertion assembly for sealing an incision in the body of a patient wherein the incision extends from the skin of the patient into a blood vessel of the patient, said insertion assembly comprising in combination:

a vessel plug which is constructed of a material that is absorbable within the body of a patient and which seals the incision from the flow of blood therethrough; and

an elongate positioning member having a passage way therein for the receipt of said vessel plug therein, and at least a portion of said positioning member is expandable so that it has an outer diameter in use which is greater than the diameter of the incision to position said vessel plug in the incision proximally of the blood vessel such that said vessel plug obstructs the flow of blood through the incision without extending into the blood vessel.

JA179.

The method of Claim 14 of the '616 patent is essentially the process of using the device of Claim 21 of the '375 patent. Both claims include the limitation which was necessary for allowance, namely that the plug be positioned so that it

does not extend into the blood vessel. The only substantive difference between the claims is that Claim 14 does not require use of the "elongate member" with a passageway for the plug.

### C.    SJM Does Not Practice The Fowler Inventions

SJM did not develop any of the inventions described in the patents-in-suit. Instead, SJM purchased these patents. In 2001, it bought the Fowler patents. In 2008, two months before bringing this suit, SJM bought the Janzen patents.

SJM's vascular closure device is called the Angio-Seal. In use, a physician positions an absorbable polymer anchor on the inside of the punctured vessel to achieve hemostasis. JA18323-24. The physician then ejects a collagen plug to the puncture site. JA18324. The Angio-Seal sandwiches the puncture site between the anchor and the plug through the use of a suture. JA18325. Because the anchor remains in the vessel after the procedure is completed, the Angio-Seal does not practice either of the inventions of the Fowler claims.

## IV.  THE ACCUSED DEVICE SOLD BY ACI:  THE MYNX® DEVICE

SJM accuses ACI's manufacture and sale of its Mynx vascular-closure device as an infringement of the claims at issue. ACI has been manufacturing and selling the Mynx since 2007. The Mynx is an innovative, patent-protected device that seals punctures made in arteries during catheterization procedures. *See* JA23034-53. The Mynx delivers a cylindrically-shaped sealant composed of

freeze-dried polyethylene glycol to the outer surface of a patient's punctured artery.  JA23036.

The major components of the Mynx include the handle, the shuttle assembly containing the sealant, the syringe, and the balloon, as depicted in Figure 1 below. JA23046.  The shuttle assembly includes the shuttle and the shuttle tube.

**Figure 1:  Mynx Device**



As depicted in Figure 2 below, located within the shuttle tube are the sealant (shown in purple) and the advancer tube (shown in red).  JA23046, JA15663, JA15688.

**Figure 2: Cross-Section View of a Portion of the Shuttle Tube**



The sealant is made from polyethylene glycol sheets that are mounted around the balloon catheter shaft at the distal end of the shuttle tube. JA10171-72, JA15655-57.

To use the Mynx, the physician first inserts the device through a larger procedural sheath, extending out from the punctured artery, left from the completed procedure. JA23049; *see also* JA15882 (video of Mynx in use). Completion of that step introduces the balloon into the punctured artery. JA23048-49. Next, the physician uses the syringe to inflate the balloon with saline or other fluids. JA23049. Then the physician gently withdraws the device until the balloon contacts the interior artery wall, sealing the puncture temporarily and stopping the bleeding (*i.e.*, achieving hemostasis). JA23049.

After the balloon is in place, the physician properly positions the sealant by advancing the shuttle assembly. JA23050. The entire shuttle assembly detaches from the handle and advances along the balloon catheter shaft until the shuttle is at

the top of the procedural sheath, thereby positioning the sealant at the punctured

artery. JA23050. That process is depicted in Figure 3 below. *Id.*

**Figure 3: Advancing the Shuttle Assembly**



Because the shuttle assembly moves as a single unit, its internal components (the

sealant and advancer tube) do not change position relative to one another when the

shuttle assembly is advanced. *See* JA10281-82.

The physician then withdraws the sheath and the shuttle assembly together,

leaving the sealant in place against the punctured artery. JA23050. If any friction

causes the sealant to be pulled outward when the physician withdraws the shuttle

assembly, the advancer tube holds the plug in place against the puncture.

JA10173-74, JA10281. Only after the physician has withdrawn the sheath and shuttle assembly may he then push on the advancer tube to compress the sealant. JA23051, JA10170, JA10281. At this time, the sealant is completely outside of the shuttle tube. JA10174. Compressing the sealant ensures that it expands within the tissue tract and is positioned securely against the vessel. JA10174, JA10275, JA23036.

Finally, the physician withdraws the balloon and advancer tube, completing the procedure. JA23052. The sealant is the only part of the Mynx that remains in the patient, and it is filtered out of the body through natural processes in roughly a month. JA23036.

## V. PRIOR PROCEEDINGS

### A. Claim Construction

In January of 2010, the district court held a *Markman* hearing to construe disputed claim terms. Relevant to this appeal, the parties requested that the district court construe the "means for ejecting" and "ejecting mechanism" limitations of Claims 7 and 8, respectively, of the '439 patent. JA29-34. The parties agreed that the "means for ejecting" language of Claim 7 was a means-plus-function limitation that required construction under 35 U.S.C. § 112, ¶ 6. The parties also agreed that the function of the "means for ejecting" term was "ejecting said plug means from said distal end of said elongated member so as to place said plug means in blocking

relation with said puncture, so as to seal said puncture." JA1441-42. The district court agreed with this function. JA30.

In arriving at its claim construction, the district court rejected ACI's proposal to cite portions of the specification to limit the characteristics of the structure, holding that such request amounted to a "specific component-level description of the embodiment of Figure 1's sheath and plug pusher." JA31. Thus, the district court identified the corresponding structure as any and all of the disclosed plug pushers, specifically "a plug pusher (items 33, 69, or 95 of the '439 patent) and a sheath (items 23 or 45 of the '439 patent) and equivalents thereof." *Id.*

With regard to the "ejecting mechanism" limitation of Claim 8 of the '439 patent, the parties disagreed whether the term should be construed under § 112, ¶ 6. The parties agreed, however, that if § 112, ¶ 6 applied, the same construction would apply as for the "means for ejecting" limitation. *Id.* The district court recognized that the limitation was purely functional and did not recite sufficient structural content to avoid treatment under § 112(6)." JA33. Thus, the district court construed the "ejecting mechanism" limitation identically to the "means for ejecting" limitation. JA34.

## B.    The Jury Trial

From December 13 to 21, 2010, the district court allotted each party 14 hours to present its evidence to the jury.  At the conclusion of the trial, the jury rendered its verdict.  Relevant to this appeal, with regard to the '439 patent, the jury found that Claims 7 and 8 were infringed, but that the patent was invalid on double-patenting grounds because it claimed mere obvious variants of Claim 7 of the '498 patent.  JA92, JA94.  As such, the jury awarded no damages related to the '439 patent.  JA96.  The jury found that ACI infringed the Fowler claims and that neither of those claims was invalid for obviousness.  JA92-93, JA95.  The jury awarded damages totaling $27.1 million based on that infringement.  JA96.

When asked whether ACI had willfully infringed "any of the asserted claims" of any of the asserted patents, the jury responded "Yes."  JA93.  The district court later decided not to make any enhancement determination until after this appeal, if necessary.  JA111-12.

## C.    The Safe-Harbor Proceedings

On June 22, 2011, the district court held a one-day bench trial directed solely to determining whether the safe-harbor provision of 35 U.S.C. § 121 applied to the '439 patent to shield it from invalidation for double patenting.  In its opinion finding that the safe-harbor provision of § 121 applied, the district court indicated that the jury "found that the claims of the '439 patent were not patentably distinct

from claim 7 of another St. Jude patent," the '498 patent.  JA101.  Therefore, the only issue before the district court was whether the safe-harbor provision protects the '439 patent from any double-patenting challenge based on the '498 patent.  *Id.*

The district court analyzed whether the '439 and '498 patents were both filed "as a result of" restriction requirements.  JA104.  To meet this requirement, the district court explained that the patent subject to a double-patenting challenge must: (1) "share a common lineage" with the application in which the restriction requirement was entered and (2) claim subject matter the applicants were not permitted to pursue in an earlier patent.  *Id.*  Focusing solely on the lineage requirement, the district court held that "both of these patents were filed as a result of a restriction requirement."  JA105.

The district court acknowledged that invocation of the safe-harbor provision also requires that applications filed after a restriction requirement must remain consonant with the lines of demarcation between the restricted inventions.  JA106.  The district court did not, however, perform any analysis of the restriction requirement imposed by the Examiner between the two distinct inventions represented by groups of claims directed to devices and to methods.  Instead, the district court focused its analysis only on whether the claims in the '439 and '498 patents maintained the lines of demarcation between the different species set forth in the grandparent's restriction requirement.  *See* JA107-109.  The district court

held that the applicant did maintain consonance between elected species and thus complied with the restriction requirement. JA109. Thus, the district court held that the safe-harbor provision protected the '439 patent from a double-patenting challenge based on the '498 patent. *Id.*

Because SJM convinced the district court to apply the safe harbor of § 121, the district court gave SJM an additional 13 years of patent protection beyond the expiration of the '498 patent. As a result, SJM used this extra term to obtain injunctive relief against ACI.

### D.    The District Court's Denial Of ACI's JMOL Motion

On June 4, 2012, the district court issued its order denying ACI's Renewed JMOL Motion. JA113-22. With regard to noninfringement, the district court rejected ACI's arguments that there was not sufficient evidence to support the jury's verdict that ACI infringed the '439, '616, or '375 patents. JA115-17. Relevant to this appeal, the district court gave only a cursory analysis addressing ACI's argument that there was insufficient evidence to support a jury verdict of infringement of the '439 patent based on the "ejecting mechanism" or "means for ejecting" element of the claims. Specifically, the district court stated:

> [T]he Court construed these terms under 35 U.S.C. § 112 to encompass 'a plug pusher' and a 'sheath and equivalents thereof.' ACI argues that the Mynx devices do not have any such structures on the ground that the pusher must . . . be 'as long as the sheath.' However, the Court's claim construction does not require these additional features. Under the Court's claim construction, the Court

> finds that there was sufficient evidence for the jury to find that the
> Mynx devices satisfy the 'ejecting mechanism' limitations.

JA115 (footnote omitted).

The district court also rejected ACI's challenges to the validity of the Fowler

claims based on obviousness in view of Takayasu and Smiley.    JA119-20.

Relevant to this appeal, the district court held as follows:

> St. Jude presented the testimony of Dr. Sandor Kovacs, who stated
> that the proposed combination of Takayasu and Smiley was 'very,
> very far out and it makes no sense to me whatsoever.'   (Trial Tr.
> (12/20/2012) at 171:15-21).   The jury was entitled to credit this
> testimony over the evidence presented by ACI.   The Court finds that
> St. Jude presented the jury with sufficient evidence that the Fowler
> patents are not obvious over Takayasu in view of Smiley, and ACI is
> not entitled to a judgment as a matter of law on this issue.

JA120.

Finally, the district court rejected ACI's claims that willfulness failed as a

matter of law for failure to satisfy the two-pronged *Seagate* analysis.    JA120

(citing *In re Seagate Tech., LLC*, 497 F.3d 1360 (Fed. Cir. 2007)).   The district

court held that sufficient evidence supported the jury's findings that each prong of

the willfulness standard was met.   JA121-22.

On June 4, 2012, the district court issued an order enjoining ACI from

continuing to sell the Mynx device based solely on its finding of infringement of

the '439 patent.   JA142-43.   The district court ordered the injunction to run until

the '439 patent expired, currently March 7, 2023.  JA143.  ACI appealed to this Court, and then moved in the district court to stay all relief pending appeal.

## SUMMARY OF THE ARGUMENT

The '439 patent claims are not patentably distinct from Claim 7 of the expired '498 patent. The jury so found, and SJM has not challenged that specific finding. Rather, SJM relied solely upon convincing the district court to apply the safe-harbor provision of 35 U.S.C. § 121 to shield the '439 patent from a double-patenting defense. SJM succeeded, but only because the district court misapplied the safe-harbor provision based on two fundamental errors.

First, the district court relied on out-of-context quotations from two of this Court's opinions to hold that "new" claims, never subject to a restriction requirement, could be filed "as a result of" a restriction requirement entered in a prior familial application. The district court erred in holding that, merely because the '439 patent shared a common lineage with earlier-filed applications that were subject to restriction requirements, the '439 patent claims were also filed as a result of those restriction requirements. But such reasoning does not lead to the conclusion that the claims of the '439 patent, first added to provoke an interference, ever appeared in any application subject to a restriction requirement. Thus, under § 121, those claims were not filed "as a result of" any restriction requirement.

Second, the district court failed to analyze whether the claims of the '439 patent were directed to inventions that the applicant was unable to pursue in prior

applications because of any restriction requirement. In the parent and grandparent applications, the Examiner restricted prosecution to claims directed to devices or methods, and the applicant elected to pursue claims to devices in both of those applications. The '439 patent claims both devices (Claims 1-8) and methods (Claims 9 and 10). This shows a failure to elect pursuant to the restriction requirements of the prior applications. The district court erred in finding that the claims abided by the restriction requirement when it is apparent they are not consonant with that restriction. For those reasons, the safe-harbor provision does not apply, and the '439 patent is invalid for double patenting.

Even if this Court were to disagree that the '439 patent is invalid for double patenting, it should, nevertheless, remand the case for further proceedings because the district court erred in construing the mean-plus-function limitations of the asserted '439 patent claims. The district court's construction was overly broad and that construction prejudiced ACI at trial.

Finally, the district court also erred in holding that substantial evidence supported the jury's verdict of nonobviousness of the Fowler claims. The district court's citation to a single sentence of conclusory testimony, arguably relating to a single *Graham* factor, was insufficient to reject the explicit teachings of the prior art and to support a legal determination of nonobviousness. The Smiley prior art showed that it was known to use a balloon to achieve temporary hemostasis while

permanent repairs were made to seal the punctures in blood vessels.  The Takayasu prior art showed that one way to make permanent repairs was to insert plugs adjacent to the puncture, without extending into the blood vessel.  In view of these and other undisputed facts concerning the *Graham* factors, the district court erred in not drawing the legal conclusion that the claims would have been obvious in light of these prior art references.  Thus, this Court should hold that the Fowler claims are invalid for obviousness as a matter of law.

# ARGUMENT

## I. THE '439 PATENT IS INVALID FOR OBVIOUSNESS-TYPE DOUBLE PATENTING.

### A.    Double Patenting And The Safe-Harbor Provision Of § 121

The district court committed legal error upholding the '439 patent over ACI's double-patenting defense.  Under the patent law, an applicant is entitled to only one patent for each invention.  35 U.S.C. § 101.  If an applicant attempts to evade this statutory rule by filing claims to obvious variants of an invention in multiple applications, then the later-filed applications should be rejected for obviousness-type double patenting.  *See In re Longi*, 759 F.2d 887, 892 (Fed. Cir. 1985).  That rejection ensures the applicant does not extend the patent term by obtaining multiple patents claiming essentially the same invention.  *Id.*  The applicant can overcome this type of rejection by disclaiming the extra term that could be caused by the later-filed applications.  *Id.*  These disclaimers are called terminal disclaimers.  *Id.*

However, if the Patent Office determines that an application is directed to separate and distinct inventions, it may require the applicant to file more than one application.  35 U.S.C. § 121.  This is called a "restriction requirement."  In these cases, the applicant is given the option to elect which invention it will pursue in each application.  37 C.F.R. § 1.142 (2009).  When the applicant makes such elections, it must pursue separate inventions in separate applications to comply

with that restriction requirement. *Id.* If the applicant claims obvious variants of the same invention in more than one application, he must file a terminal disclaimer in the later applications to ensure that he cannot extended the patent term. *Longi*, 759 F.2d at 892.

Prior to June 8, 1995, the law provided that a patent's term ran for 17 years from the patent's issuance date. See 35 U.S.C. § 154(a)(2) (1992). After the General Agreement on Tariffs and Trade Uruguay Round Agreements Act ("GATT") went into effect, patents were only eligible for terms of 20 years, running from the date of the earliest-related application. Pub. L. No. 103-465, 108 Stat. 4809 (1994). For patents in force or applications filed before June 8, 1995, (like the application that matured into the '439 patent), patentees received the longer of the two aforementioned terms. *Id.* For pre-GATT applications, the obviousness-type double-patenting doctrine provides a particularly important check against an unlawful extension of patent rights through the use of divisional and continuation applications. *See Boehringer Ingelheim Int'l GmbH v. Barr Labs., Inc.*, 592 F.3d 1340, 1346 (Fed. Cir. 2010).

Section 121 of the patent law protects applicants from any obviousness-type rejection if the applicant files one or more applications as a result of a restriction requirement imposed by the PTO. The statute provides, in relevant part:

> A patent issuing on an application with respect to which a requirement
> for restriction under this section has been made, or on an application

filed *as a result of* such a requirement, shall not be used as a reference either in the Patent and Trademark Office or in the courts against a divisional application or against the original application or any patent issued on either of them . . . .

35 U.S.C. § 121 (emphasis added).   This provision is called the safe-harbor provision.

Because incorrectly applying the safe-harbor provision illegally extends the life of a patent, this Court "applies a strict test for application of § 121." *See Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1382 (Fed. Cir. 2003).   As the party seeking safe-harbor protection for claims that are not patentably distinct over earlier issued claims, SJM has the burden to prove that it applies.  *See id.* at 1381 (referring to patentee's burden).   Because SJM did not meet its burden of proof, the district court should not have given SJM's '439 patent an additional patent term extending 13 years beyond the term of the '498 patent, which expired on December 27, 2010.

### B. The Asserted Claims Of The '439 Patent Are Not Patentably Distinct From Claim 7 Of The '498 Patent

The question of whether the '439 claims are patentably distinct from Claim 7 of the '498 patent is not at issue.  Here, as the district court explained, the jury's finding of double patenting necessarily rested on its finding that the claims of the '439 patent were not patentably distinct from Claim 7 of the earlier-issued and now expired '498 patent.   JA101.   SJM has not challenged the lack of

patentable distinctiveness of the claims.  Instead, its attempt to save the '439 patent is based entirely on its assertion that the safe-harbor provision insulates the patent from double patenting.  JA94, JA10759-60; *see* JA11353.  Nor could SJM have seriously contested the finding of lack of patentable distinctiveness.  Claim 7 of the '498 patent and the claims of the '439 patent are directed to virtually identical subject matter.  All of those claims are directed to the use of a hemostatic material or plug, advanced through a channel, and directed with a guide wire, to place the hemostatic material or plug adjacent to the blood vessel wall such that it does not extend into the lumen of the vessel.  Thus, the only double-patenting question at issue is whether SJM has proven that the safe harbor of 35 U.S.C. § 121 applies.

## C.    Because The '439 Patent Claims Were Never Subject To A Restriction Requirement, The Safe Harbor Does Not Apply

The district court erred when it applied the safe harbor.  It incorrectly focused on the issue of consonance.  But regardless of consonance, SJM had to prove first that the claims of the '439 patent appeared in an application that was subject to a restriction requirement.  *Geneva*, 349 F.3d at 1379.  Because those claims never appeared in any restricted application, SJM could not prove the safe harbor applied.  This is illustrated in the chart below:



Relevant to this appeal, only the grandparent and the parent applications were ever subject to restriction requirements. *See* JA18556-60, JA18879-80. Before prosecuting the '439 patent, the applicant submitted a preliminary amendment, cancelled ***all*** of the originally restricted claims, and replaced them with new claims "copied" to "correspond either identically or substantially to certain claims of U.S. Patent No. 5,292,332 to Lee." JA22011. As explained in the preliminary amendment, the applicant did so to provoke an interference. JA22015. The applicant won that interference with those same claims. JA22085-88. Those newly copied claims were never subject to any restriction requirement.

In *Geneva*, the patentee sought safe-harbor protection for claims never formally entered at the time the Examiner issued restriction requirements. It argued "that § 121 does not require that the claims later sought to be shielded must appear in an application before restriction." 349 F.3d at 1379. This Court expressly rejected that argument, holding that the statute "indicates otherwise." *Id.* It observed that the first clause of the statute states: "If two or more independent and distinct inventions ***are claimed*** in one application, . . ." *Id.* (emphasis in original) Therefore, the Court concluded, for the safe-harbor provision of § 121 to apply, "the earlier application must contain ***formally entered claims*** that are ***restricted*** and ***removed***, and that ***claims*** to the second invention ***reappear*** in a separate divisional application after the restriction." *Id.* (emphasis added).

Because the claims at issue "could not have been subject to a restriction requirement," this Court held the safe-harbor provision did not apply. *Id.* And because the patent claims lacked patentable distinctiveness over earlier-issued claims, this Court held the patent invalid for obviousness-type double patenting. *See id.* at 1382.[1]

Because the application leading to the '439 patent did not contain a restriction requirement, any possible safe-harbor protection for that patent must

---

[1] In addition, the *Geneva* court rejected the patentee's attempt to rely upon an Examiner interview that occurred three years after the restriction requirements as forming the basis for another restriction requirement. *Id.* at 1380-82.

derive from the restriction requirements imposed in its earlier parent or grandparent patent applications.  But when the Examiner imposed the restriction requirements during prosecution of the earlier parent and grandparent applications, those applications did not contain any version of the claims later added in the '439 patent.  It is uncontested that the preliminary amendment filed in the '439 patent *canceled all of the pending claims* from the parent application and replaced them with claims that were "copied" to provoke an interference with Lee.  JA22011, JA22015.  Thus, the claims of the '439 patent were never "formally entered" in any application subject to a restriction requirement and did not "reappear" in the '439 patent's application, as *Geneva* requires.  *See Geneva*, 349 F.3d at 1379.

As the *Geneva* Court aptly stated," "[i]f the applicants sought the benefit of § 121, the applicants should have requested entry of the claims so that the [Patent Office] could issue a formal restriction requirement under § 1.145."  *Id.* at 1380.  Here, the '439 patent applicants never did so, and therefore the § 121 safe harbor is inapplicable as a matter of law.  Any other result would directly contravene the purposes of the safe-harbor provision and would allow for the illegal time-wise extension of newly presented claims that were never subject to restriction by the PTO.

### D.    The District Court Erred In Holding That The '439 Patent Claims Were Filed "As A Result Of" A Restriction Requirement

In its opinion applying the safe harbor, the district court held that a patent is

filed "as a result of" a restriction requirement if it shares a "common lineage" with an earlier application that was subject to the restriction requirement and claims subject matter that the applicant was not allowed to pursue in an earlier patent. JA104 (citing *Boehringer*, 592 F.3d at 1350). Because the '498 and '439 patents "trace their lineage to a patent in which a restriction requirement was imposed" (a point not in debate), the district court concluded: "Thus, both of these patents were filed as a result of a restriction requirement." JA105. That was legal error, for the district court's analysis was insufficient to show any claim was filed as a result of a restriction requirement.

First, the district court never addressed whether the '439 patent "claims subject matter that the applicant was not allowed to pursue in an earlier patent." *See* JA104. To answer such question, the district court would have had to analyze the restriction requirement imposed and the subject matter claimed in the '183 (grandparent), '130 (parent), and '439 patents. Such analysis would have revealed that the restriction requirement, at its most basic level, compelled the applicant to elect *either* device claims or method claims. JA18556-60, JA18879-80. In both the '183 and '130 applications, the applicants prosecuted device claims. In contrast, the '439 patent applicant never complied with any restriction requirement because that patent contains *both* device claims (Claims 1-8) and method claims (Claims 9-10). JA222-23. Rather than making any findings concerning what the

applicant was not allowed to pursue as a result of the restriction, the district court incorrectly treated the applications' common lineage as controlling.

The district court then rejected ACI's argument that, under *Geneva*, the '439 claims were never subject to a restriction requirement because the claims were "new" and were never entered in any earlier patent application. JA105. As ACI pointed out, the '439 patent claims were copied from a Lee patent to provoke an interference. JA22011, JA22015.

The district court determined that the applicant's motivation to provoke an interference was irrelevant. JA105. But that is not true where the motivation shows the genesis of the new claims and that they were not filed "as a result of" any restriction requirement. Here the copying of the claims from the Lee patent shows that the claims did not previously exist to be entered, subjected to a restriction requirement, withdrawn in compliance with such requirement, and reappear as required by *Geneva*. Moreover, that the '439 patent claims were directed to both device and methods further demonstrates that the claims were not withdrawn in compliance with any restriction requirement because they would not have complied with any such requirement. Thus, all of the evidence shows that the claims were not filed "as a result of" any restriction requirement.

Next, relying on this Court's opinion in *Boehringer,* 592 F.3d at 1344, the district court held that the safe-harbor provision applied even where the challenged

- 45 -

patent included "new claims." *See* JA105. That is incorrect as a broad proposition and as such would run afoul of *Geneva*.

In *Boehringer*, the applicants filed a divisional application containing all of the claims that were subject to a restriction requirement in the parent application. 592 F.3d at 1344. Those same claims were then amended in the divisional and after amendment maintained the lines of demarcation set forth in the restriction requirement. *Id*. Moreover, none of the claims covered subject matter previously elected in the parent. *Id*. The district court relied on this Court's reference to these ultimately allowed claims as "new claims" to support its holding.

But *Boehringer's* reference to the claims at issue as "new" in no way undermines the holdings of *Geneva*. The *Boehringer* opinion makes clear that the claims were the same but for amendments, and thus those claims were subject to a restriction requirement. But the present facts more closely resemble the facts of *Geneva*. In *Geneva*, as in the present case, the claims at issue were filed for the first time in the application for the challenged patent. Thus, *Boehringer* does not create any conflict with *Geneva*.

SJM and the district court rely on *Symbol Techs., Inc. v. Opticon, Inc.,* 935 F.2d 1569, 1579 (Fed. Cir. 1991). But *Symbol* does not extend safe-harbor protection to "new" claims. *See* JA11371, JA11373, JA105. The district court relied upon SJM's quotation from *Symbol* to say that "new or amended claims in a

divisional application are entitled to the benefit of § 121." JA105. In *Symbol*, what this Court actually said was:

> The corollary to this Court's statement in *Gerber Garment* is that new or amended claims in a divisional application are entitled to the benefit of § 121 *if* the claims do not cross the line of demarcation drawn around the invention elected in the restriction requirement.

935 F.2d at 1579 (emphasis added). Obviously a new claim cannot be filed "as a result of" the restriction requirement if it violates that same restriction requirement. Moreover, in *Symbol*, this Court held that the "new claims" were still within the same group elected in compliance with the restriction requirement. 935 F.2d at 1579-80. Finally, in *Symbol*, this Court was never presented with the argument that the new claims were never entered and subject to any restriction requirement.

Because the claims of the '439 patent were never filed "as a result of" any restriction requirement, they cannot gain the benefit of the safe-harbor provision of § 121. Accordingly, the '439 patent is invalid for obviousness-type double patenting.

### E.    The Safe Harbor Is Also Inapplicable Because Consonance Was Not Maintained.

In addition, to gain the benefit of the safe-harbor provision of § 121, the applicant must maintain consonance between the restricted groups representing the independent and distinct inventions that prompted the restriction requirement. *See Symbol*, 935 F.2d at 1579. While claims may be amended and still gain that

- 47 -

benefit, they may not be amended so that they cross the line drawn by the Examiner in issuing the restriction requirement. *Gerber Garment Tech. v. Lectra Sys., Inc.*, 916 F.2d 683, 688 (Fed. Cir. 1990). Congress gave the courts the right to determine whether any amendment violated the restriction requirement during the prosecution of the later patent. *See id.*

During the prosecution of the '439 patent, the applicant disregarded the clear line of demarcation drawn by the Examiner in his prior restriction requirement. In the applications leading to both the parent and grandparent patents, the Examiner set forth a line of demarcation between claims to devices and claims to methods. JA18556-60, JA18879-80. In neither of those applications did the Examiner ever alter this line of demarcation and allow prosecution of both device and method claims. But, as mentioned above, the '439 patent contains claims drawn to both devices and methods. JA222-23. Because the '439 patent claims violated the restriction requirement at this most basic level, this Court need not reach the district court's incorrect conclusion that the applicant properly elected among the various species set forth within restriction requirement. *See* JA106-109.

Thus, by including claims drawn to the explicitly restricted subject matter, the '439 patent applicant violated the restriction requirement and thereby destroyed consonance. For this reason, the '439 patent is invalid for obviousness-type double patenting.

## II. THE DISTRICT COURT ERRED IN CONSTRUING THE "MEANS FOR EJECTING" AND "EJECTING MECHANISM" LIMITATIONS OF THE '439 PATENT.

This Court reviews a district court's claim construction *de novo*. *Cybor. Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454-55 (Fed. Cir. 1998) (*en banc*). Means-plus-function claims are governed by 35 U.S.C. § 112, ¶ 6, allowing a patentee to express a claim element as a means for performing a specific function without reciting structure. Section 112, ¶ 6 requires, however, that the construction of such a claim "cover the corresponding structure . . . described in the specification and equivalents thereof" that performs the recited function. Construction of such a limitation involves two steps: (1) the court must identify the recited function; and (2) the court must identify the corresponding structure(s) in the specification that perform(s) that function. *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1578 (Fed. Cir. 1993).

To determine the corresponding structure, the specification must be read as a whole "to determine the structure capable of performing the claimed function." *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1379 (Fed. Cir. 2001). A district court's determination of the function and corresponding structure is a matter of law subject to *de novo* review. *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1329 (Fed. Cir. 2005).

The district court properly identified the "means for ejecting" limitation of Claim 1 (upon which asserted Claim 7 depends) as a means-plus-function claim. Neither party disputes that § 112, ¶ 6 applies to this limitation. JA29. Similarly, the district court correctly held that the "ejecting mechanism" limitation of Claim 8 is also a means-plus-function limitation. JA33-34. Because the district court determined that both "means for ejecting" and "ejecting mechanism" were means-plus-function limitations reciting the same function, it applied the same construction to both limitations. JA32, JA34. ACI agrees that both limitations should receive the same construction. ACI also agrees with the district court's construction of the function, namely "ejecting said plug means from said distal end of said elongated member so as to place said plug means in blocking relation with said puncture, so as to seal said puncture." JA32, JA34.

For two separate reasons, ACI does not agree, however, with the district court's identification of the structure that corresponds to the specified function. The district court held that the corresponding structure was: "a plug pusher (items 33, **69,** or 95 of the '439 patent) and a sheath (items 23 or 45 of the '439 patent) and equivalents thereof." JA32, JA34 (emphasis added). First, by including plug pusher 69, the district court erred in not adhering to the recited function. Second, by holding that this construction means that the structure could be any plug pusher, the district court again erred in not adhering to the recited function. Those two

errors allowed SJM to convince the jury that ACI infringed, merely by showing that ACI's advancer tube could be called a "plug pusher."

### A. Because Plug Pusher 69 Does Not Perform The Recited Function, The District Court Erred In Identifying It As Corresponding Structure

A "structure disclosed in the specification is corresponding structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003) (citation omitted). This requirement limits the claim "to the means specified in the written description and equivalents thereof." *Id.* at 1211 (citation omitted).

In addition to ejecting the plug, the recited function requires that the ejection is from the distal end of the sheath "so as to place said plug means in blocking relation with said puncture, so as to seal said puncture." Notwithstanding this argument, the district court nevertheless included plug pusher 69 in its determination of corresponding structure, even though neither party identified that structure in its proposed claim constructions. The district court incorrectly held that "*all* of the disclosed plug pushers are linked with the agreed function" and that the "skilled artisan would link *any* of the plug pushers with the claimed ejecting function." JA32 (emphasis added). This was error. Plug pusher 69 does not position the plug as required by the recited function. While plug pusher 69 pushes

the plug a certain distance, it does not eject the plug from the distal end of the elongated member "so as to place said plug means in blocking relation with said puncture, so as to seal said puncture." The specification makes clear that plug pusher 69 does not perform that function.

Figures 2 and 3 and col. 6, lines 15-58 of the '439 patent depict and describe the operation of plug pusher 69. JA205, JA220. Specifically, the patent describes how "[p]lug pusher 69 is then moved down through channel 67 until plug 57 has entered common leg 61 and pusher 69 is then withdrawn so that it will not interfere with dilator 17 as it passes from leg 65 into leg 61." JA 220 at 6:32-37 (emphasis added). It is only after "pusher 69 has been retracted, dilator 17 is again advanced into leg 61. When resistance is encountered, the physician knows that plug 57 has reached the artery." *Id.* at 6:38-41 (emphasis added). Thus, it is dilator 17, and not plug pusher 69, that is the structure used to eject vessel plug 57 from the distal end of the elongated member to block the puncture.[2]

Because it is readily apparent from the specification that plug pusher 69 does not perform the recited function, those of skill in the art would not link that plug pusher to the recited function. Accordingly, the district court erred in identifying that structure.

---

[2] Neither party proposed that the district court identify dilator 17 as corresponding structure.

**B.    The District Court Erred In Holding That The Corresponding Structure Could Be Any Plug Pusher**

At the *Markman* hearing, ACI proposed that the district court include a description of the necessary characteristics of structures identified to perform the recited function.  JA1442-44, JA14621-22.  ACI identified those portions of the specification which explained that the plug pusher had to be at least as long as the sheath to be able to eject the plug from the distal end of the sheath so as to position the plug against the artery.  JA14621-22.  The district court rejected ACI's attempt to describe the corresponding plug pusher in any detail and held that ACI's construction impermissibly limited the identified structure to a "component-level description."  JA31.  The district court explained that "the number and ***nature*** of pieces that make up the plug pusher and the sheath are not 'necessary' to the function."  *Id.*  Thus, the district court broadened its construction to plug pushers and sheaths, ***generally***, regardless of whether they could perform the recited function.  That holding is incorrect as a matter of law.

Furthermore, in denying ACI's JMOL for noninfringement, the district court effectively admitted its error by stating that its claim construction did not require the "additional feature" of a pusher "as long as the sheath."  JA115.  The district court even acknowledged that its construction merely required "'***a*** plug pusher' and ***a*** 'sheath and equivalents thereof.'"  *Id.* (emphasis added).

- 53 -

The district court erred because it ignored that performing the recited function requires much more than simply pushing the plug. Rather, the structure must eject the plug from the distal end "so as to place said plug means in blocking relation with said puncture, so as to seal said puncture." To perform that function, the plug pusher must be at least as long as the sheath to eject the plug from the distal end of the sheath to the punctured artery. Thus, referring generically to a plug pusher was legal error.

### C. Because The District Court's Erroneous Construction Prejudiced ACI At Trial, This Court Should Order A New Trial

Because the district court broadened the means-plus-function limitations to include anything that could be called a plug pusher, regardless of its length, SJM was able to present a very general infringement theory to the jury. SJM convinced the jury of infringement by merely showing that the Mynx device had a plug pusher, regardless of whether that plug pusher actually had structure to perform the recited function.

But the Mynx has no such structure to perform the recited function. In the Mynx, the shuttle assembly delivers the sealant to the punctured artery. JA23050. The advancer tube merely holds the sealant in place against the puncture as the sheath is withdrawn. *Id.* Thus, the advancer tube never ejects the sealant to place it against the puncture as required by the claim because the sealant is already in that position once the shuttle assembly is advanced. *See id.*

- 54 -

Dr. Kahn, SJM's expert, never said anything to the contrary. He merely testified that the Mynx has a sheath and a plug pusher and how the Mynx operates after the sealant is placed against the puncture. JA9687-88, JA14238. The district court even relied on that legally irrelevant testimony in its JMOL opinion to support the jury's verdict of infringement. JA115. An examination of this testimony shows SJM failed to present any evidence that the Mynx has structure to perform the recited function.

Specifically, Dr. Kahn relied on the portion of the '439 patent specification describing how, when withdrawing the sheath, the physician should maintain pressure on the plug pusher so the plug *remains* pressed against the artery. JA9686, JA14235. He compared that irrelevant disclosure with how the Mynx's advancer tube is "locked in place to prevent the plug from moving backwards" after the sealant is in position against the artery. JA9688. He then explained that the sealant in the Mynx "ejects from the device [as] it's withdrawn." *Id.* But once again, this testimony concerned action that occurs *after* the Mynx has already placed the sealant in position against the artery to seal the puncture. It did not concern how the Mynx ejects the sealant from the distal end "so as to place said plug means in blocking relation with said puncture, so as to seal said puncture."

Dr. Kahn's reliance on ACI's submission to the FDA regarding the Mynx's advancer assembly fairs no better. See JA9689, JA15737. That document says the

advancer tube merely "provides the means to advance" the sealant "from the interior of the Mynx catheter to the surface of the arteriotomy." JA15737. But that general statement does not explain the exact sequence by which the Mynx actually works, a sequence which is not in dispute.

The district court's erroneous claim construction led the jury to find infringement merely because the Mynx device has an advancer tube that could be called a "plug pusher." That severely prejudiced ACI because the Mynx's advancer tube undeniably does not have structure to perform the recited function. Accordingly, if this Court were to uphold the validity of the '439 patent, it should then vacate the judgment that ACI infringed Claims 7 and 8 of the '439 patent and remand the issue for a new trial under a proper claim construction of the means-plus-function limitations. *See, e.g.*, *Pressure Prods. Med. Supplies v. Greatbatch Ltd.*, 599 F.3d 1308, 1316-18 (Fed. Cir. 2010).

## III. THE FOWLER CLAIMS ARE INVALID FOR OBVIOUSNESS.

The district court erred in denying ACI's JMOL motion that the Fowler claims are invalid for obviousness. The district court essentially deferred to the jury's verdict of nonobviousness based on a single sentence of testimony critical of combining the Takayasu and Smiley prior art references. This Court reviews, and the district court should have reviewed, "the jury's conclusions on obviousness, a question of law, without deference, and the underlying findings of fact, whether

explicit or implicit within the verdict, for substantial evidence." *Boston Sci. Scimed, Inc. v. Cordis Corp.*, 554 F.3d 982, 990 (Fed. Cir. 2009) (citation omitted).

## A.    The District Court Erred In Not Making Its Own Conclusion On Obviousness

The district court erred by failing to make its own legal determination regarding obviousness.  The district court wrote that "obviousness is a question of law depending on underlying question of fact" as set forth in *Graham v. John Deere Co.* 383 U.S. 1, 17-18 (1966).  JA119.  However, in analyzing the Fowler claims, the district court simply deferred to the jury as if obviousness presented a question of fact.  Therefore, it determined that the jury had sufficient evidence to find nonobviousness, referencing only a single piece of testimony that arguably relates to only one *Graham* factor.  JA120.  The district court never determined what facts the jury could have found in accordance with the jury instructions that could have supported the legal conclusion of nonobviousness.

As this Court has repeatedly held, "although it is not error to submit the obviousness/nonobviousness issue to the jury, it is ultimately a question of law decidable by the court in response to a motion for [JMOL]." *Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 764-65 (Fed. Cir. 1988).  While the jury was free to render a verdict on obviousness, the district court was obligated to make its own legal determination based on the underlying facts that were supported by substantial evidence.  Because the district court did not do so, it improperly denied

ACI's JMOL motion of obviousness of the Fowler claims.   Under the proper

analysis, however, the invalidity of those two claims is apparent as a matter of law.

### B.   The Fowler Claimed Inventions Would Have Been Obvious To A Person Of Ordinary Skill In The Art

The jury was properly instructed to consider the four *Graham* factors.

JA10760-63.   An examination of these factors shows that the parties did not

genuinely dispute the level of ordinary skill in the art, what the prior art teaches, or

the differences between the prior art and the claims.   Moreover, SJM presented no

probative evidence of any secondary consideration of nonobviousness.   *See*

JA10635-37 (Kovacs' conclusory testimony mentioning "long-felt need," "failure

of others," and "commercial success" without providing any nexus to the claimed

inventions).

The parties agree that one of ordinary skill in the art is a person having "a

doctorate in medicine or someone who is trained in vascular closure devices, ha[s]

at least one year of experience in actual vascular closure procedures or an

equivalent combination of education and work experience."   JA10630.   That is

undoubtedly a very high level of skill.

With regard to the Takayasu and Smiley prior art, both parties' experts agree

that Takayasu described ejecting a plug from a sheath using a plug pusher so that

the plug blocks the flow of blood from a puncture in a vessel.   *See* JA10328-32,

JA10631-32.   Importantly, both experts agreed that Takayasu employed x-ray

visualization techniques to position the gelfoam plug to ensure his plug would ***not*** extend into the punctured vessel. JA10427, JA10632. While ACI's expert, Dr. Brown, testified that the procedure of Takayasu had not been used to close a hole in an ***artery***, such testimony is not relevant to whether Takayasu taught sealing a blood "vessel," as recited in both of the Fowler claims. *See* JA10427, JA153, JA157, JA179. In Takayasu, the punctured vessel was a vein. Thus, there is no genuine dispute regarding what Takayasu teaches.

As to Smiley, Dr. Brown testified that it described a surgical practice widespread in the 1970's and 80's, well before the filing of the Fowler patents. JA10332. Dr. Brown further testified that Smiley taught the use of "balloon catheters to stick in puncture holes, blow them up, pull them back to stop the bleeding until they could get the arteries fixed," essentially "using the balloon to seal an artery from the inside out." JA10332-33. While SJM's expert's, Dr. Kovacs', testimony focused on the fact that Smiley specifically discussed patients suffering from gunshot wounds to "major vessels," this testimony did not dispute any fact offered by Dr. Brown. JA10633-34. Thus, the parties had no material dispute that Smiley teaches the use of a balloon to achieve temporary hemostasis while more durable repairs are made.

The prior art and uncontroverted testimony establish that there was a known problem in the art—achieving hemostasis in punctured or damaged blood vessels.

And, the identified Takayasu and Smiley prior art references were both directed to methods of solving that precise problem.  Moreover, Takayasu even recognized and addressed avoiding the problem of leaving material inside of the vessel through his x-ray visualization techniques to ensure the gelfoam plug did not enter the blood vessel.  As such, a person of ordinary skill in the art at the time of the invention would have reasonably expected to succeed in permanently stopping bleeding in blood vessels by employing the techniques described in Takayasu in combination with those described by Smiley.  JA10332-36, JA10430.  As shown in more detail below, nothing in the evidence proffered by SJM rebuts the readily apparent reason to combine the Takayasu and Smiley references to develop a device or method that would meet the Fowler claims' limitations.

Significantly, neither Takayasu nor Smiley was before the Patent Office during examination of the Fowler claims.  The closest prior art described a device for sealing a blood vessel using an expandable plug inserted "into *the interior* of the blood vessel."  JA149, JA175.  That reference did not address the problems associated with material remaining in the blood vessel, the basis upon which the Fowler claims were allowed.  In contrast, Takayasu identifies and specifically addresses this problem by monitoring the position of his gelfoam plug, using x-rays, so it *does not* go into the interior of the blood vessel.  Accordingly, the Fowler claims should have been declared invalid as a matter of law.

**C.    Substantial Evidence Does Not Support The District Court's Finding Of A Lack Of Any Reason To Combine The Takayasu And Smiley Prior Art References**

The district court held that the jury had sufficient evidence to reject ACI's proposed combination of the Takayasu and Smiley references based on a single sentence of testimony from SJM's expert.  JA120.  In its opinion, the district court relied only on the testimony of Dr. Kovacs that the proposed combination of Takayasu and Smiley was "very, very far out and it makes no sense to me whatsoever."  *Id.*  The district court determined that the jury "was entitled to credit this testimony over the evidence presented by ACI."  *Id.*

The district court erred in holding that this conclusory testimony was sufficient to overcome ACI's evidence that the Fowler claims were obvious as a matter of law based on the combination of Takayasu and Smiley.  First, Dr. Kovacs' statement that he thought the combination was "very, very far out" and that it "makes no sense" to him is totally meaningless and does not establish the absence of any reason to combine the references under the controlling jury instructions.  JA10760-63.  Second, such testimony does not rebut the explicit teachings of the references that would have led one of ordinary skill in the art to combine the techniques of first using a balloon catheter to temporarily close the blood vessel, as described in Smiley, followed by using the more durable vessel

plug to permanently close the blood vessel and leave it free of obstruction, as described in Takayasu. *See* JA23032-33, JA22942-46.

Dr. Kovacs' conclusory statement, relied upon by the district court, simply did not address the proper inquiry for obviousness. Even if the district court had relied on other testimony of Dr. Kovacs, there was none that addressed the proper inquiry for obviousness. Dr. Kovacs testified that Takayasu was "not relevant to Fowler whatsoever" because it did not contain an expandable member. JA10633. He then testified that Smiley was "not relevant whatsoever" to Fowler because it did not have a plug or an elongated positioning member. JA10633-34. Those statements, however, only address whether each reference—independently—would anticipate the inventions claimed in the Fowler claims.

Rather than anticipation, ACI argued that the **combination** of Takayasu and Smiley renders the Fowler claims obvious—an assertion Dr. Kovacs completely failed to address. Tellingly, when asked for his opinion regarding the proposed combination of Takayasu and Smiley, Dr. Kovacs answered: "Independently, the references, in my opinion, are not something that one skilled in the art would turn to in trying to solve these kind[s] of problems of **arterial access**." JA10634 (emphasis added). Not only did that response not answer the combination question, it was substantially irrelevant for at least two reasons. First, both Fowler claims are directed to blood vessels generally and are not limited to arteries

specifically. Second, the problem solved by the claimed invention did not focus on vessel access, but rather concerned vessel closure. Indeed, the jury was instructed that the field of endeavor was "vascular closure." JA10760. Here, both Takayasu and Smiley are specifically directed to repairing punctured or damaged blood vessels to achieve hemostasis.

In explaining why he opined the proposed combination to be "very, very far out," Dr. Kovacs stated that neither reference anticipated the Fowler claims and concluded that "[c]ombining two references which are independently farfetched is farfetched times farfetched, it's farfetched squared." JA10634-35. Again, these types of conclusory opinions did not focus on the proper inquiry of whether one of skill in the art would have any reason to combine the prior art references. Therefore, even if the jury credited Dr. Kovacs' conclusory opinions, including those not relied upon by the district court, such testimony could not have provided substantial evidence to support the jury's verdict and the district court's denial of ACI's JMOL for obviousness.

The proper obviousness inquiry is whether one of skill in the art would have had *any* reason to combine Takayasu and Smiley and arrive at the claimed invention. Both references deal with "vascular closure," the field of endeavor set forth in the jury instructions. JA10760. Takayasu and Smiley are both directed to techniques for achieving hemostasis in blood vessels. JA10328-29, JA10334-35.

Similarly, the Fowler patents address the need for a hemostatic device. JA149, JA175. Takayasu even explicitly defines the problem of avoiding bleeding after catheterization and addresses it by using a gelfoam plug that remains outside of the vessel. JA22942-46. This is precisely the technique Fowler used to address the very same general problem. Takayasu also provides reasons to try other methods to achieve hemostasis, referencing modifications made to another device prepared to achieve hemostasis after needle biopsy. JA22946. Smiley describes the use of a balloon to achieve temporary hemostasis while more durable repairs (in that case suturing) could be made. JA23032. Thus, even though this Court has repeatedly held that the reason to combine references need not be to solve the same problem that the inventor sought to solve, here there was significant problem overlap, if not identity. *Alcon Research, Ltd. v. Apotex Inc*., No. 2011-1455, Slip Op. at 12-13 (Fed. Cir. Aug. 8, 2012) (citing *KSR* and numerous other cases).

Because Dr. Kovacs' conclusory testimony is not substantial evidence that can rebut the readily apparent reasons to combine the Takayasu and Smiley references, the district court improperly relied upon that testimony to deny ACI's JMOL motion of obviousness. This Court should hold that the Takayasu and Smiley prior art references render the Fowler claims obvious as a matter of law. *See SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1359 (Fed. Cir. 2000); *Newell*, 864 F.2d at 762-63.

## IV. THE DISTRICT COURT'S WILLFULNESS HOLDING, IF APPEALABLE, MUST BE VACATED.

At present, the district court has not issued any decision regarding whether to enhance any damages because of the jury's finding of willfulness, which the district court upheld. Thus, ACI maintains that it is not yet required to appeal the district court's denial of its JMOL motion challenging the jury's willfulness finding. Presently, absent any enhancement, the jury's finding has caused no injury to ACI.[3]

However, if this Court were to find that ACI had an obligation to appeal the denial of JMOL on willfulness now, this Court should vacate and remand the willfulness issue to the district court in light of this Court's recent decision in *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, No. 2010-1510 (Fed. Cir. June 14, 2011). When the district court rendered its JMOL decision, it did not have the benefit of the *Bard* decision and did not analyze the reasonableness of ACI's defenses under the objective prong of *Seagate*, as required by *Bard*. The district court simply deferred to the jury and found that SJM "presented sufficient evidence to the jury regarding the objective prong of the willfulness standard." JA121. But under *Bard*, the district court is the "final arbiter" on whether the first

---

[3] ACI is unaware of any decision from this Court suggesting that one must appeal a willfulness ruling before the district court determines whether that finding warrants any enhancement to the damages.

prong of *Seagate* was satisfied.  Accordingly, if this issue is ripe for appeal, this Court should vacate the finding of willfulness and remand in light of *Bard*.

## **CONCLUSION**

The Court should declare the '439 patent invalid for double patenting.  The court should also declare the Fowler claims invalid for obviousness.

Respectfully submitted,

KNOBBE MARTENS OLSON & BEAR LLP

Dated:  August 13, 2012    By: */s/ Joseph R. Re*
                                 Joseph R. Re

*Attorney for Defendant-Appellant*
ACCESS CLOSURE, INC.

## CERTIFICATE OF COMPLIANCE UNDER
## FED. R. APP. P. 32

Defendant-Appellant Access Closure, Inc. ("ACI") submits its brief under Rules 32(a)(5)(A) and 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

As required by Rule 32(a)(7)(C), I hereby certify that ACI's brief complies with the type-volume limitation therein provided, and that ACI's brief contains approximately 13,719 words, including headings, footnotes and quotations. I further certify that ACI's brief complies with the typeface and type style requirements of the Federal Rules of Appellate Procedure 32(a)(5)(A) and 32(a)(6) by using 14-point proportional spacing in a Times New Roman font. The word processing program used for this brief is Microsoft Word, 2010.


Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP


Dated:  August 13, 2012          By: */s/ Joseph R. Re*_____
                                        Joseph R. Re

                                        *Attorney for Defendant-Appellant*
                                        ACCESS CLOSURE, INC.

# ADDENDUM

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

|  |  |  |
|---|---|---|
| ST. JUDE MEDICAL, INC., a Minnesota Corporation, and ST. JUDE MEDICAL PUERTO RICO LLC, a Puerto Rico Limited Liability Company, | ) ) ) ) ) | |
| Plaintiffs | ) ) | Case No. 4:08-cv-04101-HFB |
| v. | ) ) | JURY TRIAL DEMANDED |
| ACCESS CLOSURE, INC., a Delaware Corporation, | ) ) ) | |
| Defendant. | ) ) | |

**CLAIM CONSTRUCTION ORDER**

**JA 1**

# I INTRODUCTION

This claim construction opinion construes the disputed terms in U.S. Patent Nos. 5,275,616 ("the '616 patent"), 5,601,602 ("the '602 patent"), 5,716,375 ("the '375 patent"), 5,725,498 ("the '498 patent") and 7,008,439 ("the '439 patent"). Plaintiffs are St. Jude Medical, Inc. and St. Jude Medical Puerto Rico LLC (hereinafter collectively, "St. Jude," "Plaintiffs"). Defendant is Access Closure, Inc. (hereinafter "Defendant" or "ACI").

The parties have submitted a number of claim terms for construction and filed claim construction briefs (Doc. Nos. 56, 68, 69, 71, 94, 95, and 96). A tutorial and claim construction hearing was held on January 19 and 20, 2010. Tr. January 19-20, 2010.

For the reasons stated herein, the Court adopts the constructions set forth below.

# II SUMMARY OF THE TECHNOLOGY

Catheterization procedures are commonly performed medical events that result in holes in blood vessels. Doc. 56 at 2. A patient's comfort may vary depending upon the medical treatment applied to promote healing of those holes. Prior to the purported inventions discussed herein, one such medical treatment required patients to endure hours of uncomfortable manual pressure on the skin over the opening in the artery (often involving heavy sand bags) to prevent bleeding. *Id.* The patents at issue in this case describe devices and methods intended to facilitate faster and more comfortable recovery using procedures and tools for sealing the hole in the blood vessel.

There are two distinct patent families at issue in this case. One family emanates from an inventor named "Fowler" and includes the '616 patent, the '602 patent, and the '375 patent (collectively, the "Fowler patents"), all entitled "Insertion Assembly and Method of Inserting a Vessel Plug into the Body of a Patient." The Fowler patents share a common written description and Plaintiffs are asserting claim 14 of the '616 patent; claims 38, 40, and 44 of the '602 patent; and claim 21 of the '375 patent. Fowler discloses vascular closure devices and methods for positioning a plug to seal a hole in a blood vessel. Among other things, Fowler describes closing or sealing the wound in a blood vessel by using a positioning element to locate a plug "adjacent to the outer surface of the blood vessel duct or lumen." '375 patent, 2:51-66. In one

1

**JA 2**

embodiment, the positioning element is an inflatable balloon that is inserted into the hole in the blood vessel and is expanded. *Id.*, Fig. 3 (shown). The vessel plug is then inserted until encountering resistance from the expanded balloon. *Id.*, 4:64-67. Once the plug is properly positioned, the balloon may be deflated and withdrawn. *Id.*, 5:2-6.

The second patent family involved in this case originates with an inventor named Janzen. The Janzen family comprises the '498 patent, and the '439 patent (collectively, the "Janzen patents"), both entitled "Device and Method for Sealing Puncture Wounds." Like the previous family, the Janzen patents share a common written description. Plaintiffs are asserting claims 7-10 of the '439 patent and claim 1 of the '498 patent against Defendant, ACI.

The Janzen specification also discloses vascular closure devices and methods for positioning a plug to seal the hole in a blood vessel. *See, e.g.*, '439 patent, 1:14-16. In one exemplary embodiment, a guide wire is used in positioning a sheath containing the plug into the tissue tract created during a catheterization procedure. *Id.*, 2:45-54; 7:40-46; Fig. 14. The guide wire guides the plug towards the hole. *Id.*, 7:40-50. Once the end of the plug "is near to or abuts" the hole in the blood vessel, the sheath is withdrawn, leaving the plug next to the hole. *Id.*, 2:45-54; 7:22-29. The plug seals the flow of blood sufficiently so that the blood can, for example, clot. *Id.*, 3:37-43. The plug is later absorbed by the body. *Id.*, 2:21-25.

### III  LEGAL PRINCIPLES

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999) (*quoting Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989)). Claim construction is an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996).

In construing patent claims, the court looks to three primary sources: the claims, the specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) (*quoting Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1561 (Fed. Cir. 1991)). Under the patent law, the specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the

invention. 35 U.S.C. § 112; *id.* at 978. A patent's claims "must be read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979. "For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims." *Id.* "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nevertheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's claims. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (*en banc*). "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips,* 415 F.3d at 1312 (internal quotes omitted). "The claim construction inquiry...begins and ends in all cases with the actual words of the claim." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002). There is "a heavy presumption that claim terms carry their full ordinary and customary meaning, unless . . . the patentee expressly relinquished claim scope." *Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1334 (Fed. Cir. 2009). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1313. Claim construction is not always difficult—it often "involves little more than the application of the widely accepted meaning of commonly understood words." *Id.*, at 1314.

The primacy of claim terms notwithstanding, the Federal Circuit has made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *See Phillips*, 415 F.3d at 1313. The Federal Circuit has emphasized the role of the specification as follows:

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction. *Phillips*, 415 F.3d at 1316.

3

**JA 4**

Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

*Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

> While the specification is prominent in claim construction, courts cannot 'import limitations' into claims from examples or embodiments appearing only in a patent's written description, even when a specification describes very specific embodiments of the invention or even describes only a single embodiment.' *JVW* Enterprises*, Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005). The rationale for this rule is straight-forward: '[i]f everything in the specification were required to be read into the claims, or if structural claims were to be limited to devices operated precisely as a specification-described embodiment is operated, there would be no need for claims." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985). Thus, "particular embodiments appearing in the written description will not be used to limit claim language that has broader effect.

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004).

The court "should also consider the patent's prosecution history, if it is in evidence." *Phillips*, 415 F.3d at 1317. Because the prosecution represents an "ongoing negotiation" rather than the "final product" of the negotiation, "it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* The prosecution history only limits the claims when the patentee's intent to surrender claim scope was "clear and unmistakable." *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1358 (Fed. Cir. 2003) (finding that a statement "amenable to multiple reasonable interpretations" did not constitute "a clear and unmistakable surrender"). This is a high standard, and generally is met only when the patentee "explicitly characterizes an aspect of his invention in a specific manner to overcome prior art." *Purdue Pharma L.P. v. Endo Pharma, Inc.*, 438 F.3d 1123, 1136-37 (Fed. Cir. 2006) (finding no disavowal of claim scope where inventors touted a feature to overcome the prior art, but that feature was not described as a "necessary feature" of the claimed formulations).

"Extrinsic evidence," on the other hand, "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317. *Phillips* made clear that extrinsic evidence is "less

significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* (internal cites omitted). A court may "rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Id.* at 1322-23. Although dictionaries sometimes present difficulties because they collect many different definitions and may describe terms more generally or simply than would one skilled in the art, this is redressed by reading their definitions not as abstract pronouncements, but with the claim language and specification in mind. *Id.* at 1322-24; *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.,* 423 F.3d 1343, 1349 (Fed. Cir. 2005) (in choosing between dictionary definitions, "the task is to scrutinize the intrinsic evidence in order to determine the most appropriate definition").

## IV    CONSTRUCTION OF THE TERMS

### a.    *Preambles of Asserted Claims*

#### i.    The Parties' Positions

Defendant makes a blanket request for this Court to hold that all of the preambles of all of the claims at issue are limitations to those claims. Doc. 68 at 7-8; Tr. January 19-20, 2010 at 44-45.  Plaintiffs oppose this request. Doc. 69 at 4-5.  The preamble issue for each and every claim is not reflected in the Joint Claim Construction Chart Pursuant to Patent Rule 4-5(d).  *See* Doc. 72-1.

#### ii.    Analysis

"Generally, the preamble does not limit the claims."  *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002).  While claim preambles are not always limiting, "[i]n general, a preamble limits the invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim."  *Eaton Corp. v. Rockwell Intern. Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003).  As such, a preamble is limiting where it is necessary to understand limitations in the body of the claim.  *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305-06 (Fed. Cir. 1999).  However, there is "[n]o litmus test [that] defines when a preamble limits claim scope."  *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002).  Even a preamble that provides an antecedent basis is not always limiting.  *See, e.g., Apple Computer, Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 18, 22

(Fed. Cir. 2000) (preamble held not limiting even though it provided an antecedent basis for "said plurality of windows").

As suggested by the legal authorities cited by the parties and recast above by the Court, the inquiry regarding whether a preamble is a claim limitation, is subtle and claim-specific. This inquiry necessarily involves examination of specifically chosen claim words and the relationship between those words and other items throughout the intrinsic record. During the January 20 hearing, Plaintiffs' counsel made light of that exact point: "The preamble, the Federal Circuit has told us '[t]he preamble does not limit the claims unless it is 'necessary to give life, meaning and vitality' to the claims. Well, now there's the standard for you. So what does this really mean for the preamble to give life and meaning to the claims?" Tr. January 19-20, 2010 at 45.

Defendant's blanket request regarding the claim preambles invites the Court to examine each and every asserted claim in five patents to evaluate the possibility that the preamble is a limitation of the claim. Since no specifics regarding that request have been identified in the Rule 4-5 chart, this examination would involve an exploration into each preamble and whether the particularities of the claim body, specification, or file history impact one or more unidentified words in that preamble. In other words, the Court has been asked to find specific issues, assume a dispute, and resolve those issues without understanding the parties' positions regarding those specific issues.

### iii. Holding

The Court declines to undertake the requested analysis. The Court will address preambles as limitations to the extent those issues are relevant to determination of the specific disputes raised by the parties, for example in the Rule 4-5 statement.

### b. *"operatively associated with"*

#### i. The Parties' Positions

The term "operatively associated with" occurs in claims 38 and 40 of the Fowler '602 patent. Plaintiffs propose that no construction is necessary, although alternatively offer the following: "functionally joined, combined or linked." Defendant asserts that the term is indefinite.

6

**JA 7**

In support of its indefiniteness assertion, Defendant shows that similar or identical phrases were rejected during prosecution of patent applications related to the '602 Patent.[1] Doc. 68 at 8. Defendant asserts that "the examiners rejected the phrase because Fowler failed to disclose the location and structural relationship of the claimed elements. Fowler did not dispute the legitimacy of the three examiners' rejections. Instead, Fowler either amended the language of the claim in an attempt to cure the indefiniteness or dropped the indefinite claims entirely." *Id*. Defendant cites *Fantasy Sports Props., Inc. v. Sportsline.com, Inc*., 287 F.3d 1108, 1115 (Fed. Cir. 2002) to support its conclusion that applicant acquiesced to the rejections in the related patent applications causing the subject term of the '602 patent to be indefinite as well.

Plaintiffs argue in response to Defendant that in various unrelated cases, both the Courts and the Patent Office have approved the use of the subject words, so the term is not inherently indefinite. Doc. 69 at 5-6 *citing Innova/Pure Water, Inc., v. Safari Water Filtration Systems, Inc*., 381 F.3d 1111, 1120-21 (Fed. Cir. 2004); *also citing* (Faber (Formerly Landis) On Mechanics Of Patent Claim Drafting § 3:24 (6th. ed. 2009)) ("[T]he Federal Circuit and the leading treatise on patent drafting both endorse use of the claim terms 'operatively' and 'associated with' to denote the joining of the recited elements 'in some kind of relationship' that allows them to 'perform the function.'"). Plaintiffs also cite section 2173.02 of the Manual of Patent Examining Procedures (MPEP) for the proposition that "[p]atent examiners make judgments on indefiniteness on a claim by claim basis, not on the kind of scattershot basis that ACI proposes." Doc. 69 at 6. Plaintiffs note that with respect to the prosecution of the '602 patent, the Patent Office examiner rejected the phrase "operatively associated with" in pending claim 25, but not in pending claim 33, demonstrating that the examiner was properly performing his diligence in reviewing the language across all the claims. Doc. 71 at 6. Finally, Plaintiffs point out alleged inaccuracies in Defendant's assessment regarding the indefinite rejections in the related patent applications. *Id*.

Defendant disagrees with Plaintiffs' allegation regarding inaccuracies and contends that those perceived inaccuracies actually support Defendant's view. Doc. 69 at 2-3.

---

[1] Defendant's Supplemental Sur-Reply identifies similar material. Doc. 94 at 4.

**JA 8**

ii.    Analysis

The second paragraph of 35 U.S.C § 112 requires that the "specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C § 112, ¶ 2. Claims that do not meet those requirements are considered *indefinite* "when they are not amenable to construction or are insolubly ambiguous. Thus, the definiteness of claim terms depends on whether those terms can be given any reasonable meaning. Indefiniteness requires a determination whether those skilled in the art would understand what is claimed." *Hearing Components, Inc. v. Shure Inc.,* 600 F.3d 1357, 1367 (Fed. Cir. 2010). The purpose of the definiteness requirement is to ensure that "the claims, as interpreted in view of the written description, adequately perform their function of notifying the public of the scope of the patentee's right to exclude." *Honeywell Int'l, Inc. v. Int'l Trade Comm'n,* 341 F.3d 1332, 1339 (Fed. Cir. 2003).

Claims 38 and 40 are reproduced below with the subject claim language in bold.

38. An assembly for sealing or closing an incision or puncture in the body of a living patient wherein the incision or puncture extends into a blood vessel or an organ of the patient, the assembly comprising:

an elongate shaft member having a proximal end and a distal end and having an expandable member disposed at said distal end, said expandable member constructed to be positioned alternatively in a relaxed condition and an expanded condition;

said shaft member and said expandable member dimensioned to be inserted within the puncture so that said expandable member is positioned within a target organ or blood vessel of the patient;

control member operatively connected to said expandable member and associated with said shaft member for selectively positioning said expandable member between said expanded condition and said relaxed condition; and

a vessel plug *operatively associated with* said shaft member for insertion into the puncture, said expandable member configured to cooperate with said plug when said expandable member is in said expanded condition to prevent said vessel plug from entering the vessel or the organ of the patient, and said vessel plug, when sealingly positioned within the puncture, extends proximally of the target organ or blood vessel without extending into said vessel or said organ.

40. An apparatus for sealing or closing an incision or puncture in the body of a living patient wherein the incision or puncture extends into a blood vessel or an organ of the patient, the apparatus comprising:

a tubular member having a proximal end and a distal end and having an expandable member disposed at said distal end of said catheter, said expandable member constructed to be positioned alternatively in a relaxed condition and an expanded condition;

said expandable member dimensioned to be positioned within a target organ or blood vessel of the patient and constructed to permit blood and other body fluids to pass through the target organ or blood vessel while said expandable member is positioned therein;

a control member operatively attachable at one end thereof to control expansion of said expandable member through said tubular member; and

a vessel plug *operatively associated with* said tubular member and said expandable member, said vessel plug dimensioned to close the puncture or incision, said expandable member, when in said expanded condition within said blood vessel or said target organ, preventing said vessel plug from extending into said vessel or said organ.

Reading the claims in light of the specification, the Court finds that the term "operatively associated with" is readily understood in describing both the relationship between the vessel plug and the "tubular member and said expandable member" (claim 40) and the relationship between the vessel plug and "said shaft member for insertion into the puncture" (claim 38). For example, referring to claim 38, there is "operative association" in that the shaft is positioned with respect to the plug so that the expandable member (*e.g.*, a balloon) prevents the plug from entering the blood vessel. The relative position of the components is a structural relationship and the way the plug and vessel work together is a functional relationship. The specification describes this well: "The vessel plug 20 is then inserted into the incision along the shaft of the balloon catheter 22 until the distal end 32 of the vessel plug 20 contacts the inflated balloon 24 on the distal end 26 of the balloon catheter 22. In this position, the distal end 32 of the vessel plug 20 is aligned with the outer lumen of the artery 10 and the balloon 24 prevents the vessel plug 20 from extending into the artery 10." '602 patent, 4:66-5:5.

The Court is not persuaded by Defendant's arguments regarding Patent Office rejections of similar language on related patent applications. As Plaintiffs point out, indefiniteness is considered for a particular claim as a whole. MPEP § 2173.02 ("In reviewing a claim for

9

compliance with 35 U.S.C. § 112, second paragraph, the examiner must consider the claim as a whole to determine whether the claim apprises one of ordinary skill in the art of its scope and, therefore, serves the notice function required by 35 U.S.C. § 112, second paragraph, by providing clear warning to others as to what constitutes infringement of the patent. *See, e.g.*, *Solomon v. Kimberly-Clark Corp.*, 216 F.3d 1372, 1379, 55 U.S.P.Q. 2d 1279, 1283 (Fed. Cir. 2000)." When considered as a whole, the phrase "operatively associated with" is readily understandable in claims 38 and 40 of the '602 patent.

### iii.    Construction

The Court construes the term "operatively associated with" to mean "functioning in combination with," because this best describes the claimed interaction of the vessel plug and the items respectively claimed to be "operatively associated" therewith.

### c.    *"lumen" as occurring in the Fowler '616 patent*

### i.    The Parties' Positions

The term "lumen" occurs in the '616 and '498 patents. At the outset, the parties disagree regarding whether the term should have the same construction with respect to both patents. For example, in the '616 patent the term "lumen" only occurs in the preamble of claim 9 so there is some dispute regarding whether construction of the term is necessary. To the extent a construction is necessary, Plaintiffs propose the construction "space within a vessel or organ and the walls surrounding the space." Alternatively, Defendant proposes the construction "open space within a vessel or organ."

Plaintiffs argue that "as a general matter, 'lumen' refers just to the space within a vessel or organ, [but] St. Jude's proposed definition of 'lumen' acknowledges Fowler's particular use of the word in the claims and specification, referring to a space within a vessel *and also the walls surrounding that space*." Doc. 56 at 11 (emphasis in original). In support of its contention that vessel walls are part of the "lumen," Plaintiffs note the legal principle that a patentee may be his own lexicographer and point to places in the specification and claims where the alleged usage of "lumen" includes the vessel wall. First, Plaintiffs cite the claim language, which states "through the lumen of a blood vessel and into the blood vessel of a patient." Plaintiffs reason that, "[t]o get into the blood vessel the device needs to go 'through the lumen,'" which would have to be

10

**JA 11**

the vessel wall. Doc. 56 at 11-12.  Plaintiffs bolster this point stating that "Fowler's specification refers to the exterior of the arterial wall as the 'outer lumen of the artery' and the interior of the arterial wall as the 'inner lumen of the artery.' Doc. 56 at 12, *citing* '375 patent, 4:37-40; 4:60-63.  Lastly, Plaintiffs object to Defendant's suggestion that the "lumen" constitutes "open space." Doc. 056 at 12.  Plaintiffs contend that the specification is clear that blood may fill the vessel so the lumen need not be "open space." *Id. citing* '375 patent, 4:37-40.

Defendant argues that the term "lumen" must be construed because it is a key part of the claimed incision and affects both the length and location of that incision, which determines the dimensions and position of the vessel plug.  Defendant also argues ordinary meaning must govern this term and that the "burden to overcome the ordinary meaning of 'lumen' is a high one—the Federal Circuit requires that a patentee 'must clearly express' the intent to redefine a term. *Merck & Co. v. Teva Pharms., Inc.,* 395 F.3d 1364, 1370 (Fed. Cir. 2005)."  Doc. 68 at 10. Defendant contends that the high burden cannot be met, because Plaintiffs' citations show only a lack of clarity. *Id*.  Further, Defendants press that if a term is unclear, this Court must adopt its most narrow construction. *Id*., *citing*, *Genentech, Inc. v. Wellcome Found*., 29 F.3d 1555, 1564 (Fed. Cir. 1994).  Defendant also argues that including vessel walls in the construction of "lumen" would exclude the preferred embodiment as shown in figures 3-4 and 6-9. *Id*.  Finally, Defendant argues that claim 9's preamble phrase "through the lumen and into the blood vessel" is not redundant because it may refer to a "double-wall technique" shown in the prior art.

    ii.     Analysis

Claim 9 of the '616 reads as follows:

9. A method of sealing an incision formed in the body of a patient ***wherein the incision extends generally from the skin of the patient; through the lumen of a blood vessel and into the blood vessel of a patient***, the method including the steps of:

forming a vessel plug of a material which is absorbable in the body of the patient and wherein the vessel plug is formed to include distal and proximal ends therein and is dimensioned to be received in the ***incision***; and

11

**JA 12**

positioning the vessel plug in the *incision* such that the distal end of the vessel plug is located proximally of the blood vessel to seal the *incision* from the flow of blood passing through the blood vessel.

'616 Patent, claim 9 (emphasis added).

The Court agrees with Defendant regarding the importance of the preamble relative to the body of claim 9. The preamble defines the "incision" that is a primary frame of reference in the body of the claim. In general, a preamble is construed as a limitation "if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (*quoting Pitney Bowes, Inc.*, 182 F.3d at 1305). "A preamble is not limiting, however, where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1288 (Fed. Cir. 2008) (citations and quotations omitted). Here, a phrase of the preamble serves as antecedent basis for the "incision" term in the body of the claim: "wherein the incision extends generally from the skin of the patient; through the lumen of a blood vessel and into the blood vessel of a patient." In particular, the quoted preamble phrase defines the incision that is referenced in the claim body as "the incision." Thus, the Court finds the entire phrase is a limitation of the claim.

The parties dispute the meaning of the term "lumen" within that phrase. The Court finds that the term must be given its ordinary meaning because there is no clear expression that the patentee redefined that term. The Court acknowledges that the patent's use of the phrases "inner lumen" and "outer lumen" introduce ambiguity as to whether the patentee was referring to vessel walls or some portion of the lumen adjacent the vessel walls. However, this potential ambiguity does not clearly redefine the term lumen to include the vessel wall. Indeed, to the extent the patentee was defining anything with those terms, he was discussing the phrasal terms "inner lumen" and "outer lumen," which are irrelevant to our inquiry because those phrasal terms are not used in the claims. In sum, the Court construes the term "lumen" consistent with its ordinary meaning.

**JA 13**

Having found that the term "lumen" should have its ordinary meaning, the Court now turns to claim 9's larger preamble phrase, "the incision extends generally from the skin of the patient; through the lumen of a blood vessel and into the blood vessel of a patient." On its face, this preamble phrase requires that the incision must be "from the skin . . . through the lumen . . . and into the blood vessel of a patient." So the preamble defines the starting point of the incision as "the skin" and the end point as in "the blood vessel of a patient." The intermediate phrase "through the lumen" designates that the incision extends past the vessel wall "through" some portion of the lumen. This intermediary phrase is not redundant of the final phrase ("into the blood vessel of the patient") because the final phrase defines the end point and the intermediary phrase does not. The intermediary phrase "through the lumen" provides no indication regarding how much of the lumen is traversed by the incision. It is the final phrase, "into the blood vessel," that defines the termination of the incision as some point within the lumen. Thus, the preamble does not provide for the incision to go "completely" or "entirely" through the lumen. Finally, in view of the foregoing, the Court finds that the "double-wall" technique (as described by Defendant) is clearly inconsistent with teachings of the '616 patent and the body of claim 9. *See* Doc. 71 at 3-4. The claim 9 preamble is not describing the double-wall technique.

iii.    Construction

For claim 9 of the '616 patent, the Court construes "lumen" to mean "space within a vessel or organ." Further, with respect to the preamble of claim 9, the parties are instructed to tailor their trial arguments to be consistent with this Order.

d.    *"lumen" as occurring in the Janzen '498 patent*

i.    The Parties' Positions

As noted above, Plaintiffs propose that the construction of the term "lumen" should differ between the Fowler and Janzen patents. For Janzen, Plaintiffs propose that the claim have its ordinary meaning, which Plaintiffs propose as "space within a vessel or organ." Doc. 56 at 17. Defendant also applies the plain and ordinary meaning of the term, which it proposes is "open space within a vessel or organ." Thus, on the briefing, the only disagreement between the parties is whether the word "open" should be included to describe the "space within a vessel or organ." Doc. 68 at 9.

13

**JA 14**

Plaintiffs object to the use of the word "open" because it "adds the confusing limitation that the vessel space must be 'open,' rather than full of blood." Doc 56 at 17. At the hearing, Defendant's counsel defended use of the term "open" by pointing to extrinsic evidence, but effectively agreed that the presence of blood or fluid does not mean that a vessel is not open:

> Now, as you can see, Your Honor, for Janzen the parties basically agree on the construction with respect to everything except our use of the word "open" in there, and we've highlighted that in green. St. Jude has objected and they did this in their brief that a blood filled space within the lumen of a vessel is not open. Our point is, and I think we made this in our brief, that dictionaries cited in our claim construction briefing describe lumen with the word "open" and we're not saying that the lumen or vessel is empty. There is definitely blood in it, but the point is it's still open. Having said all of that, we're willing, Your Honor, if it will take a dispute away to say that the term should be defined as a "blood filled or fluid filled space within a vessel or organ," as long as the court makes clear that the surrounding walls are not part of the construction. So rather than saying an open space within a vessel or organ, we would be happy with blood filled or fluid filled space within a vessel or organ. I think that would respond to the objection that St. Jude has made with respect to that claim term.[2]

ii.      Analysis

The Court agrees with the parties that the ordinary meaning applies to this term. The parties only dispute the use of the word "open" in the construction, and the Court is not persuaded by Defendant's arguments. Defendant asserts that an "open" vessel may be filled with blood or fluid. While the Court does not opine on the merits of that argument, the Court believes the argument demonstrates why a juror may be confused by including the word "open" in the construction. Thus, the Court declines to construe the term "lumen" using the word "open" to describe the vessel.

iii.      Construction

The Court construes the term "lumen" in the Fowler patents to mean "space within a vessel or organ."

---

[2] Tr. January 19-20, 2010 at pp. 81-82.

e.    *vessel plug*

    i.    The Parties' Positions

This term occurs in claim 9 of the Fowler '616 patent, claims 38, 40 and 43 of the Fowler '602 patent, and claim 21 of the Fowler '375 patent.  Plaintiffs cite extrinsic evidence to argue that the term's ordinary meaning is "a mass obstructing a hole or intended for closing a hole." Doc. 56 at 13, *citing* Exh. J.  Defendant similarly relies upon extrinsic evidence in submitting an ordinary meaning proposal of "an item that occupies and fills a hole in a vessel."  Doc. 68 at 11, *citing* Exhs. K, L, M, and N.  Therefore, the principle dispute between the parties is whether a plug must fill the hole or merely obstruct the opening.  *See, e.g.*, *id.* at 11 ("A plug does not merely obstruct a hole—it occupies and fills it so that nothing may pass through.").

Defendant argues that by merely requiring obstruction, Plaintiffs' proposal is far too broad and would encompass many items that are clearly not plugs: "SJM's construction would include, for example, a bottle-cap or even a finger placed over part of, or near to, the opening in a bottle.  It similarly would include a sheet wrapped around a punctured vessel or a finger placed over part of, or near to, the puncture in a vessel, which no one would understand to be a 'vessel plug.'"  Doc. 68 at 11-12.  Plaintiffs respond that Defendant's proposal is too narrow because by requiring the plug to seal the hole, embodiments of the patents are excluded:

> ACI is simply wrong that Fowler is limited to a plug that occupies and fills a hole in a blood vessel. The specification makes it clear that the plug need not extend into the blood vessel. 375 patent, 2:32-37. Instead, the plug generally conforms to the outside of the artery: "the vessel plug 20 is preferably contoured to conform to the outer lumen of the artery 10." *Id.*, col. 4:38-40.  In operation, it could very well be that part of the plug dips slightly into the puncture and perhaps mates with part of the balloon, especially since the blood vessel is flexible and both the plug and balloon expand.  But this does not mean that the plug must "occupy and filly [*sic*] a hole."

Doc. 69 at 8.

    ii.    Analysis

As discussed above, the primary dispute between the parties relates to the ultimate function of a vessel plug, not its structure or nature.  The Court finds that each and every relevant

claim speaks extensively to the function, use and positioning of the vessel plug. Claim 9 of the '616 patent requires,

> positioning the vessel plug in the incision with an elongate member to position the vessel plug in the incision such that the distal end of vessel plug is located proximally of the b*lood* vessel without extending into the blood vessel to seal the incision from the flow of blood passing through the blood vessel, such that the blood vessel is free of obstruction.

Claim 38 of the '602 patent requires,

> a vessel plug operatively associated with said shaft member for insertion into the puncture, said expandable member configured to cooperate with said plug when said expandable member is in said expanded condition to prevent said vessel plug from entering the vessel or the organ of the patient, and said vessel plug, when sealingly positioned within the puncture, extends proximally of the target organ or blood vessel without extending into said vessel or said organ.

Claim 40 of the '602 patent requires,

> a vessel plug operatively associated with said tubular member and said expandable member, said vessel plug dimensioned to close the puncture or incision, said expandable member, when in said expanded condition within said blood vessel or said target organ, preventing said vessel plug from extending into said vessel or said organ.

Claim 43 of the '602 patent requires,

> inserting a vessel plug into said incision or puncture, said expandable member operating in said expanded condition to prevent said vessel plug from extending into said vessel or target organ of said patient;

> positioning said expandable member in said relaxed condition; and

> retracting said elongated tubular member and said expandable member from said incision or puncture while retaining said vessel plug within said incision or puncture.

Finally, claim 21 of the '375 patent requires,

**JA 17**

> a vessel plug which is constructed of a material that is absorbable within the body of a patient and which seals the incision from the flow of blood therethrough; and
>
> an elongate positioning member having a passage way therein for the receipt of said vessel plug therein, and at least a portion of said positioning member is expandable so that it has an outer diameter in use which is greater than the diameter of the incision to position said vessel plug in the incision proximally of the blood vessel such that said vessel plug obstructs the flow of blood through the incision without extending into the blood vessel.

As shown in the quoted claim limitations above, the claims themselves speak in great detail regarding the use and positioning of a vessel plug. The Court thus finds that construction of the term "vessel plug" should not include a necessary function and position of the plug. Including the function of the "vessel plug" in the construction would make other language in the claims redundant and unnecessary. Furthermore, in this instance, how a particular plug is used does not speak to its characteristics which make it a plug. For example, a vessel plug would still be a vessel plug if it sits on a shelf and is never used. The ordinary meaning of a vessel plug cannot require the plug to actually do something, like seal or fill a hole. A vessel plug is a structure and the Court's construction should primarily reflect a structural description. Functional language may be necessary to describe the structure, but the structure itself does not mandate an actual use of the plug. The structure of the vessel plug is discussed in the patents as follows:

> As shown in FIGS. 3-5, the vessel plug 20 of the present invention is preferably a cylindrical rod-shaped member which is constructed of a porous, biodegradable and expandable hemostatic collagen sponge such as the collagen cuff 35 sold by Vitaphore Corporation under the name VITACUFF, or a polymerized polylactic acid, or polyglycolic acid matrix. The distal end 32 of the vessel plug 20 is preferably oriented at an angle of approximately 25 to 45 degrees with respect to the lengthwise dimension of the vessel plug 20 and, as shown in FIG. 5, the distal end 32 of the vessel plug 20 is preferably contoured to conform to the outer lumen of the artery 10. The proximal end 34 of the vessel plug 20 may be excised after placement in the patient and positioned at or slightly below the epidermal layer of the patient's skin as described more fully hereinafter.

'602 patent, 4:31-45.

That description is a statement of alternative embodiments and may therefore inform our construction. Furthermore, the parties have submitted a number of extrinsic dictionary

17

**JA 18**

definitions for the Court's consideration.  For example, Plaintiff submits the definition "[A] mass obstructing a hole or intended to close a hole."  Doc. 56, Exh. J.  Defendant submits and discusses several extrinsic definitions:

> A plug occupies and fills a hole, as in the case of a bottle's cork or a test-tube's stopper.  *See* Ex. K ("An object, such as a cork or wad of cloth, used to stop a hole or gap."; Ex. L ("a piece used to fill a hole").  Medical dictionaries indicate that the term "plug" has no more specialized usage in that field.  *See* Ex. N ("Any mass filling a hole or closing an orifice."); Ex. M ("Something that stops up an orifice or opening, especially when inserted for that purpose or if [*sic*?] removable.").  The Federal Circuit has held in another medical device case that the "plug" at issue in that case filled the hole it was designed to plug.  *See C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 860 (Fed. Cir. 2004) ("The conformable surface allows the plug to fill irregularly shaped hernia defects more completely than other plugs.").

Doc. 68 at 11.

In view of the entirety of the specifications and the extrinsic evidence, the Court finds that a vessel plug must be a structure that is designed or configured to close a hole in a vessel. Plaintiffs' extrinsic definition is most instructive in this regard: "mass obstructing a hole or *intended for closing a hole*."  Doc. 056 at 13, *citing* Exhibit J (emphasis added).  That definition comports most closely with all the extrinsic and intrinsic evidence presented by the parties. Defendant's argument would confine the meaning of a plug essentially to that of a cork in a wine bottle (filling and sealing a specific hole).  While the embodiments may conjure this analogy, none of the intrinsic or extrinsic evidence supports confining the definition of a plug in this way. Even Defendant's submitted definitions acknowledge that a plug might simply "close an orifice." The term is entitled to be given its full breadth.

### iii.   Construction

The Court construes the term "vessel plug" to mean "a mass designed or configured to close a hole in a vessel."  The Court provides the following guidance to ensure that the parties' dispute is resolved.  "To close" does not require a seal or fit that is completely fluid-tight.  Rather it requires only that the plug is designed or configured to close the hole well enough to substantially stem liquid flow in a way that is consistent with improved healing.  On the other hand, for example, if a mass is designed or configured to merely partially close the vessel and

allow fluid flow beyond minor amounts that would be consistent with healing the hole in the vessel, then that mass is not a plug within the meaning of these patents.

       f.     *"puncture" and "incision"*

            i.     The Parties' Positions

The term "puncture" occurs in claims 38, 40 and 43 of the '602 patent. The term "incision" occurs in: claim 9 of the '616 patent; claims 38, 40 and 43 of the '602 patent; and claim 21 of the '375 patent. Plaintiffs contend that these terms do not require construction, but if they are construed they should be given their common meaning of a "hole or slit opening created during a procedure." Doc. 56 at 13. Defendant argues that the ordinary meanings of "incision" and "puncture" are distinctly different. Doc. 68 at 13-14. Thus, Defendant proposes that "incision" means "cutting wound" and "puncture" means "piercing wound."

Defendant supports its proposal first with extrinsic dictionary definitions. *Id.* Plaintiffs respond to Defendant's dictionaries saying they "would result in a construction divorced from the disclosures in the intrinsic record." Doc. 69 at 10. Plaintiffs cite to the following portions of the intrinsic record to show that the words "'puncture' and 'incision' refer interchangeably to an opening in the artery or elsewhere:

> During catheterization procedures, the nurse or physician will create an <u>opening</u> into an artery or other vessel...." '375, col. 1:22-25 (emphasis added). Further: 'The <u>puncture</u> of the artery 10 by the needle is then confirmed by the physician and a small diameter guide wire (not shown) is inserted through the needle for approximately 15 to 20 cm. The needle is then withdrawn over the guidewire while pressure is applied to the artery 10 to limit the bleeding and prevent the formation of a hematoma at the <u>incision</u> site. '375, col. 4:2-8 (emphasis added).

Doc. 69 at 10. Defendant replies arguing that the specification actually supports different definitions for the subject terms because "'incision' and 'puncture' are connected seven different times in the Fowler specification by the disjunctive 'or,' indicating a choice between alternatives." Doc. 71 at 6, *citing Kustom Signals, Inc. v. Applied Concepts, Inc.*, 995 F. Supp. 1229, 1236 (D. Kan. 1998) ("'Or' typically is defined as 'a choice of available alternatives.' An 'alternative' is defined as 'a proposition or situation offering a choice between two things wherein if one thing is chosen the other is rejected.'") (internal quotations and citations omitted). Defendant further notes that the terms "incision" and "puncture" appear in the same Fowler

19

**JA 20**

claims at least three times. Doc. 71 at 6.  Defendant's criticism of Plaintiffs' proposal is that Plaintiffs' common definition does "not reflect the plain meaning of the terms to one of skill in the art or to anyone else." Doc. 71 at 7.

Finally, Defendant notes that its proposals are affirmatively supported by words in the specification and claims:  "The Fowler patents state that a 'needle pierc[ing] the femoral artery' creates a 'puncture' and use 'said <u>wound</u> or incision' to refer to the antecedent 'incision or puncture')".  *See* col. 3:67 – 4:3; '602 cl. 45." Doc. 71 at 7 (emphasis in Doc. 71).

      ii.    Analysis

The Court finds the following dictionary definitions of interest in examining these terms[3]:

"Puncture –    1. To pierce with a pointed object. 2. To make (a hole) by piercing. 3. To cause to collapse by piercing."  Doc. 68, Exh. K.

"Puncture –    1. To pierce with or as if with a pointed instrument or object." Doc. 68, Exh. L.

"Incision –    A surgical cut with a sharp instrument into the body that results in a division of tissue and creation of a wound." Doc. 68, Exh. M.

"Incision –    A cut made with a knife, esp. for surgical purposes." Doc. 71, Exh. JJ.

"Puncture –    1. A hole or wound made by a sharp pointed instrument. 2. To make a hole with such an instrument." *Id*.

"Incision –    [to cut open, to cut through] 1. A cut, or a wound produced by cutting with a sharp instrument." Doc. 71, Exh. KK.

"Puncture –    1. The act of piercing or penetrating with a pointed object or instrument. 2. a wound so made." Doc. 71, Exh. KK.

"Incision –    A cut; a surgical wound; a division of the soft parts made with a knife." Doc. 71, Exh. LL.

"Puncture –    1. To make a hole with a small pointed object , such as a needle. 2.  A prick or small hole made with a pointed instrument." Doc. 71, Exh. LL.

---

[3] The Court notes that some Exhibits contained illegible material.

The Court finds that the extrinsic evidence supports Defendant's conclusion that a skilled artisan would interpret an "incision" differently from a "puncture."[4] The vast majority of the intrinsic evidence supports the same conclusion. As Defendant points out, the Fowler specifications use the term disjunctively and many claims also use both words. For example, claims 40 and 43 of the '602 patent disjunctively use the terms in both the claim preamble and body. Since the nature of patent claims is precise, the Court finds this disjunctive use as strong evidence that the patentee distinguished between these terms. Indeed, the Court finds that the majority of the specification and the plethora of disjunctive claim usage show that the intrinsic record supports distinct meanings for the two terms.

There are two items in the intrinsic record that may be interpreted to create ambiguity. First, claim 38 of the '602 patent use "incision" and "puncture" disjunctively in the preamble: "an assembly for sealing or closing an incision or puncture in the body of a living patient wherein the incision or puncture extends . . . ." Oddly, however, in the body of claim 38, only the "puncture" term is referenced. Further, there is a single specification passage where the terms appear to be used interchangeably:

> The <u>puncture</u> of the artery 10 by the needle is then confirmed by the physician and a small diameter guide wire (not shown) is inserted through the needle for approximately 15 to 20 cm. The needle is then withdrawn over the guidewire while pressure is applied to the artery 10 to limit the bleeding and prevent the formation of a hematoma at the <u>incision</u> site.

'375, col. 4:2-8 (emphasis added). In the first portion of the quoted passage, the patentee refers to the wound as a puncture, but later in the passage, when referring back to the same wound, the patentee uses the word "incision." While there may be meaning to glean from this passage, the Court finds that this is not a re-definition of both terms, such that they have the same meaning. *See CCS Fitness v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002) ("First, the claim term will not receive its ordinary meaning if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history."). In the overall context of the extrinsic and intrinsic evidence, the Court finds that this

---

[4] This is consistent with the testimony of Mr. Wolvek submitted in Defendant's Supplemental Sur-Reply and distinguishing between cutting wounds and those caused by a needle. Doc. 94 at 4.

particular specification quote and the unusual term usage in '602 claim 38 (disjunctive use in the preamble and using only "puncture" in the claim body) do not clearly indicate that a puncture and an incision are the same. Rather, like the entirety of the evidence, these two potentially ambiguous uses indicate that the nature of a wound as a puncture or incision is not material to the application of the inventive ideas.

Without a clear indication from the patentee that he intended those terms to have the same meaning, and given the many other uses of those terms which indicate they are intended to have different meanings, the Court declines to construe "puncture" and "incision" as having the same meaning.

### iii. Construction

The Court generally agrees with Defendant's evidence that incisions are cutting wounds and punctures are piercing wounds. However, for clarity and certainty regarding resolving the parties' disputes, the Court construes "puncture" to mean "piercing wound or opening such as that made by piercing with a needle or other pointed object." The Court further construes "incision" to mean "cutting wound or opening such as that made by a knife or scalpel or other bladed object." The Court also clarifies that the constructions of "puncture" and "incision" are not intended to limit the appearance of the wound created. For example, the Janzen '439 patent suggests that after removal of instruments, punctures may appear as "slits." '439 patent, 3:43-48. Regardless of appearance, a puncture remains a puncture.

### g. *"relaxed" and "expanded"*

At the hearing, the parties reported that there was no longer a dispute regarding these terms.

> In the Joint Claim Construction Chart at page 3 the parties had been disputing the claim terms "relaxed" and "expanded" and yesterday afternoon after the tutorial, the parties reached an agreement that the court need not construe the terms "relaxed" or "expanded" as they appear in the Fowler 602 patent. So that one is off the table. The parties are fine with the court not construing either of those terms.

**JA 23**

Tr. Jan. 19 – 20, 2010 at 72.  In view of the parties' agreement, the Court declines to define these terms.

      h.      *"(located / extends) proximally of"*

      i.      The Parties' Positions

These terms are used in claim 9 of the '616 patent, claim 38 of the '602 patent and claim 21 of the '375 patent.  Plaintiffs contend that the terms use the word "proximally" for its general meaning, which Plaintiffs contend is "close to" based primarily upon extrinsic evidence. Doc. 56 *citing* Exh. K.  Defendant proposes a different meaning for "proximally" based upon the parties' agreement for the term "proximal end" and the medical meaning of that term.   In particular, Defendant proposed the construction "away from the midline."  Doc. 68 at 16-17. Thus, the primary issue presented by the parties is whether the terms use the word "proximally" to indicate closeness (general meaning) or away from the patient (medical meaning).

      ii.      Analysis

When construing claims, we look first "to the words of the claims themselves . . . to define the scope of the patented invention."  *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Furthermore, it is fundamental that we give due weight to the specification when construing the claim term.  *Phillips v. AWH Corp.,* 415 F.3d 1303, 1315 (Fed. Cir. 2005).  In this instance, the parties have proposed constructions that appear to have only a very subtle difference when applied to the relevant claims.  The Court examines the claims to determine whether either or both proposals may be applied to the claims and remain faithful to the specification.

Claim 9 of the '616 patent states:

> 9.  A method of sealing an incision formed in the body of a patient wherein the incision extends generally from the skin of the patient; through the lumen of a blood vessel and into the blood vessel of a patient, the method including the steps of:
>
> forming a vessel plug of a material which is absorbable in the body of the patient and wherein the vessel plug is formed to include distal and proximal ends therein and is dimensioned to be received in the incision; and

positioning the vessel plug in the incision with an elongate member to ***position the vessel plug in the incision such that the distal end of vessel plug is located proximally of the blood vessel without extending into the blood vessel*** to seal the incision from the flow of blood passing through the blood vessel, such that the blood vessel is free of obstruction (emphasis added).

Claim 38 of the '602 patent states:

> 38. An assembly for sealing or closing an incision or puncture in the body of a living patient wherein the incision or puncture extends into a blood vessel or an organ of the patient, the assembly comprising:
>
> an elongate shaft member having a proximal end and a distal end and having an expandable member disposed at said distal end, said expandable member constructed to be positioned alternatively in a relaxed condition and an expanded condition;
>
> said shaft member and said expandable member dimensioned to be inserted within the puncture so that said expandable member is positioned within a target organ or blood vessel of the patient;
>
> control member operatively connected to said expandable member and associated with said shaft member for selectively positioning said expandable member between said expanded condition and said relaxed condition; and
>
> a vessel plug operatively associated with said shaft member for insertion into the puncture, said expandable member configured to cooperate with said plug when said expandable member is in said expanded condition to prevent said vessel plug from entering the vessel or the organ of the patient, and ***said vessel plug, when sealingly positioned within the puncture, extends proximally of the target organ or blood vessel without extending into said vessel or said organ*** (emphasis added).

Claim 21 of the '375 patent states:

> Claim 21 (asserted). An insertion assembly for sealing an incision in the body of a patient wherein the incision extends from the skin of the patient into a blood vessel of the patient, said insertion assembly comprising the combination:
>
> a vessel plug which is constructed of a material that is absorbable within the body of a patient and which seals the incision from the flow of blood therethrough; and
>
> an elongate positioning member having a passage way therein for the receipt of said vessel plug therein, and at least a portion of said positioning member is expandable so that it has an outer diameter in use which is greater than the diameter of the incision to position ***said vessel plug in the incision proximally of the blood vessel such that said vessel plug obstructs the flow of blood through the incision without extending into the blood vessel*** (emphasis added).

24

**JA 25**

All three of those claims use the term "proximally" in referring to the position of the vessel plug with respect to a blood vessel (or organ). All three claims also expressly require that the plug does not extend into the blood vessel. Further, the Court notes that the purpose of all three claims is to recite an assembly for sealing or closing a wound such as an incision or puncture. With that context, if the Plaintiff's definition is applied to the relevant phrase of claim 21, it would state, "said vessel plug in the incision *[close to]* the blood vessel such that said vessel plug obstructs the flow of blood through the incision without extending into the blood vessel." This application of the claim is consistent with the embodiments of the specification in that it places the vessel plug close to the opening in the vessel without extending into the blood vessel. The Plaintiff's proposal applies similarly to the other relevant claims.

Applying the Defendant's proposal results in the relevant part of claim 21 stating as follows: "said vessel plug in the incision ***away from the midline*** of the blood vessel such that said vessel plug obstructs the flow of blood through the incision without extending into the blood vessel." While far less clear, this application of the claim phrase also appears consistent with the specification in that it would place the vessel plug in the incision without extending into the blood vessel. However, while the Defendant's proposal is consistent with the specification, the Court finds that it may confuse the fact finder by suggesting that plug should be "away" from the vessel. Indeed, "away from the midline" does not connote any proximity to the vessel. The outside surface of the skin is "away from the midline." That is confusing because the entire intrinsic record discusses only embodiments that place the plug close to the vessel. Furthermore, the reference to the vessel midline may also be confusing because that midline is a new reference point that would require independent explanation to the fact finder. The potential for confusion and putative need for further definition is verified with certainty in view of Defendant's Supplemental Claim Construction Sur-Reply-Brief, where Defendant argues that very old testimony of inventor Fowler defines "proximally" as ""the direction away from the midline of the patient." Doc. 94 at 2. This reference to Mr. Fowler's testimony is confusing because, according to the same testimony, the "midline of the patient" is "an imaginary line that runs through from the top of the head down between the legs right through the center of the patient."

Id.  With respect to the claims at issue here and discussed above, such a construction would not make sense.[5]

Finally, even if Defendant's proposal is adopted, the only reasonable interpretation of the contextually relevant portions of the claims will place the plug close to the vessel without extending into the vessel.  Thus, the Court finds that, in context, both the general meaning and the medical meaning of the term "proximally" lead to the same result.

   iii. Construction

The Court construes the term "proximally of" in the referenced claims to mean "close to."

   i. *"threading a plug over said guide wire . . .[and] moving the plug inwardly along the guide wire"*

   i. The Parties' Positions

This term occurs in claim 10 of the '439 patent, which is a method claim.  The term requires two distinct steps of the method claim – the "threading" step and the "moving" step.  Plaintiffs argue that both of these steps refer to "movement of the plug in the tissue channel" requiring both that the plug pass "over" the guide wire and that the plug move inwardly "along" the guidewire.  Doc. 56 at 17.  Plaintiffs reason that the two steps differ because the second step "simply requires that the plug move toward the puncture using the guide wire as a guide." Doc. 56 at 18.  Thus, Plaintiffs propose that the "threading" step be construed as "passing a plug over the guide wire," and that the "moving" step be construed as "advancing the plug from the proximal end of the guide wire toward the patient." Doc. 69 at 14.

Defendant disagrees with Plaintiffs only regarding the "threading" step, which Defendant proposes be construed as "feeding the proximal end of the guide wire into and through the lumen in the plug." Doc. 71 at 12.  Defendant argues that "threading" is a commonly understood word as in the context of putting thread through the eye of a needle.  Tr. Jan. 19-20, 2010 at 112.

---

[5]  In their Supplemental Sur-Reply, Defendant's also note a related and abandoned patent application where claims use the word "distal" in a similar context.  Doc. 94 at 2-3.  Whatever inference may be gained from this usage is insufficient to persuade this Court to read the "proximally" limitation outside of the clear context of the claims at issue in this case.

**JA 27**

Further, Defendant notes that Plaintiffs' proposal conflates both claimed method steps into the single action of moving the plug. Doc. 71 at 12.

        ii.        Analysis

The crux of the parties' disagreement regards the term "threading" and whether the claim's threading step merely indicates the position of the plug with respect to the guide wire, or whether that step requires placing the guide wire through the lumen of the plug. Claim 10 of the '439 patent is a four-step method claim that states:

> 10. A method of closing a puncture in a wall of an artery comprising the steps of:
>
> inserting a removable guide wire through said puncture into the artery;
>
> ***threading a plug over said guide wire so that the guide wire extends from the plug through said puncture,***
>
> moving the plug inwardly along the guide wire into blocking relation with said puncture, and
>
> withdrawing the guide wire from the plug so as to leave the plug sealed in blocking relation with said puncture (emphasis added).

A brief review of the claim shows it bears a strong resemblance to the description in the '439 patent specification at column 7:

> FIG. *12e* shows yet another form of plug, similar to the plug of FIG. *12d,* but with a lumen 85. This form of plug is designed for use by physicians who prefer not to remove the guide wire immediately after a procedure. The proximal end of the guide wire 15 can be fed through lumen 85 and through the collagen membrane 81. The plug is slid down along the guide wire through tissue channel 9 until its front end reaches the wall of the femoral artery. Indeed, the plug of FIG. *12e* could even be inserted without the use of a sheath. When the wire 15 is withdrawn, the collagen membrane automatically reseals itself.

'439 patent, 7:39-50.

In view of the strong association of the claim with this specification passage and the common meaning of the word "threading," the Court agrees with Defendants that the claim term "threading" is embodied in the statement "the proximal end of the guide wire 15 can be fed

through lumen 85 . . . ."  The inquiry does not end here because the term "threading" may have a broader meaning than that expressed in a preferred embodiment.

The "threading" step of this method claim states "*threading a plug over said guide wire so that the guide wire extends from the plug through said puncture*."  On its face, this step requires that the "threading" of the plug over the wire result in the wire extending from the plug to the puncture.  In relevant part, this indicates that the "threading" verb is an action that brings the plug and the wire together.  The common use of the word "threading" would bring those items together in a particular way – moving the wire through the lumen of the plug.

In addition, when the threading step is viewed in the context of the "moving" step, the Court finds that "threading" is something other than "moving" the plug along the wire.

        iii.     Construction

The Court construes the term "threading a plug over said guide wire" to mean "feeding the proximal end of the guide wire into and through the lumen of the plug."  Furthermore, the Court adopts the parties' agreement and defines "moving the plug inwardly" to mean "advancing the plug towards the puncture."

     j.     *"means for ejecting said plug means from said distal end of said elongated member so as to place said plug means in a blocking relation with said puncture, so as to seal said puncture"*

        i.     The Parties' Positions

This term occurs in claim 1 of the '439 patent.  The parties agree that the term should be interpreted under 35 U.S.C. § 112(6).  Further, the parties agree that the function of the clause is "ejecting said plug means from said distal end of said elongated member so as to place said plug means in a blocking relation with said puncture, so as to seal said puncture."  The parties disagree only on the structure that corresponds to the claimed function.  Plaintiffs propose that the structure requires a plug pusher and a retracting sheath, but rather than list all the embodiments for those items, Plaintiffs state their proposal as "a plug pusher (for example, plug pusher 33, fig. 1) and retracting sheath (for example, sheath 45, fig. 16), and equivalents thereof." Doc. 69 at 29.  In view of the partial agreement discussed above, Defendant updated its proposal at the hearing, proposing "items 33 and 23 in Fig. 1, col. 3:49-60, 4:1-13, and

28

**JA 29**

equivalents thereof." Tr. Jan. 19-20, 2010 at 103-105 (discussing slides 79 and 80 of Defendant's presentation).

        ii.      Analysis

Section 112, ¶ 6, provides that "a patentee may express an element in a claim as a means for performing a specified function without reciting the particular structure that performs the recited function . . . the 'means-plus-function' limitation must be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." *Commonwealth Sci. & Indus. Research Org. v. Buffalo Tech., Inc.*, 542 F.3d 1363, 1383 (Fed. Cir. 2008) (internal cites and quotes omitted). The Court construes a means-plus-function limitation by a two-step process: (1) "identify[ing] the function of the means-plus-function limitation;" and (2) "identify[ing] the corresponding structure in the written description necessary to perform that function." *Minks v. Polaris Indus.*, 546 F.3d 1364, 1377 (Fed. Cir. 2008) (internal cites and quotes omitted).

The parties have agreed on a function, which is stated as "ejecting said plug means from said distal end of said elongated member so as to place said plug means in a blocking relation with said puncture, so as to seal said puncture." The Court agrees with the parties regarding the function, so the Court must now determine the structure that is necessary to perform that function. The Court notes that the parties have some level of agreement regarding the structure as well. In particular, at the core of both proposals is a plug pusher (for example, item 33 of figure 1) and a sheath (for example, item 23 of Figure 1). In this respect, the Court agrees with the parties. The function requires ejecting the plug into a certain position and such function necessarily requires a plug pusher to push the plug through a necessary sheath (the placement of which will result in the ultimate position of the plug).

The parties appear to disagree on two primary points. First, as indicated by the parties' respective proposals, Plaintiffs disagree with Defendant's proposal to add the following paragraphs of the written description to the required structure:

        In order to insert the plug to assure that it is properly located and to be able to hold it in place until a good seal is established, a special insertion apparatus has been designed. One embodiment (FIG. 1) of an insertion apparatus according to the instant invention is comprised of a sheath assembly 23, a plug holder 29 and

a plug pusher 33. Sheath assembly 23, in turn, is comprised of an elongated tubular sheath 45 and a collar 35. At its rear end, collar 35 is provided with an external thread 37. In addition, sheath assembly 23 is provided with a sheath channel 27, which runs through the entire assembly, from front end 25, through sheath 45 and through collar 35.

'439 Patent, 3:48-60.

Like the other two components, the plug pusher 33 is also comprised of two parts, an elongated piston 49, and a stop knob 43. Piston 49 has a cross sectional size and configuration so as to permit sliding passage into channels 31 and 27 with only minimal clearance. The length of piston 49 is such that when sheath assembly 23 and plug holder 29 are screwed tightly together, shoulder 51 of knob 43 will abut rear end 53 of plug holder 29 as front end 55 of piston 49 is aligned with front end 25 of sheath 45.

*Id.*, 4:1-13.

As evident from the quoted portions, the first excerpt is a component-level description of the sheath 23 of Figure 1 and the second excerpt is a component-level description of the plug pusher 33. Thus, Defendant is proposing that the means be limited to the specific component-level description of the embodiment of Figure 1's sheath and plug pusher. The Court agrees that sheath 23 and plug pusher 33 are structural elements underlying the means, but disagrees that the structure is limited to described component-level descriptions. The number and nature of pieces that make up the plug pusher and the sheath are not "necessary" to the function. To be clear, the Court is not creating a vague amalgamation of the disclosed structures -- they are limited to what is disclosed. However, the Court is holding that a plug pusher or sheath would meet this limitation if composed of more or less components having varying characteristics, as long as the assembled or manufactured plug pusher and sheath are the same or equivalent to the disclosed items.

Next, the parties disagree regarding whether the plug pusher embodiment of Figure 1 is the only embodiment where the means may derive associated structure. In this respect, Defendant argues that "[t]his structure is the only structure disclosed in the specification that can perform the function as claimed because it is the only plug pusher that includes a channel to receive the guide wire required by other claim limitations. *See* col. 4:1-13. Notably, this plug pusher is what the '439 patent specification says forces the plug out of the device because the

30

**JA 31**

front end 55 of piston 49 is aligned with front end 25 of sheath 45. *See* col. 4:8-9; *see also* col. 5:39-47." Doc. 68 at 33. Defendant is proposing that the structural plug is limited to the plug having a channel to accommodate a guide wire. The Court disagrees with Defendant because, notwithstanding the guide wire requirement of the claim, all the disclosed plug pushers are linked with the agreed function that does not involve the channel or the guide wire. The skilled artisan would link any of the plug pushers with the claimed ejecting function.

iii.     Construction

The Court construes the term "means for ejecting said plug means from said distal end of said elongated member so as to place said plug means in a blocking relation with said puncture, so as to seal said puncture" under § 112(6) and finds that the function is as agreed by the parties, "ejecting said plug means from said distal end of said elongated member so as to place said plug means in a blocking relation with said puncture, so as to seal said puncture." Furthermore, the Court construes the corresponding structure as "a plug pusher (items 33, 69 or 95 of the '439 patent) and a sheath (items 23 or 45 of the '439 patent) and equivalents thereof."

k.     *"ejecting mechanism for ejecting said plug member from said distal end of said elongated member so as to place said plug member in a blocking relation with said puncture, so as to seal said puncture"*

i.     The Parties' Positions

This term occurs in claim 8 of the '439 patent. The parties primarily dispute whether §112(6) applies to this term. Doc. 72-1 at 17. The parties agree that, if §112(6) applies, the Court should refer to the parties' positions for the "means for ejecting" term in claim 1 of the '439 patent. *Id.* Thus, to the extent §112(6) applies, the parties agree that the function of this term is "ejecting said plug means from said distal end of said elongated member so as to place said plug means in a blocking relation with said puncture, so as to seal said puncture." To the extent that §112(6) applies, the parties disagree only on the structure that corresponds to the claimed function. Plaintiffs proposed that the structure requires a plug pusher and a retracting sheath, but rather than list all the embodiments for those items, Plaintiffs state their proposal as "a plug pusher (for example, plug pusher 33, fig. 1) and retracting sheath (for example, sheath 45, fig. 16), and equivalents thereof." Doc. 69 at 29. In view of the partial agreement discussed above, Defendant updated its proposal at the hearing, proposing "items 33 and 23 in

31

**JA 32**

Fig. 1, col. 3:49-60, 4:1-13, and equivalents thereof." Tr. Jan. 19-20, 2010 at 103-105 (discussing slides 79 and 80 of Defendant's presentation). Finally, to the extent that §112(6) does not apply, the Defendant offers the following construction: "a plunger with a front end that does not extend past the front end of the elongate member." Doc. 72-1 at 17.

       ii.     Analysis

A limitation that does not use the word "means" triggers a rebuttable presumption that the limitation does not require construction as a "means plus function" term. *Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1023 (Fed. Cir. 2006). A limitation, like the "ejecting mechanism" term, that lacks the term "means" may overcome the presumption against means-plus-function treatment if it is shown that "the claim term 'fails to recite sufficiently definite structure' or else recites a 'function without reciting sufficient structure for performing that function.'" *CCS Fitness*, 288 F.3d at 1369 (*quoting Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)); *see also Depuy*, 469 F.3d at 1023 (the presumption that such terms are not means plus function terms "can be rebutted by showing that the claim element recites a function without reciting sufficient structure for performing that function.") (Citation omitted).

The Federal Circuit has specifically commented on "generic structural terms" such as "mechanism" or "element" and determined that these terms do not recite "sufficient structure to avoid 112 ¶ 6." For example, the court holds that "generic terms 'mechanism,' 'means,' 'element,' and 'device,' typically do not connote sufficiently definite structure." *MIT v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006) (holding that the term "colorant selection mechanism for receiving said modified appearance signals" is a means-plus-function term). *See also, Widevine Techs., Inc. v. Verimatrix, Inc*., Civil Action No. 2-07-cv-321, 2009 WL 3734106, at *14 (E.D. Tex. Nov. 4, 2009) (holding that "first device" and "second device" were means plus function limitations since the "claim provides no structural context and describes each 'device' by the functions that it performs").

As used in the "ejecting mechanism" term, the word "ejecting" is purely functional stating only the function of the "mechanism." Furthermore, as discussed above, the word "mechanism" does not, itself, recite sufficient structural content to avoid treatment under §112(6). Moreover, the remainder of the limitation ("ejecting said plug member from said distal

end of said elongated member so as to place said plug member in a blocking relation with said puncture, so as to seal said puncture") contributes nothing to the structure of the "ejecting mechanism." As a result, the Court finds this term does not recite sufficient structure to avoid treatment under §112(6).

Like the parties, the Court refers to the analysis for the "ejecting means" term for further discussion regarding the determination of the "function" and corresponding structure for this term.

### iii. Construction

The Court construes the term "ejecting mechanism for ejecting said plug member from said distal end of said elongated member so as to place said plug member in a blocking relation with said puncture, so as to seal said puncture" under § 112(6). The Court finds that the function is as agreed by the parties, "ejecting said plug means from said distal end of said elongated member so as to place said plug means in a blocking relation with said puncture, so as to seal said puncture." Furthermore, the Court construes the corresponding structure as "a plug pusher (items 33, 69 or 95 of the '439 patent) and a sheath (items 23 or 45 of the '439 patent) and equivalents thereof.

### l. *"separable plug means for plugging said puncture being disposed in said elongate member."*

#### i. The Parties' Positions

This term occurs in claim 1 of the '439 patent. Defendant asserts that this term should be interpreted under §112(6) due to the presumption created by use of the word "means" in the claim. Doc. 68 at 29. Plaintiffs disagree arguing that the term recites sufficient structure to rebut the presumption. Doc. 56 at 28.

#### ii. Analysis

Defendant asserts that "The limitation itself merely says "plug means," and the specification of the '439 patent states that the shape and composition of the plug "may vary widely." Col. 6:65-73. "'That the plug means must be separable' does not rebut the presumption; it simply indicates that whatever structure the 'plug means' has, it must be detachable from the

33

**JA 34**

insertion apparatus." Doc. 68 at 29-30. The Court disagrees with Defendant. The term "plug" is recited in the claim as a noun and it is a reference to a well-known structure. This is particularly true with respect to the specific claim words that place the plug structure in a clear contextual framework. The fact that an embodiment's shape may vary does not bear on whether the claim recites structure. In claim 1 of the '439 patent, the plug means recites a well-known structure that is a plug, and as such is not subject to interpretation under §112(6). *Envirco Corp. v. Clestra Cleanroom, Inc.*, 209 F.3d 1360, 1365 (Fed. Cir. 2000); ("[t]he term 'baffle' itself is a structural term...[and] the claims describe the particular structure of this particular baffle." ); *see also TurboCare Division of Demag Delaval Turbomachinery Corp. v. General Electric Co.*, 264 F.3d 1111, 1121 (Fed. Cir. 2001) (holding that "radial positioning means" and "compressed spring means" do not invoke § 112, ¶ 6 because "the claim recites sufficient structure to overcome the presumption.").

### iii. Construction

The Court does not construe the "plug means" term under §112(6).

m. *"movable guide means extending longitudinally through said elongated member and said plug means for extension through said puncture for guiding said plug means to said puncture" and "movable guide element extending longitudinally through said elongated member and said plug member for extension through said puncture for guiding said plug member to said puncture."*

### i. The Parties' Positions

The "guide means" term occurs in claim 1 and the "guide element" term occurs in claim 8, both in the '439 patent. Defendant asserts that both these limitations are subject to §112(6) because the "guide means" term uses the word "means" and because the "guide element" term has no more structure than the means term. Doc. 68 at 34. Plaintiffs respond stating "that the 'means': (1) must be a 'guide means' ('guide' is addressed separately above with the terms 'guide wire' / 'guide element'); (2) must be 'movable' independent from the rest of the device; and (3) must pass through the elongate member and plug." Doc. 56 at 28.

ii.    Analysis

As used in the "guide means" term, the word "guide" is employed in the sense of action without evoking any particular structure.  For example, viewing the claim language alone, the guide means could be a wire, a finger, a pipe, a string or virtually anything that would fulfill the function.  In essence, the word "guide" does not connote any structure, which (semantically) is only limited by the function.  Plaintiffs effectively makes this point in suggesting that the structure is defined by the functional limitations, *e.g.*, "movable" or "pass through an elongate member." Doc. 56 at 28.  Claim 8's substitution of the word "element" for "means" does nothing to change this analysis.  *See Bausch & Lomb, Inc. v. Moria S.A.*, 222 F. Supp. 2d 616, 632-36 (E.D. Pa. 2002) (finding no structure in the "guide element" limitation to distinguish it from the "guide means" claim and analyzing both under § 112, ¶ 6).

Having determined that §112(6) applies, the Court must determine the appropriate function and structure.  Furthermore, the parties and the Court agree that the claimed function is "guiding said plug means/element to said puncture." Doc. 72-1 at 14 and 17.  The parties, however, disagree subtly as to structure.  Defendant would simply state the structure as "a guide wire."  Plaintiffs, alternatively propose "a guide wire (for example, guide wire 15) capable of movement independent from said elongated member and said plug means and extending longitudinally through said elongated member and said plug means for extension through said puncture and equivalents thereof." *Id*.

The Court disagrees with the Plaintiffs' illustrative and exemplary structural recitation because it may be confusing to the jury and does not find the suggested verbiage clearly linked to the function through the specification.

iii.    Construction

The Court construes the "guide means" and "guide member" limitations under §112(6). For both terms, the function is as agreed, "guiding said plug means to said puncture" for claim 1 and "guiding said plug element to said puncture" for claim 8.  Additionally for both terms, the structure is a guide wire and equivalents thereof.

35

**JA 36**

n.     *"plug"*

      i.     The Parties' Positions

The term "plug" as discussed here occurs in claims 9 and 10 of the '439 patent. While the term bears a strong resemblance to the "vessel plug" term discussed above, the Court notes that term is distinguishable because it occurs in the Janzen family of patents.

While the Janzen patents are independent of the Fowler patents, the parties' arguments with respect to the term "plug" ring familiar to their respective positions regarding Fowler's "vessel plug" term. In particular, Plaintiffs assert that a "plug" is a "mass that obstructs a hole" and Defendant counter-proposes an "item that occupies and fills a hole." Once again, both parties argue the use of ordinary meaning. Doc. 56 at 22 ("it should be given its common meaning"); Doc. 68 at 35 ("Fowler used "plug" consistently with its commonly-understood meaning"). Furthermore, both parties cite to the specification to support their positions. In particular, Plaintiffs state:

> The specification describes using "a plug, preferably a collagen plug or plug of some other resorbable material, to seal the artery along its outside wall." '439, col. 2:22-24. Janzen specifically notes that "[t]he physical form of the plug may vary widely, with the one selected by the physician being dependent upon the circumstances of the case." *Id.*, col. 6:65-7:3. . . . [T]he plug can form a "bandage-like covering *over* puncture." '439, col. 7:54-57 (emphasis added); Figs. 10, 11, 18-19, and 21 . . . .

Doc. 56 at 22.

In response, Defendant points to figures 10, 11 and 17-22 and states that the "specification unambiguously shows the plug occupying and filling the incision." Doc. 68 at 35.

      ii.     Analysis

The Court agrees with the parties that the Janzen patents apply the ordinary meaning of the term "plug." Furthermore, like the parties, the Court does not find the language of the Janzen specification casting a different construction for "plug." A "plug" as claimed by Janzen is a structure that the Court construes for what it is, not what it does. The parties may refer to the Court's discussion of the term "vessel plug" for further discussion on this point.

**JA 37**

Finally, regarding the Janzen version of "plug," the parties pointedly dispute the notion of whether a plug must fill the void or recess that is created in a vessel wall by a puncture, incision or wound. On this point, in addition to the discussion of "vessel plug," the Court notes its agreement with Plaintiffs regarding the persuasiveness of Figure 11 (showing no plug portion in the vessel hole) and the cited "bandage" portion of the specification:

> As noted earlier, the sheath is substantially larger in cross section than is arterial puncture 13. Consequently, when plug 57, which fills the entire cross section of the sheath channel, reaches the artery, even in its compressed state it overlaps puncture 13 on all sides. Obviously, then, when it exits the sheath and is permitted to expand, a full bandage-like covering over puncture 13 is assured.

'439 Patent, 7:50-56. These passages of the Janzen patent reinforce the Court's earlier conclusion that the common meaning of a plug is not limited to a cork-like structure.

### iii. Construction

The Court construes the term plug to mean "a mass designed or configured to close a hole." The Court provides the following guidance to ensure that the parties' dispute is resolved. "Closing" does not require fluid-tight sealing or filling the hole. The Court also refers the parties to the discussion above regarding "closing" and the term "vessel plug."

### o. *"plug member being disposed in said elongate member"*

### i. The Parties' Positions

The term "plug member being disposed in said elongate member" occurs in claim 8 of the '439 patent. The parties disagree whether this term requires construction. Plaintiffs assert that no construction is necessary, but offer a contingent construction. Doc. 56 at 22; Doc. 69 at 15. In sum, Plaintiffs assert that Defendant seeks to add limitations to the term improperly. *Id.* Defendant disagrees and argues that the specification and prosecution history of the Janzen patents make clear "the applicants claimed only plugs that were larger than the arterial puncture when in the 'elongate member.'" Doc. 68 at 36. In particular, Defendant argues as follows:

> The plug must completely fill the tissue channel leading to the puncture in the artery. In order to do so, and ensure "a full bandage-like covering over [the] puncture," it must be larger than the puncture. '439 col. 7:55-57. In the only passage from the specification that describes the physical dimensions of a plug

37

disposed in an elongate member, Janzen states that "plug 57, which fills the entire cross section of the sheath channel, ... even its compressed state it overlaps puncture 13 on all sides." *Id.*, col. 7:53-55. The specification repeatedly explains that the plug must "overlap[] the arterial puncture on all sides."

*Id.*, col. 2:50-54; *see also id.* Figs. 9-10. The specification supports ACI's proposed construction.

Indeed, Janzen explicitly stated about his specification that "it is clear to a person skilled in the art that the plug or charge must cover the area of the puncture together with a portion of the surrounding perimeter." Ex. MM at JM0046626. The Australian examiner stated that every claim supported by that specification needed to "explicitly include" the "essential" feature of the invention "that hemostatic material is placed against the outside wall of a punctured artery (or blood vessel) and that the hemostatic material covers the entire puncture site." Ex. OO. SJM cannot be permitted to read out this "essential" feature of the invention that "is clear to a person skilled in the art" based on one non-enabling sentence at the end of the specification. The plug must, at all times, be larger than the puncture in the vessel.

Doc. 71 at 18-19

ii. Analysis

The parties disagree whether this claim term speaks to the relative sizing of the plug and the puncture. In context, this claim term is referring to the plug while inside of the elongate member. Thus, references to embodiments where the plug is not within the elongate member have minimal relevance. Similarly, the foreign prosecution cited by Defendant does not bear on the instant term in the '439 patent. The term carries no size restriction and Defendant offers insufficient basis for the Court to otherwise import such a limitation into the claim term.

iii. Construction

The Court declines to define the instant term but instructs the parties to tailor their trial arguments in accord with this Order.

38

**JA 39**

p.    *"puncture" in the Janzen patents*

i.    The Parties' Positions

The term "puncture" occurs in claim 1 of the '498 patent and claims 1, 8, 9 and 10 of the '439 patent.    As with "puncture" in the Fowler patents, Plaintiff proposes "hole or slit." Defendant proposes "piercing wound."

ii.    Analysis

The Janzen patents are independent of the Fowler patents and therefore require independent evaluation of the term.    While the Court's earlier definition of "puncture" (Fowler patents) was informed by the intrinsic record, the Court also concluded that the specification coincided with the ordinary meaning of the term puncture as provided in extrinsic sources.

Here, Plaintiffs offer one intrinsic description that was absent in consideration of the Fowler patents:

> In accordance with one embodiment of the instant invention, wounds of this type are closed by inserting a plug into tissue wound or channel 9, and holding it against the outside of the artery wall over arterial puncture 13 for a short period of time until a good self-sustaining hemostatic seal is established. Although punctures of the sort made by percutaneous procedures will generally, after removal of all cannulas and catheters, be in the nature of slits, for ease of understanding, they are depicted in the drawings herein more as holes.  The shape of the puncture, however, is not critical.

'439 Patent, 3:37-48.

The Court finds this quotation informative in that, according to Janzen, a "puncture" may appear as a slit.  However, the Court  finds no reason to define the term puncture differently from Fowler.

iii.    Construction

The Court construes   "puncture" in the Janzen patents to mean "piercing wound or opening such as that made by piercing with a needle or other pointed object."   As with the Fowler construction, the Court clarifies that the construction of "puncture" is not intended to

limit the appearance of the wound created. Regardless of appearance, a puncture remains a puncture.

      q.     *"guide wire"*

          i.     The Parties' Positions

The term "guide wire" is used in claims 9 and 10 of the '439 patent. Plaintiffs propose that the term should be construed as a "wire used to assist in positioning." Doc. 72-1 at 18. Defendant proposes a construction of "a wire for guiding and exchanging catheters." *Id.* As evident, the dispute relates to whether the essence of a guide wire requires guiding and exchanging catheters.

Defendant supports its construction arguing that a "guide wire" is a "specialized instrument used in intravascular medical procedures for guiding and exchanging catheters." Doc. 68 at 38. After arguing at length, Defendant requests entry of its proposal "[b]ecause the exchange function of a guide wire is not readily obvious to a lay person . . . ." *Id.* at 39.

Plaintiffs rebut Defendant's suggestion asserting that Defendant "seeks a radical narrowing of the claims, proposing that the claimed guide wires are only used "for guiding and exchanging catheters," even though the specification discloses that guide wires are used for multiple purposes (*e.g.*, positioning the plug, the plug sheath, or a tissue dilator). Doc. 56 at 23-24. Plaintiffs further note that the specification "discloses that the guide wire used for the catheterization procedure need not be used for plug placement. Instead, a guide wire just for the placement of the vascular closure device can be used: '[i]f no guide wire has been employed, prior to the removal of the catheter and cannula, a guide wire may be inserted.'" *Id.*, col. 4:17-18. Doc. 56 at 24.

          ii.     Analysis

The Court has examined Defendant's citations to the intrinsic and extrinsic evidence and, while the Court finds that a guide wire may be commonly used to "exchange" catheters, the Court is otherwise not persuaded. The Court agrees with Plaintiffs that both the specification and extrinsic evidence do not confine a guide wire to the function of "exchanging catheters."

At the hearing on January 20, 2010, Defendant also argued as follows:

> Your Honor, as we saw yesterday during the tutorial, a guide wire is a device used commonly in these sorts of procedures. It's designed to reach from the surface of the patient's skin down through the puncture in the vessel and into the puncture of the vessel, so that when the doctor is exchanging one device for another, a catheter or other device, you maintain access to the puncture in the vessel the whole time. You want the guide wire in that hole or puncture in the vessel so that when you're taking different devices back up and over, the doctor doesn't have to go back in through the vascular structure and find the puncture in the vessel. So that's the function of a guide wire. It's maintaining access to the vessel interior and it's allowing a doctor to guide catheters to that area. Maintaining access and guiding. Your Honor, St. Jude's proposed construction actually ignores both of those functions, in our opinion. It only requires that a guide wire be used in positioning. It would not even require that a guide wire actually guide. It simply says a guide wire is "a wire used to assist in positioning." But it makes common sense that if you're talking about a guide wire, you're talking about guiding something over that wire.

Tr. January 19-20, 2010 at 108-109.

In arguing as quoted, Defendant raised the issue that the guide wire must "guide." The Court agrees and finds the Plaintiffs are in agreement as well. Doc. 56 at 23 ("a guide wire is a wire that guides"). But "guiding" is not exchanging catheters, which is a very specific activity. In effect, Defendant's proposal would limit the use of Plaintiffs' invention to situations where an exchange of catheters has occurred on the wire. The claims are not so limited by reference to the guide wire. Claim 9 is a method claim that actually speaks to the use and withdrawal of a catheter that is not necessarily exchanged over the guide wire. Claim 10 does not speak to catheters at all. Thus, the patentee was aware of the potential placement of catheters in the claims, but chose to make claims without requiring an exchange over a guide wire. Defendant does not present sufficient evidence or argument to justify inserting this limitation, which the Court finds outside the ordinary meaning of the term.

  iii.  Construction

The Court construes the term "guide wire" as "a wire used to assist in positioning by guiding."

r.    *"sheath introducer"* and *"exterior guide tube"*

i.    The Parties' Positions

The term "sheath introducer" occurs in claim 44 of the '602 patent.  The term "exterior guide tube" occurs in claim 9 of the '439 patent.  The Court notes that the two terms are from two different patent families so their contextual support may differ.  Plaintiffs propose that both "sheath introducer" and "exterior guide tube" should be construed to mean "hollow tube through which other objects are inserted." Doc. 72-1 at 9 and 18.   Defendant argues that "sheath introducer" means "hollow tube through which catheters are inserted" and that "exterior guide tube" means "outermost hollow tube through which catheters are inserted." *Id*.   Thus, with respect to these terms, the parties dispute whether the "exterior guide tube" must be outermost, and with respect to both terms, whether they necessarily must carry catheters.   Defendant clarified its position as merely requiring that the tubes carry "at least" catheters, but not exclusively catheters. Doc. 71 at 9.

Defendant argues that catheters are always used with sheaths so the terms should be interpreted as such:

> In each patent family, the "sheath introducer" or "exterior guide tube" is a tube placed into the vessel to aid insertion of catheters into the vessel.  The Fowler specification repeatedly describes a "catheter sheath" through which catheters are inserted into the vessel.  *See, e.g*., col. 4:8-16, 4:44- 53. In fact, the claim in which "sheath introducer" appears requires that the tubular member is inserted through the sheath introducer into the vessel or target organ.  *See* '602 patent, cl. 9. The Janzen specification similarly describes a sheath (or cannula) through which catheters are inserted into the vessel.  *See, e.g*., col. 1:28-35, 3:30-32 ("as seen in FIG. 5, a catheter or other device 7 is inserted, often over a guide wire 15, through a guide cannula 3 into an artery 11").  Claim 9 of the '439 patent similarly requires that "the catheter" go "through the guide tube and into the artery" before being removed so that the puncture can be closed.

Doc. 68 at 18.

In discussing Fowler, Plaintiffs respond stating that, "The claim does not recite "catheter introducer," 'catheter sheath' or even anything similar relating to catheters.  Moreover, Fowler specifically discloses that the sheath introducer can be used to insert objects other than a catheter: for example, it may be used to insert the balloon and vessel plug. '375, col. 4:12-16."

42

**JA 43**

Doc. 69 at 12-13. With respect to Janzen, Plaintiff states, "The specification confirms that an exterior guide tube can be a hollow tube through which other objects are inserted – not just a hollow tube through which catheters are inserted, as ACI would have it. '439, col. 1:32-35 ('catheter *or other device* can be inserted through the cannula') (emphasis added)." Doc. 69 at 24.

ii.     Analysis

Assuming, arguendo, that every embodiment in the patents instructs on the use of catheters, the law would not allow this Court to narrow these terms as suggested without something more. "Generally speaking, we indulge a 'heavy presumption' that a claim term carries its ordinary and customary meaning." *CCS Fitness,* 288 F.3d at 1366 (*quoting Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999)); *Wasinger v. Levi Strauss & Co.*, 106 Fed. Appx. 34, 38 (Fed. Cir. 2004). "[A] claim term will not receive its ordinary and customary meaning only in limited situations." *CCS Fitness,* 288 F.3d at 1366-67. "Those situations include: where the patentee has acted as his own lexicographer and clearly provided an alternate definition for the term; where the intrinsic evidence shows that the patentee distinguished his invention from a prior art reference, expressly disclaimed subject matter, or highlighted a particular feature as important to the invention; or, where the term chosen makes the scope of the claim so unclear as to require resort to the intrinsic evidence for meaning." *W.E. Hall Co. v. Atlanta Corrugating*, LLC, 2004 U.S. App. LEXIS 11122 (Fed. Cir. 2004) (citations omitted). "While clear indications in the intrinsic evidence communicating an intent to depart from an ordinary customary meaning will be respected, those that fall short must be disregarded." *Id*.

With respect to the catheter limitation, Defendant simply fails to meet any recognized legal standard for altering the plain meaning of the claim. Furthermore, as Plaintiffs indicate, the specifications at least suggest, if not specify, that "sheaths" may be employed for purposes other than catheters.

The parties provide little discussion with respect to Defendant's proposal regarding the word "outermost" as applied to the term "exterior guide tube." The Court must apply meaning to the word "exterior" and accepts Defendant's suggestion.

43

**JA 44**

### iii.    Construction

The Court construes the term "sheath introducer" to mean "hollow tube through which other objects are inserted."   The Court construes the term "exterior guide tube" to mean "outermost hollow tube through which other objects are inserted."

s.    *"blocking relation"*

### i.    The Parties' Positions

This term occurs in claims 1, 8, 9 and 10 of the '439 patent.  Plaintiffs propose that "blocking relation" be defined as "positioned to impede the passage through." Doc. 72-1 at 15. Defendant proposes the construction "covering a hole and its perimeter to prevent passage therethrough." *Id.*

Plaintiffs argue that "the claim's own language says it best, this language requires that the plug impede the flow of blood, through either the puncture or the tissue channel, sufficiently to allow the puncture to seal." Doc. 56 at 24.  Plaintiffs further assert that the specification supports their proposed construction by "disclosing that the plug may 'fill that section of channel 9 which is adjacent puncture 13' thereby resulting in sealing of the puncture. '439, 9:2-3." *Id.*   In addition, Plaintiffs argue that the extrinsic evidence is similarly supportive because "to 'block' is 'to stop or impede passage.'" *Id. citing* Ex. H.

Defendant counters Plaintiffs, stating that [t]he central purpose of the '439 patent is 'to stop bleeding from the puncture wound.'   *See* '439 Patent, col. 2:32-33. It accomplishes this purpose by placing a large plug against the outside wall of the vessel to cover the entire puncture. This complete covering of the puncture is what is meant by placing a plug in "blocking relation" with the puncture." Doc. 68 at 27.  Defendant also argues that the claims make clear that the plug is placed in a "blocking relation" with the puncture in order to seal the puncture. *Id.*  Defendant reasons that the plug can only perform this function if it covers the entire puncture. *Id.*   For further support, Defendant cites to an embodiment in the patent:

> As noted earlier, the sheath is substantially larger in cross section than is arterial puncture 13. Consequently, when plug 57, which fills the entire cross section of the sheath channel, reaches the artery, <u>even in its compressed state it overlaps puncture 13 on all sides</u>. Obviously, then, when it exits the sheath and is

44

permitted to expand, a full bandage-like covering over puncture 13 is assured.
'439, 7:51-57(emphasis supplied).

Doc. 68 at 27.

### ii. Analysis

The parties essentially argue about the construction of the common word "blocking." The Court agrees with Defendant that the embodiments of the invention indicate that the plug covers the perimeter of the puncture. However, the Court also finds that the patentee chose not to claim the invention with that detail. Instead the patentee claimed "a blocking relation" "so as to seal" the puncture (or similar words). The Court declines to impose limitations from the embodiments when, as here, the claim language does not encompass those limitations.

The Court also agrees with Defendant that the Plaintiffs' proposal ("positioned to impede the passage through") is too broad. In the context of the specification, the term "blocking" requires a physical barrier. As this term is used in the claims, it requires a physical "blocking" to accomplish the claimed "seal." Assuming support in the written description, the patentee could have claimed sealing by other mechanisms such as gluing, clamping or "covering a hole and its perimeter." Instead, the patentee claimed "blocking" and that term is readily understood for its ordinary meaning in view of the specification. Perhaps "covering a hole and its perimeter" is a type of blocking, but there is no reason to limit the term to this type.

### iii. Construction

The Court construes the term "blocking relation" to mean "positioned to physically impede the passage through."

t.    *"sized to be fitted through a passageway leading to said puncture so that said distal end is disposed near said puncture in said artery."*

### i. The Parties' Positions

This term occurs in claims 1 and 8 of the '439 patent. Plaintiffs propose the construction "having a size that fits through the passageway towards the puncture so as to put the distal end near the puncture in the artery." Doc. 72-1 at 12. Defendant proposes, "wider than the puncture in the artery." Doc. 72-1 at 12.

Plaintiffs largely support their proposal by pointing to the claim language and an embodiment that Plaintiffs assert contradicts Defendant's proposal. Doc. 56 at 25. Plaintiffs state:

> The claim language says nothing about the width of the elongate member in relation to the hole in the vessel. ACI ignores the disclosure that "it would be within the scope of the instant invention to use the procedure cannula as the delivery sheath through which hemostatic material is passed." '439, col. 9:52-56. Because the existing "procedure cannula" enters the arterial puncture, and the plug sheath in turn fits into the procedure cannula, this embodiment calls for a plug sheath that fits into, *i.e.*, is not *wider* than, the puncture.

*Id.* (emphasis in original).

Defendant makes a variety of arguments. First, Defendant argues that the file history requires its interpretation. Doc. 68 at 23. Next Defendant points to the specification's abstract and summary where "Janzen unambiguously states that the claimed invention's elongated member . . . is larger than the puncture in the artery." *Id.* Defendant further dismisses Plaintiffs' exemplary embodiment as "boilerplate" or "throw-away." *Id.* at 24. Finally, Defendant argues that the claim words themselves require the size limitation because the sizing is "so as to put the distal end near the puncture in the artery." Doc. 71 at 11.

ii.     Analysis

The Court agrees with Plaintiffs that the term does not require the "elongated member" to be "wider than the puncture in the artery." The Court has reviewed Defendant's U.S.-based file history citations and finds them unpersuasive because they relate to other patents where relative size limitations were included in the pending claims. *See* Doc. 68, Exhs. V, P, and Q. In other words, those citations are directed at different claims with different limitations. The Court also finds the citations to the foreign prosecution unpersuasive for similar reasons. Thus, the cited statements are not persuasive as to the construction of the instant limitation because those statements are directed at different claims, with different limitations and in other prosecution.

The Court also disagrees that the Summary and Abstract statements (or other specification statements) should limit the ordinary meaning of this claim term. As Plaintiffs note, the specification states that the scope of the invention provides for delivery of the

46

**JA 47**

hemostatic material in the procedure cannula, which was inside of the hole in the artery. *See* '439 patent, 9:52-56. Defendant argues that the Court should ignore this embodiment as boilerplate, but the Court finds that it is not a boilerplate statement but rather a specific potential alteration of the previously disclosed embodiments.[6] However, at the January 20 hearing, Defendant also suggested the embodiment should be ignored because the specification does not say how to use the cannula and still keep the hemostatic material out of the hole in the artery. Tr. January 19-20, 2010 at 98 and 99. Defendant's argument is unpersuasive because the relevant claims (1 and 8) do not require that the hemostatic material be kept out of the hole. In sum, the Court will not ignore the cited embodiment.

Finally, Defendant argues that the claim wording itself requires the greater width of the elongated member because it must be "sized to be fitted . . so that said distal end is disposed near said puncture." The Court disagrees. Even assuming that the "sized to be fitted" words modify the "so as . . ." clause, the claim merely would require that the elongated member "fit" in a way to deposit the material as claimed. The language simply does not require a specific relative width limitation as Defendant suggests.

### iii. Construction

The Court construes the term "sized to be fitted through a passageway leading to said puncture so that said distal end is disposed near said puncture in said artery" to mean "having a size that fits through the passageway towards the puncture so as to put the distal end near the puncture in the artery."

### u. *"without extending into" and "preventing . . . from extending into"*

### i. The Parties' Positions

The term "without extending into" occurs in claim 9 of the '616 patent, claim 38 of the '602 patent and claim 21 of the '375 patent. The term "preventing . . . from extending into" occurs in claims 40 and 43 of the '602 patent. Defendant proposes the construction "without extending into the open space within a vessel or organ." Plaintiffs suggest no construction for

---

[6] Boilerplate language is general in nature, thus making the language "boilerplate." In contrast, the specification language discusses a specific relative use of hemostatic material and a procedure cannula.

either of these terms, and criticizes Defendant's offering because it "oddly repeats the claim language, but adds 'open space,' adding limitations where none exist." Doc. 56 at 16.

Defendant supports its construction by noting the ambiguity it wishes to clarify: "The issue is whether the terms prevent the vessel plug from entering into the vessel wall. ACI's proposed construction eliminates this ambiguity by making clear that, consistent with the intrinsic evidence, the vessel plug may extend into the wall of the vessel or organ, but not the space within the wall." Doc. 68 at 12-13. Defendant further argues that:

> The Fowler specification repeatedly states that the vessel plug does not extend into the lumen and, as such, does not disrupt the flow of blood therethrough. *See, e.g.*, Abstract, col. 2:52-57, col. 3:3-8. Specifically, Fowler states at col. 5:1-6 that "the distal end of the vessel plug contacts the inflated balloon on the distal end of the balloon catheter. In this position, the distal end of the balloon prevents the vessel plug from extending into the artery." Figures 3-4, depicting Fowler's balloon catheter embodiment, show a plug extending into the vessel wall, but not into the space within that wall (*i.e.*, the lumen). Figures 6-9 show that the same is true for the winged embodiment—each figure shows the vessel plug extending into the vessel wall but no further.

Doc. 68 at 13.

### ii. Analysis

The claim language in every claim at issue is very clear that the claimed plug may not extend into the blood vessel. The Court agrees with Defendant that, to be consistent with the specification, this term must be construed to allow the plug to enter the void or opening (*i.e.*, the wound) in the vessel wall. The Court, however, rejects Defendant's wording regarding "open space," and instead adheres to terminology consistent with the Court's construction of "lumen."

### iii. Construction

The Court declines to construe these terms, but clarifies for the parties that the terms "without extending into" and "preventing . . . from extending into" should not be interpreted to prevent the plug from extending into the wall of the vessel, but only to prevent the plug from extending into the lumen. The parties are instructed to tailor their motion and jury arguments in accord with this holding.

48

**JA 49**

v.    *"seal(ed)" and "seal(ing)(ly)"*

i.    The Parties' Positions

The "seal" terms occur in claim 9 of the '616 patent, claim 38 of the '602 patent and claims 1, 8, 9 and 10 of the '439 patent.  While the parties have not argued any distinction, the Court notes that the '439 patent is a Janzen patent and both the '616 and '602 patents are Fowler patents.  Thus, the Court presumes that the same specification teachings do not apply across the patent families.

Defendant asks the Court to construe the "seal" terms to mean "close in a manner that prevents passage of liquid."  Doc. 72-1 at 1.  Plaintiffs assert that no construction is necessary, although provides a provisional proposal of "close or effect closure."  *Id*.  Thus, the parties disagree regarding whether the claimed "seal" prevents passage of liquid.

Defendant argues that "[b]oth Fowler and Janzen chose to use the common term 'seal' and variants of that term to claim the manner in which the vessel wound is repaired. They did not use the broader term "close," choosing "seal" to reflect the special type of "closure" they were claiming—to close in a manner that prevents passage of liquid." Doc. 71 at 8.  Defendant argues further that:

> Every dictionary definition of "seal" supports ACI's construction. *See*, *e.g.*, Ex. K ("airtight closure"); Ex. L ("a tight and perfect closure (as against the passage of gas or water)").  Nowhere do Janzen or Fowler ever indicate that they are using the term in some other or broader sense than is reflected in the dictionaries.  In fact, both specifications repeatedly emphasize the importance of preventing the passage of blood: Fowler explicitly states that the purpose of his invention is to more quickly "seal[ ] an incision" so as to "decrease the likelihood that a hematoma will form" ('375 col. 2:43-46); and Janzen states that the "hemostatic <u>seal</u> is formed <u>so as to stop bleeding from the puncture wound</u>." '439 col. 2:32-33 (emphasis added). This interpretation is further supported by the special plug Janzen describes for working with a guide wire, which includes a "collagen membrane [that] automatically reseals itself" after the guide wire is removed.

*Id*. at col. 7:49-50.  Doc. 71 at 8-9.

Plaintiffs' respond that Defendant's proposal is adding limitations to the claim.  Doc. 69 at 12.  Plaintiffs state that "[t]he patents do not require that all passage of liquid is prevented,"

49

**JA 50**

but "only that a seal be formed." *Id*. Plaintiffs plainly assert that "[s]ome liquid may indeed still pass, or at least for some time, until clotting occurs. *See* '375, col. 7:43-46." *Id*. Thus, Plaintiff's position is that the term seal simply requires "the promotion of closure: 'the vessel plug 52 of the present embodiment may include a clotting agent incorporated therein to promote localized hemostasis in the incision . . . .'" *Id*. Finally, in support of its provisional construction using the word "close," Plaintiff points to the Fowler specification which states "None of the prior art devices teach the use of a simple and relatively inexpensive means for effecting the closure of a puncture or incision in the wall of a blood vessel . . . ." '375 patent, 2:32-36.

>     ii.    Analysis

The Court has been asked to interpret the word "seal" in the medical context provided in the subject patents discussing the healing of wounds in living organisms. The Court finds Plaintiffs' statement at the January 19-20 hearing relevant in this regard:

> The fact of the matter is that blood vessels are permeable. The fact of the matter is that all sorts of substances permeate through the blood vessels, perhaps not blood, but water permeates, lymphocytes permeate, all sorts of cells permeate. You cannot just completely seal it and prevent all passage of anything therethrough. It doesn't make any sense from an anatomical point of view.

Tr. January 19-20 at 57.

Indeed, the Court must agree that high school biology teaches us about a myriad of molecular movement in and out of cells and that cells themselves can be the primary ingredient of a fluid (*e.g.*, blood). If the Court adopts a construction proscribing the "passage of fluids," a sub-question arises then regarding what, if anything, can pass (*e.g.*, cells, molecules). The Court finds that the term "seal" does not, and in context, cannot address the question of micro-movements of anatomical agents, including fluids. None of the patents are discussed in that context and at that level of detail.

Nevertheless, the parties dispute whether the movement of fluid past the plug is proscribed by the word "seal." The Court can best answer this question by reference to the specifications. Janzen speaks most voluminously regarding the nature of a "seal" through his contextual comments. In particular, Janzen analogizes "closure" to a "sealing" when after

discussing a prior art problem of "closing" a wound, he refers back to the discussion as one regarding "sealing":

> After a procedure, for example, counterpulsation, has been completed, the sheath must be removed and ***the wound closed***. Often, this can be accomplished simply by the application of digital pressure, generally augmented by the use of a pressure dressing. Customarily, pressure must be applied for at least 1/2 hour, and frequently for much longer than that. While pressure dressings often suffice, it is not uncommon for additional devices, such as sandbags, to be needed. In addition, during this period the patient must be immobilized, lest movement interfere with ***the closing process***. Because of the pressure required, the time during which it must be applied and the need for immobilization, the procedure is painful and uncomfortable. It also requires prolonged personal attention of a health care professional. Finally, ***wound closures*** accomplished in this manner are prone to reopen unexpectedly long after closure appears to have been completed. Patients are therefore often required to remain in the hospital for 24 hours or longer.
>
> ***Because sealing can be such a problem***, cardiologists tend to use the smallest caliber catheters . . . .

'439 patent, 1:47-67 (emphasis added).

Janzen several times discusses the notion of a "good seal" being achieved by the invention only after a waiting period for the assertion of pressure:

> After the plug has been inserted, the upstream clamping pressure is maintained for a very short period of time, and then gently removed. Slight pressure may be maintained on the plug to ***hold it against the artery wall until a good seal has been established***. '439 patent, 2:40-44 (emphasis added).
>
> In accordance with one embodiment of the instant invention, wounds of this type are closed by inserting a plug into tissue wound or channel 9, and holding it against the outside of the artery wall over arterial puncture 13 for a short period of time ***until a good self-sustaining hemostatic seal*** is established. *Id*. at 3:37-43 (emphasis added).
>
> Minimal axial pressure is thereafter continued while clamping pressure is slowly released ***until a good self-sustaining hemostatic seal*** has been confirmed. The sheath, holder, and pusher can all then be removed.' *Id.* at 5:52-57 (emphasis added).

51

**JA 52**

As was described in connection with the embodiment of FIG. 1, pressure is then maintained *until a good self-sustaining hemostatic seal has been established*. *Id*. at 6:47-50 (emphasis added).

In practice it has been found that when using a collagen plug in accordance with the subject invention, *a good hemostatic seal can be achieved in five minutes or less*. With larger wounds, for example, ones left after removal of 14 Fr. or larger catheters, or after the use of anticoagulants and heparin, sealing may take somewhat longer. *Id*. at 7:57-64 (emphasis added).

While not as replete with references, Fowler also analogized closure to sealing by using the words apparently interchangeably.

By positioning the distal end 32 of the vessel plug 20 at or near the outer lumen of the artery 10, there is no disruption of the fluid flow through the artery 10 at the incision site and the risk of thrombosis is minimized as compared to prior devices which *include a closure or sealing member* which is positioned along the inner lumen of the artery 10. It is anticipated that the vessel plug 20 will degrade and be absorbed within a few weeks or months so that there is no need to remove the vessel plug 20 from the incision at a later date.

'616 patent, 5:47-58 (emphasis added).

None of the above references expressly define or re-define the term "seal." However, the Court finds that, with regard to the dispute between the parties, the construction of the term "seal" must be informed by these references to the specification. Most prominently, the references reveal that in the parlance of the Janzen patent, a "good" seal (perhaps still less than perfect) is not achieved upon placement of the plug, but rather over time. Also, the references reveal that both patents, however loosely, sometimes equate "sealing" and "closing."

Defendant's proposal would exclude these statements and embodiments by potentially requiring a perfect seal upon placement of the plug. Furthermore, while Plaintiffs' proposal is consistent with the disclosure, the Court finds it is potentially too broad because the term "close" may not sufficiently connote a substantial fluid barrier to the fact finder. The patentee chose the word "seal," which is at least technically different than "close." The Court gives meaning to that difference by interpreting "seal" more narrowly than the broadest reasonable meaning a juror might ascribe to the word "close." In view of all the foregoing, the Court finds that a "seal" may allow fluid passage as follows: any amount of passage that is normal and consistent with the

52

**JA 53**

healing of a plugged wound (*e.g.*, one that is corked and/or completely covered by the plug); and only other types of fluid passage that are insignificant to the healing of the wound.  Lastly, the parties are cautioned that the Court's use of the words "completely covered" is exemplary and bears only on the "seal terms" and not on the "blocking relation" terms.

### iii.    Construction

Having resolved the parties' dispute, the Court declines to construe these terms and instructs the parties to tailor their motion and jury arguments in accord with this Order.

### w.    *"device"*

#### i.    The Parties' Positions

The term "device" occurs in the preambles of claims 1, 7 and 8 of the '439 patent.  The Court notes that, in each case, the term is used as a generic recitation in an apparatus claim. Defendant argues that statements in the specification and file history require that the generically claimed "device" is limited to "the device may not enter the blood vessel." Doc. 72-1 at 12. Plaintiffs argue that the term is not limiting in any way. Doc. 69 at 23.

Defendant argues its position based upon two sets of statements from the patentee. Defendant asserts the following regarding the specification:

> The '439 specification repeatedly states that the crucial aspect of the invention is that it does not enter the blood vessel.  *See* col. 2:11-14, 2:45-54, 4:53-56, 5:14-15, 7:51-57.  Specifically, the '439 specification states that the "special device" is sized so as to prevent it from ever entering the blood vessel. Col. 2:46.  Therefore, "device" must be construed to exclude any devices that enter the blood vessel from the scope of the '439 patent's asserted claims.

Doc. 68 at 19 (footnote omitted).

In addition, Defendant quotes a variety of file history statements, but admits those statements are merely from related patents.  Doc. 68 at 20.

Plaintiffs reply stating that "ACI's suggestion that nothing of the "device" of claims 1, 7 and 8 of the '439 patent can enter the blood vessel, is wrong on its face" because "[t]here clearly are parts of the claimed device that enter the blood vessel." Doc. 69 at 23.  Plaintiffs assert, for

example, that claims 1, 7 and 8 recite a "guide means" or a "guide element," as part of the described device, which expressly extends through the puncture and therefore into the blood vessel. *Id. citing* '439 patent, Figs. 6-8, 13-15, 17.

ii.     Analysis

As discussed above, "[g]enerally, the preamble does not limit the claims." *Allen Eng'g Corp*., 299 F.3d at 1346. A preamble may limit the invention "if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Eaton Corp*., 323 F.3d at 1339. As such, a preamble is limiting where it is necessary to understand limitations in the body of the claim. *See Pitney Bowes, Inc.,* 182 F.3d at 1305-06. A preamble is also limiting where the preamble is the basis for a distinction over the prior art made during prosecution. *See In re Cruciferous Sprout Lit.,* 301 F.3d 1343, 1347 (Fed. Cir. 2002).

Thus, whether the term "device" should be considered a limitation at all depends upon whether it breathes life into the claim or otherwise qualifies as a limitation under the law. As stated above, Defendants advance two sets of evidence in this regard. First, Defendants suggest that the "specification repeatedly states that the crucial aspect of the invention is that it does not enter the blood vessel." Doc. 68 at 19. The Court has examined Defendant's citations closely and finds no words indicating that the feature is necessary to the device. All of the citations refer to either normal suggestive language or recitation of embodiments. Second, Defendant points to file history statements of other, but related, patents. In this regard, Defendant emphasizes the general nature of the patentee's comments regarding the device's exclusion from the vessel. The Court finds that those comments are not relevant to claims 1, 7 and 8 of the '439 patent. As Plaintiffs point out, claims 1, 7 and 8 recite a "guide means" or a "guide element," as part of the described device, which expressly extend through the puncture and therefore into the blood vessel.

In view of the foregoing, the Court does not apply the quoted file history statement to the subject claims. Thus, the Court finds that the term "device" does not limit the claims in any way. The Court recognizes that file history statements may alter and contradict the ordinary meaning of claim terms. If the statements cited by Defendant were in the '439 patent file history and clearly tied to the subject claims, this result may be different. Here, there are no statements by

54

**JA 55**

the patentee or Patent Office that tie the statements to the claims. The Court will not imply a relationship merely because the statements are general and unequivocating. The Court finds that the quoted statements do not apply to the subject claims. Given the differing contexts between these related patent applications and the stark contradiction between the statements and the express claim language, the Court finds that it is unreasonable to believe the two relate to each other.

### iii. Construction

The Court finds that the term "device" is not a limitation.

### x. *"method comprising the steps of"*

### i. The Parties' Positions

This dispute applies to claims 9 and 10 of the '439 patent. The parties disagree regarding whether the claimed method steps must be performed in order. The Defendant asserts that "the '439 patent's claim language, specification, and prosecution history all require that the steps of claims 9 and 10 be performed sequentially." Doc. 68 at 37. In substance, Plaintiffs argue that the file history makes clear that there is no order to the steps.

### ii. Analysis

The steps of method claims must be performed in order when the language of the claims requires ordering the steps or something in the intrinsic record suggests they must occur sequentially. *See Loral Fairchild Corp. v. Sony Corp.*, 181 F.3d 1313, 1321-22 (Fed. Cir. 1999) ("Although not every process claim is limited to the performance of its steps in the order written, the language of the claim, the specification and the prosecution history support a limiting construction in this case."); *see also Mantech Envtl. Corp. v. Hudson Envtl. Svcs., Inc.*, 152 F.3d 1368, 1375-76 (Fed. Cir. 1998) (finding sequential limitation implicit in claim language).

The Court reproduces the claims below and labels the method steps so that the discussion may contain reference thereto.

9. A method of closing a puncture in a wall of an artery made for the purpose of moving an elongated cardiac catheter into the artery in which an exterior guide tube is extended through a passage leading to the puncture and through the

55

**JA 56**

puncture in the wall of the artery and into the artery so a to enable the catheter to be guidingly moved through the guide tube and into the artery, the method comprising the steps of:

(a) withdrawing the cardiac catheter and moving the guide tube outwardly so that it no longer extends within the puncture,

(b) extending a plug having a removable guide wire extending longitudinally therethrough so that the guide wire extends from the plug through said puncture,

(c) moving the plug inwardly along the guide wire into blocking relation with said puncture, and

(d) withdrawing the guide wire from the plug so as to leave the plug sealed in blocking relation with said puncture.

10. A method of closing a puncture in a wall of an artery comprising the steps of:

(a) inserting a removable guide wire through said puncture into the artery,

(b) threading a plug over said guide wire so that the guide wire extends from the plug through said puncture,

(c) moving the plug inwardly along the guide wire into blocking relation with said puncture, and

(d) withdrawing the guide wire from the plug so as to leave the plug sealed in blocking relation with said puncture.

With reference to claim 9, the first recited method step is the withdrawing of the cardiac catheter and moving the guide tube outwardly. This step was the subject of discussion in the prosecution history. Doc. 69, Exh. EE at 4 and 5. Prior to the amendments made during the cited prosecution document, the part of step (a) requiring "moving the guide tube outwardly" was recited after the current step (b) ("extending the plug") *Id*. at 1 and 2. At the time of the cited amendment, the patentee effectively changed the position of the "moving the guide tube" substep from its original position after step (b), to its current position prior to step (b). *Id*. While the exact purpose of this amendment may be debatable, there is no doubt that it was performed to

56

**JA 57**

overcome the examiner's rejections ("[a]pplicants have now amended claim 103 in a manner which is believed to fully overcome the latest objection under §112"). *Id*. at 4-5. As a result, the patentee may not now argue that claim step may be performed in its original position, *i.e.*, any time after step (b).

Thus, with respect to claim 9, step (a) must occur before step (b). Furthermore, step (b) must occur before step (c) because the plug may not be moved along the guide wire until the guide wire has been extended. Finally, step (c ) must be performed prior to step (d) because the guide wire cannot be withdrawn from the plug until after the plug has been moved inwardly along the guide wire.

With respect to claim 10, step (a) must occur before or simultaneous with step (b) because step (b) requires the "threading" step "so that the guide wire extends from the plug through the puncture." This "so that" clause could not occur prior to (a)'s insertion of the guidewire into the puncture (*i.e.*, the guidewire cannot extend from the plug to the puncture unless the guidewire extends to the puncture). Step (b) must be performed before step (c) because, consistent with the disclosure, the plug may not be guided into a blocking relation with the puncture, unless the plug has been threaded and the guidewire is in place. Finally, step (d) must occur after step (c) because the guide wire cannot be withdrawn from the plug until after the plug has been moved inwardly along the guide wire.

        iii.    Construction

The method steps as labeled above must be performed in order from (a) to (d).

**V     ORDER**

This is the Court's Claim Construction Order with respect to the '616, '602, '375, '498, and '439 patents. The Order is based on the current record before the Court.

IT IS SO ORDERED, this 19th day of July, 2010.

                        /s/ Harry F. Barnes
                        Hon. Harry F. Barnes
                        United States District Judge

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

ST. JUDE MEDICAL, INC., a Minnesota
Corporation, and ST. JUDE MEDICAL
PUERTO RICO LLC, a Puerto Rico Limited
Liability Company.                                              PLAINTIFFS

VS.                              CASE NO. 08-CV-4101

ACCESS CLOSURE, INC., a Delaware
Corporation                                                    DEFENDANT

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

At the jury trial in this case, the jury found that AccessClosure, Inc. ("ACI") is infringing St.

Jude Medical, Inc.'s ("St. Jude") U.S. Patent No. 7,008,439 ("the '439 patent"). However, the jury

also rendered an advisory opinion on the issue of double patenting and found that the claims of the

'439 patent were not patentably distinct from claim 7 of another St. Jude patent, U.S. Patent No.

5,725,498 ("the '498 patent"), which was filed by the same applicants as the '439 patent. In other

words, the jury found that the '439 patent is invalid for obviousness-type double patenting over the

'498 patent. The issue before the Court today, which was not submitted to the jury, is whether the

safe harbor provision of 35 U.S.C. § 121, protects the '439 patent from any double patenting

challenge based on the '498 patent.

### A.      The Janzen Patent Family

The '439 and '183 patents are part of a family of patents directed to various inventions that

relate to ways of plugging holes in arteries after medical procedures, such as angioplasty. Ernst

Janzen is the lead inventor. Janzen and his colleagues came up with a number of inventions that

were important to the vascular closure industry. These inventions included precisely guiding a plug

**JA 101**

to a vascular hole, on a guidewire, without requiring a dilator.  Other inventions by Janzen included

using a dilator as part of the process of delivering the plug to the vascular hole.  The U.S. Patent and

Trademark Office ("PTO") held that these two approaches constituted patentably distinct inventions

and required the applicants to pursue them in separate patent applications.

### 1.    Prosecution of the '183 and '130 patents

On August 16, 1991, the Janzen applicants filed a U.S. Patent Application that would later

issue as U.S. Patent No. 5,351,183 ("the '183 patent"), which is the grandparent patent to the two

patents at issue here today.  On September 25, 1992, the PTO notified the applicants that it would

require the claims of the '183 application to be restricted.  The restriction requirements included

multiple levels.  First, the applicants were required to elect between method and device claims:  I)

claims drawn to a device for use in sealing a puncture in a wall of a blood vessel, and II) claims

drawn to a method of sealing a puncture in a wall of a blood vessel.  After electing a device or

method, the Janzen applicants were further required to elect one of three different species:  A) claims

relating to the apparatus comprising a solid tissue dilator; B) claims relating to the apparatus

comprising a hollow dilator and guidewire; and C) claims relating to the apparatus comprising a

guidewire and no dilator.[1]

On October 5, 1994, the Janzen applicants filed a divisional application from the '183

application, which later issued as U.S. Patent No. 5,830,130 ("the '130 patent").  On July 3, 1995,

the PTO entered restriction requirements in the '130 application.  These restriction requirements

were identical to the earlier restriction requirements for the '183 patent.  In the '130 application, the

---

[1]The restriction requirement also required the applicants to elect one of eight identified
sub-species, which correspond to the various types of plugs disclosed in the application, and one
of five sub-sub-species, corresponding to the appartus used.

Janzen applicants elected to prosecute device claims (Group I) involving an "apparatus comprising a hollow dilator and guidewire" (Species B).

2.      Prosecution of the '439 and '498 patents

The Janzen applicants followed the '130 application with two continuation applications. One of these continuation applications eventually issued as the '439 patent, which is the patent that the jury found to be invalid for double patenting. The other continuation application eventually issued as the '498 patent.

The Janzen applicants used the '439 patent to provoke an interference with another patent to determine who was entitled to claim priority to the invention. A series of delays that seem to be on the part of the PTO resulted in the '439 application languishing in the PTO for an uncommonly long time. An interference was eventually declared, and the PTO Board of Patent Appeals and Interferences issued a judgment in the Janzen applicants' favor as the first to invent the claimed subject matter. On March 7, 2006  eleven years after filing  the application finally issued as the '439 patent. In contrast, the PTO took less than two years to examine the other continuation, and the '498 patent was issued on March 10, 1998, which was eight years earlier than the issuance of the '439 patent, even though the '439 patent application was filed eighteen months before the '498 patent application.

B.      **The Safe Harbor Provision of 35 U.S.C. §121**

In the present case, the jury found that the '439 patent is invalid for double patenting over the '498 patent. However, St. Jude claims that the safe harbor provision of 35 U.S.C. § 121 protects the '439 Patent from any double patenting challenge based on the '498 Patent. Section 121 provides in pertinent part:

-3-

> If two or more independent and distinct inventions are claimed in one application, the Director may require the application to be restricted to one of the inventions .... *A patent issuing on an application with respect to which a requirement for restriction under this section has been made, or on an application filed as a result of such a requirement, shall not be used as a reference either in the Patent and Trademark Office or in the courts against a divisional application or against the original application or any patent issued on either of them*, if the divisional application is filed before the issuance of the patent on the other application.

35 U.S.C. § 121.  The emphasized sentence of § 121 is referred to as the safe harbor provision.

In other words, when the PTO determines that a single patent application contains claims directed to two or more separate and distinct inventions, it issues a "restriction requirement."  *See* Manual of Patent Examining Procedures 800.  This restriction requirement compels an applicant to elect a single invention for prosecution in the pending application and to file additional applications to pursue the unelected inventions.  *Id*.  The safe harbor provision applies to protect the claims of the divisional application from being invalidated under double patenting by the claims of the original parent application or patent issuing therefrom.  *See* 35 U.S.C. § 121. In enacting § 121, Congress recognized that patentees should not be punished for complying with PTO restriction requirements. *Boehringer Ingleheim Int'l v. Barr Labs, Inc.*, 592 F.3d 1340, 1350 (Fed Cir. 2010).

      1.    Both the '439 and 498 patents were filed as a result of restriction requirements

A patent is filed "as a result of" a restriction requirement if the patent subject to a double-patenting challenge and the application in which the restriction requirement was entered "share a common lineage" and claims subject matter the applicants were not permitted to pursue in an earlier patent.  *Id*.  The "as a result of" requirement applies to the challenged patent as well as the reference patent.  *Id*. at 1352.

-4-

Here, both the '498 and the '439 patents descend from the '183 patent application via the divisional application that issued as the '130 patent. In other words, the '498 and the '439 patents are continuation applications deriving from the same divisional application (the '130 patent application). The '130 patent application is a divisional of the '183 patent application. Thus, the '498 patent and the '439 patent share a common lineage. Both of these patents trace their lineage to a patent in which a restriction requirement was imposed. Thus, both of these patents were filed as a result of a restriction requirement.

ACI argues that the '439 patent was not filed as a result of a restriction requirement because its claims were copied from what was known as the Lee patent for the purpose of provoking an interference. The Court disagrees. Any motivation to provoke an interference is irrelevant to whether an application was filed as a result of a restriction requirement. *See id.* at 1353.

ACI asserts that the '498 patent was not filed as a result of a restriction requirement because the claims were new claims and were never entered in an earlier Janzen application. However, the Federal Circuit has stated that "new or amended claims in a divisional application are entitled to the benefit of § 121." *Symbol Technologies*, 935 F.2d 1569, 1579 (Fed. Cir. 1991). Claims may be amended, but "they must not be so amended as to bring them back over the line imposed in the restriction requirement." *Gerber Garment Tech., Inc. v. Lectra Sys.*, 916 F.2d 683, 688 (Fed Cir. 1990). Here, what is important to consider is whether the amended claims remain consonant with the restriction requirements, and the Court will take up the consonance issue later in this order.

The Federal Circuit has applied the safe harbor provision where the claims of neither the reference patent nor the challenged patent are identical to claims withdrawn from the application in which the restriction requirement was imposed. In the *Boehringer* case, the Federal Circuit found

-5-

**JA 105**

that the safe harbor provision applied where the reference patent contained all new claims and the challenged patent also included new claims. *Boehringer*, 592 F.3d at 1344. Thus, the Court rejects ACI's argument that the '498 patent was not filed as a result of a restriction requirement because the claims were new and had never been entered in a earlier Janzen patent.

### 2. The safe harbor provision applies to continuation patents

ACI argues that the '498 and '439 patents are not subject to the safe harbor provision in § 121 because they are continuation patents, not divisional patents. However, the Federal Circuit has held that § 121 applies specifically to continuing applications deriving from a divisional application filed as a result of a restriction requirement." *Boehringer*, 592 F.3d at 1352. In *Amgen, Inc. v. F. Hoffman-La Roche Ltd.*, the Federal Circuit held that "intervening continuation applications do not render a patent ineligible for § 121 protection so long as they descended from a divisional application filed as a result of a restriction requirement." 580 F.3d 1340, 1354 (Fed Cir. 2009). Both the '498 and the '439 patents are continuation patents of the '130 patent application (a divisional application), which was filed as a result of the restriction requirement imposed during prosecution of the '183 patent. Accordingly, the Court rejects ACI's argument that the safe harbor provision does not apply to the '439 and '498 patents because they are continuation patents.

### 3. The '439 and '498 patents remain consonant with the restriction requirements

A party invoking the safe harbor provision must ensure that the applications filed after the restriction requirement remain consonant with the lines of demarcation between claimed inventions. In other words, an applicant cannot elect to pursue claims from one group of a restriction requirement and then subsequently pursue claims from that same group in a later application. "'[A]

-6-

divisional application filed as a result of a restriction requirement may not contain claims drawn to the invention set forth in the claims elected and prosecuted to patent in the parent application.'" *Boehringer*, 592 F.3d at 1354 (quoting *Gerber Garment Tech.*, 916 F.2d at 688 (Fed. Cir. 1990)). Rather, the claims prosecuted in two or more applications having common lineage in a divisional chain must honor, as between applications, the lines of demarcation drawn by the examiner to what he or she considered independent and distinct inventions in the restriction requirement. *Boehringer*, 592 F.3d at 1354. The Court finds the consonance requirement the most challenging issue in analyzing this particular case.

ACI argues that claim 7 of the '498 patent and the asserted claims of the '439 patent claim the same invention and are not consonant with the restriction requirement. Specifically, ACI asserts that both patents claim the same subject matter: an apparatus comprising a guidewire and no dilator (Species C). There is no dispute that the '439 patent claims are within Species C. The dispute centers on claim 7 of the '498 patent. ACI argues that claim 7 of the '498 patent does not describe a dilator and therefore is also directed to Species C (guidewire and no dilator). St. Jude disagrees and asserts that claim 7 of the '498 patent does describe a dilator and thus is directed to Species B (hollow dilator and a guide wire).

Claim 7 of the '498 patent describes a "hollow sheath having a cross-section which is larger than the cross-section of said puncture." The "said puncture" refers to the puncture in the artery. The dispute boils down to whether the hollow sheath described in claim 7 is a dilator. If so, the claim is directed to Species B; if not, the claim is directed to Species C. Claim 7 does not mention the word "dilator" and does not specifically say that the sheath must dilate. Instead, it describes a hollow sheath having a cross-section larger than the cross-section of the puncture in the artery.

-7-

**JA 107**

There is no doubt that an oversized sheath can be used to dilate the tissue channel; the dispute is whether that oversized sheath is necessarily classified as a dilator in these particular circumstances. Dr. Sandor Kovacs testified that, when a sheath having a cross-section larger than the cross-section of the artery puncture is inserted into the tissue, it widens the channel and is thus a dilator. On the other hand, Dr. Charles Brown testified that just because an instrument dilates does not mean it is a dilator. As an interventional cardiologist, he thinks of other specific tools as dilators and would not consider the hollow sheath in claim 7 to be a dilator. However, the issue here is how the PTO uses the term "dilator" in the restriction requirement, not how Dr. Brown uses the term in his medical practice as a cardiologist.

During the prosecution of the '183 patent, the applicants pursued an original claim that described a sheath like the one recited in claim 7 of the '498 patent and likewise did not use the term "dilator." The '183 claim recited a "hollow sheath ... having a cross sectional profile larger than said puncture." (Application No. 07/746,339 (8/16/91) at claim 1). In response to the restriction requirement imposed during the prosecution of the '183 patent, the applicants ultimately identified that claim as directed to Species B (hollow dilator and guidewire). At the trial in this case, Judge Stoner testified that the PTO agreed with the applicants' classification of the claim. For classification purposes, it seems that the PTO was not concerned with the fact that the word "dilator" was not used in the claim language as long as the sheath functioned as a tissue dilator. In fact, the PTO accepted the applicants' classification of a claim describing the same oversize sheath as having a dilator. Like the original claim pursued by the applicants in the '183 patent, the Court is convinced that claim 7 of the '498 patent is directed to Species B (hollow dilator and guidewire), not Species C (guidewire and no dilator).

-8-

**JA 108**

Because the Court finds that the oversized, hollow sheath of claim 7 is a dilator, as understood by the PTO, it falls into Species B.  In contrast, the asserted claims of the '439 patent fall into Species C.  Accordingly, the Court finds that the applicants respected the PTO's directives and that the '498 and '439 patents remain consonant with the lines of demarcation between the claimed inventions.  Accordingly, the consonance requirement is satisfied.

## C.      Conclusion

For the foregoing reasons, the Court finds that the safe harbor provision applies here.  Thus, the safe harbor provision of 35 U.S.C. § 121 protects the '439 patent from any double patenting challenge based on the '498 patent.

IT IS SO ORDERED, this 8th day of November, 2011.

       /s/ Harry F. Barnes
Hon. Harry F. Barnes
United States District Judge

-9-

**JA 109**

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION


ST. JUDE MEDICAL, INC. and
ST. JUDE MEDICAL PUERTO RICO, LLC                                    PLAINTIFFS


VS.                              CASE NO. 08-CV-4101


ACCESS CLOSURE, INC.                                                  DEFENDANT


## JUDGMENT

    This matter came on for jury trial in this Court, the Honorable Harry F. Barnes, United States District Judge, presiding, on December 13, 2010. On December 21, 2010, the jury finished deliberating and returned a completed Verdict Form. (ECF No. 265). On November 8, 2011, this Court entered Findings Of Fact And Conclusions Of Law (ECF No. 307) regarding Defendant's double-patenting defense, following a one-day bench trial on June 22, 2011. A full and complete accounting has not yet been made.

    Having reviewed and considered the jury's Verdict Form, the trial record, and the Court's own Findings Of Fact And Conclusions Of Law, as well as all pleadings, papers, and other matters that have come before the Court in connection with this matter, IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

    1.    That judgment is entered in favor of Plaintiff St. Jude Medical Puerto Rico, LLC ("SJMPR") and against Defendant Access Closure, Inc. ("ACI") on SJMPR's claims for infringement of claim 14 of U.S. Patent No. 5,275,616 (the "'616 Patent") and claim 21 of U.S. Patent No. 5,716,375 (the "'375 Patent").

1

**JA 110**

2.      That judgment is entered in favor of Plaintiffs St. Jude Medical, Inc. ("SJM") and SJMPR, and against ACI, on St. Jude's claims for infringement of claims 7 and 8 of U.S. Patent No. 7,008,439 (the "'439 Patent").

3.      That ACI's infringement has been willful.

4.      That judgment is entered in favor of ACI and against SJMPR on SJMPR's claims for infringement of claims 38, 40, and 44 of U.S. Patent No. 5,601,602 (the "'602 Patent").

5.      That judgment is entered in favor of ACI and against SJM and SJMPR on St. Jude's claim for infringement of claim 9 of the '439 Patent.

6.      That judgment is entered in favor of SJMPR, and against ACI, on ACI's counterclaims for declaratory judgment of invalidity and unenforceability with respect to the '616 Patent, the '375 Patent, and the '602 Patent.

7.      That judgment is entered in favor of SJM and SJMPR, and against ACI, on ACI's counterclaims for declaratory judgment of invalidity and unenforceability with respect to the '439 Patent.

8.      Although a full and complete accounting has not yet been made, that SJMPR shall recover from ACI the sum of twenty seven million one hundred thousand dollars ($27,100,000.00) in compensatory damages for infringement of claim 14 of the '616 Patent and claim 21 of the '375 Patent.

9.      Compensatory damages for ACI's infringement of the '439 Patent have not yet been determined.  In addition to such damages for the '439 Patent, SJM and SJMPR are also seeking supplemental damages for infringement of the '439 Patent, the '616 Patent and the '375 Patent; pre-judgment interest; costs; enhanced damages based on ACI's willful infringement; attorney fees

2

**JA 111**

on the ground that this case is exceptional; post-judgment interest, and such other further relief as the Court may deem appropriate. All of these issues remain for an accounting, and the Court will receive any motions for such awards in connection with the accounting after ACI's anticipated interlocutory appeal.

10.     The Court retains jurisdiction to, inter alia, determine all post-trial motions, including St. Jude Medical's anticipated motion for a permanent injunction and any motions for judgment as a matter of law, conduct an accounting, and enforce any and all aspects of this Judgment and Order.

IT IS SO ORDERED this 23rd day of January, 2012.

　　　　__/s/ Harry F. Barnes__
　　　　Hon. Harry F. Barnes
　　　　United States District Judge

**JA 112**

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

ST. JUDE MEDICAL, INC. and
ST. JUDE MEDICAL PUERTO RICO, LLC                        PLAINTIFFS

VS.                    CASE NO. 08-CV-4101

ACCESS CLOSURE, INC.                            DEFENDANT

## <u>ORDER</u>

Before the Court is Defendant Access Closure Inc.'s Renewed Motion for Judgment as a Matter of Law. (ECF No. 311). Plaintiffs St. Jude Medical, Inc. and St. Jude Medical Puerto Rico LLC have responded. (ECF No. 327). Access Closure has filed a reply. (ECF No. 337). Having considered the briefing and all relevant pleadings and papers, the Court finds that Defendant's motion should be **DENIED**.

## I. BACKGROUND

On October 22, 2008, Plaintiffs St. Jude Medical, Inc. and St. Jude Medical Puerto Rico LLC ("collectively St. Jude") initiated the above-captioned cause against Access Closure, Inc. ("ACI") alleging that ACI infringes several patents. This case was tried to a jury in December 2010. ACI orally moved for judgment as a matter of law at the conclusion of St. Jude's case-in-chief. ACI renewed its motion in writing on December 21, 2010, before the jury began to deliberate.

At the conclusion of the trial, the jury found that ACI infringed claim 14 of U.S. Patent No. 5,275,616 ("Fowler '616 patent"); claim 21 of U.S. Patent No. 5,716,375 ("Fowler '375 patent"); and claims 7 and 8 of U.S. Patent No. 7,008,439 ("Janzen '439

**JA 113**

patent"). The jury further found that ACI's infringement was willful. On the other hand, the jury found that claims 38, 40, and 44 of U.S. Patent No. 5,601,602 ("Fowler '602 patent"), along with claim 9 of the Janzen '439 patent, were not infringed. The jury also found that all of the asserted claims of the Janzen '439 patent were invalid for obviousness-type double patenting, but the jury did not find any claims invalid based on prior art or improper inventorship. Finally, the jury awarded St. Jude Medical Puerto Rico $20.4 million in damages for lost profits, along with $6.7 million in damages for reasonable royalty.

On June 22, 2011, the Court held a bench trial on St. Jude's "safe harbor" defense to the jury's Janzen '439 invalidity verdict on double patenting. Following the bench trial, the Court reversed the jury's double patenting verdict, finding that the safe harbor applied.

On January 23, 2012, the Court entered a non-final judgment finding that ACI infringed claim 14 the Fowler '616 patent; claim 21 of the Fowler '375 patent; and claims 7 and 8 of the Janzen '439 patent. (ECF No. 308).

## II. DISCUSSION

Although Federal Circuit law governs substantive patent law issues, regional circuit law controls on matters that are not unique to patent law. *See August Tech. Corp. v. Camtek, Ltd.*, 655 F.3d 1278, 1281 (Fed. Cir. 2011) (applying Eighth Circuit law). In the Eighth Circuit, judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) should be granted where no reasonable jury could find for the nonmoving party. *See, e.g., Hinz v. Neuroscience, Inc.*, 538 F.3d 979, 984 (8th Cir. 2008). This includes situations where the nonmoving party bears the burden of proof on

an issue but fails to make out an essential element, *Tatum v. Berkeley*, 408 F.3d 543, 549-50 (8th Cir. 2005), and where a jury's verdict is not supported by substantial evidence, *Cordis Corp. v. Boston Sci. Corp.*, 658 F.3d 1347, 1358 (Fed. Cir. 2011).

**A. Infringement**

ACI argues hat the evidence is insufficient for a jury to find that it infringed the Janzen and Fowler patents. Specifically, ACI disputes the sufficiency of the evidence for a jury to find infringement with respect to one element of the Janzen patent, and ACI advances three arguments with respect to the Fowler patents.

**1. Janzen Patent**

ACI disputes the sufficiency of the evidence with respect to only one element of the Janzen patent claims: the "ejecting mechanism" or "means for ejecting." In July 2010, the Court construed these terms under 35 U.S.C. § 112 to encompass "a plug pusher" and a "sheath and equivalents thereof." ACI argues that the Mynx devices do not have any such structures on the ground that the pusher must have "a knob for the doctor to push" and must be "as long as the sheath." However, the Court's claim construction does not require these additional features. Under the Court's claim construction, the Court finds that there was sufficient evidence for the jury to find that the Mynx devices satisfy the "ejecting mechanism" limitations.[1]

**2. Fowler Patents**

The Court construed the terms "incision" and "puncture" differently. An "incision" is a "cutting wound or opening such as that made by a knife or scalpel or other bladed object." A puncture is a "piercing or opening such as that made by piercing with a

---

[1] *See* Plaintiffs' Trial Exs. SJM0018, SJM0022, SJM0086, SJM0208, SJM309, SJM0311, SJM1065, SJM 1069, SJM1848; Trial Tr. (12/14/2010) at 217:11-222:17; Trial Tr. (12/15/2010) at 76:18-79:14; Trial Tr. (12/16/2010) at 226:8-231:15; Trial Tr. (12/17/2010) at 174:2-183:19.

needle or other pointed object." (ECF No. 101 at 22.) ACI argues that the Mynx device is only used to close punctures and that Claim 21 of the Fowler '375 patent and Claim 14 of the Fowler '616 patent cover only devices used to close incisions. ACI made this same argument in its unsuccessful motion for summary judgment on noninfringement. At trial, St. Jude presented the jury with sufficient evidence for the jury to find that the Mynx devices are literally used to close incisions. ACI's own documents explain to patients that the hole closed by a Mynx device after a standard catheterization procedure is an "incision," and ACI's Vice President of Research & Development made admissions about the beveled, cutting part of the needles used to create holes closed by Mynx devices.

ACI asserts that it is entitled to judgment as a matter of law because there is no single structure in the Mynx device that has a passageway and an expandable portion. The "elongate positioning member" in claim 21 of the Fowler '375 patent must have a passageway and an expandable portion. ACI made this same argument to the Court in its summary judgment motion, which the Court rejected. According to ACI, the portion of the Mynx device with the passageway and the portion that is expandable constitute separate structures. In opposition to that motion, St. Jude pointed to evidence that the Mynx device has a single, integrated structure that constitutes an "elongated positioning member" having both a passageway and expandable portion. At trial, St. Jude presented to the jury this same evidence plus more, including testimony that the allegedly separate structures are always together as part of a single unit.[2] (Trial Tr. (12/15/2010) at 82:19-

---

[2] *See* Trial Tr. (12/14/2010) at 251:9-252:11; Trial Tr. (12/15/2010) at 81:22-83:24 and 82:19-83:17.

83:17).   The Court concludes that this evidence was sufficient to support the jury's conclusion that the Mynx device has a passageway and expandable portion.

ACI argues that the Mynx device does not infringe claim 14 of the Fowler '616 patent because no single actor forms and positions the sealant.   In order to infringe a method claim, a single actor must perform every step of the claim.  *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1329 (Fed. Cir. 2008).   When there is an agency relationship, multiple actors can jointly infringe a method claim.  *Muniauction*, 532 F.3d at 1330.   The Court denied ACI's motion for summary judgment of noninfringement because St. Jude presented evidence that doctors who use Mynx perform both the "forming" and "positioning steps."   At trial, St. Jude presented the jury with the same evidence, plus more.[3]   The Court concludes that the evidence was sufficient to support the jury's conclusion that a single actor forms and positions the sealant of the Mynx device.

### 3.  Indirect Infringement

ACI argues that it cannot be liable for indirect infringement because St. Jude did not prove that ACI had the requisite specific intent needed to find indirect infringement. There was evidence at trial that ACI intended to cause infringement of St. Jude's patents, including evidence of ACI's knowledge of the asserted patents, concerns expressed to ACI by third parties, and ACI's instructions to doctors about how to use the Mynx device.[4]   The Court finds that there is sufficient evidence for a jury to find that ACI has the requisite specific intent.

### B. Validity

---

[3] *See* Trial Tr. (12/14/2010) at 246:25-249:5 and 252:19-254:25.
[4] *See* Trial Tr. (12/14/2010) at 197:16-199:18 and 254:6-255:9; Trial Tr. (12/15/2010) at 79:15-22, 87:22-106:6.

Patents are presumed valid, and a party alleging that a patent claim is invalid bears the burden of overcoming this presumption with clear and convincing evidence. *See Ultra-Tex Surfaces, Inc. v. Hill Bros. Chem. Co.*, 204 F.3d 1360, 1367 (Fed. Cir. 2000).

### 1. Unnamed Co-Inventor

ACI argues that it is entitled to judgment as a matter of law that the Janzen '439 patent is invalid because Dr. Andreas Gruentzig is an unnamed co-inventor. A person is not entitled to a patent if he did not invent the subject matter sought to be patented. 35 U.S.C. § 102(f). The naming of the correct inventor or inventors is a condition of patentability. *See id.*; *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1349-50 (Fed. Cir. 1998). A collaborator is a co-inventor with his other collaborators. *See Kimberly Clark-Corp. v. Proctor & Gamble Distrib. Co., Inc.*, 973 F.2d 911, 916 (Fed. Cir. 1992). ACI maintains that Dr. Gruentzig collaborated on the Janzen '439 patent and is therefore an unnamed co-inventor.

The Court rejected ACI's inventorship argument a number of times before trial in ACI's Motion to Dismiss for Lack of Standing, Motion to Bifurcate Standing, Motion to Amend its Answer, and Motion to Take Additional Discovery. The parties spent a significant amount of time on this issue at trial. ACI presented evidence that Gruentzig's idea for a vascular closure device was different from the inventions claimed in the '439 patent because it included an intra-arterial umbrella, which was rejected by the inventors of the Janzen '439 patent. Janzen testified in his deposition that he "didn't like [Gruentzig's] idea from the beginning" because this idea "would bring something into the artery." (Trial Tr. (12/20/2010) at 147:18-22). Wolvek testified in his deposition that

Gruentzig did not suggest any alternatives to the intra-arterial umbrella idea. (Trial Tr. (12/20/2010) at 153:6-9. Wolvek stated that the named inventors came up with an approach using a device that would deliver a plug to the outside of the artery, in contrast to Gruentzig's intra-arterial umbrella. (Trial Tr. (12/20/2010) at 165:7-16). St. Jude also presented evidence that it was not until after at least four years after Gruentzig's death that Janzen came up with the insights that lead to a successful vascular closure device. (Trial Tr. (12/20/2010 at 163:1-165:16). The evidence presented at trial was sufficient for a jury to find that Gruentzig was not an inventor that should be named on the Janzen '439 patent.

## 2. Obviousness

A patent claim is invalid as obvious if its subject matter would have been obvious to one of ordinary skill in the art of the time of invention. *See* 35 U.S.C. § 103(a). Obviousness is a question of law depending on underlying questions of fact including the content of the prior art, differences between that art and the asserted claims, the level of ordinary skill in the art, and any relevant secondary considerations of obviousness. *See Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1996). A combination of known elements to achieve a predictable result is obvious. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416-17 (2007).

First, ACI argues that it is entitled to judgment as a matter of law on the issue that the Janzen '439 patent is obvious over the Takayasu article, which describes putting gel foam in the liver and ejecting a plug from a sheath using a plug pusher so that it blocks the flow of blood from a puncture in a vessel. ACI asserts that using a guidewire to assist in placement of the plug is an obvious modification of Takayasu's method. St. Jude

presented to the jury evidence of non-obviousness, such as the long-felt need for the Janzen inventions, the failure of others to develop the invention, and the commercial success of the inventions.[5]  The Court is convinced that ACI failed to establish by clear and convincing evidence that the Janzen '439 patent is obvious over Takayasu.

Second, ACI argues that the Fowler patents, which broadly relate to the deployment of a vessel plug using a balloon backstop, are obvious over Takayasu and Smiley and that it is entitled to judgment as a matter of law on this issue.  According to ACI, the Takayasu article combined with the Smiley article, which teaches how to use a balloon to stop bleeding from an injured vessel after a gunshot wound, renders the Fowler patents obvious.  However, St. Jude presented the testimony of Dr. Sandor Kovacs, who stated that the proposed combination of Takayasu and Smiley was "very, very far out and it makes no sense to me whatsoever."  (Trial Tr. (12/20/2012) at 171:15-21).  The jury was entitled to credit this testimony over the evidence presented by ACI.  The Court finds that St. Jude presented the jury with sufficient evidence that the Fowler patents are not obvious over Takayasu in view of Smiley, and ACI is not entitled to a judgment as a matter of law on this issue.

### C. Willful Infringement

ACI argues that St. Jude's willfulness allegations fail as a matter of law because St. Jude did not satisfy the two-pronged test from *In re Seagate*, 497 F.3d 1360 (Fed. Cir. 2007), and that it is entitled to judgment as a matter of law on this issue.  St. Jude was required to prove "by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent."  *See Seagate*, 497 F.3d at 1371.  Only if the objective prong is satisfied should the trier of

---

[5] *See* Trial Tr. (12/20/2010) at 176:8-169:24 and 172:21-174:19; Trial Tr. (12/21/2010) 37:5-38:8.

fact consider the second prong of the *Seagate* test. *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1374 (Fed. Cir. 2008). The second prong asks whether the objective likelihood of infringement from the first prong "was either known or so obvious that it should have been known to the accused infringer." *Seagate*, 497 F.3d at 1371.

ACI maintains that, because it presented substantial defenses at trial, the jury could not have found that ACI acted despite an objectively high likelihood that its actions constituted infringement of a valid patent. One of ACI's defenses was that the '439 patent is invalid for obviousness-type double patenting. The jury did find that the '439 patent invalid, but the Court later ruled that the safe harbor provision shielded the '439 patent from invalidity over the Janzen '498 patent.

ACI's defenses were but one factor among the totality of the circumstances that the jury was entitled to consider. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 725 F. Supp. 2d 474, 480. (D. De. 2010). Also, the fact that ACI presented several defenses at trial, including invalidity, does not mean the jury's willfulness finding lacks a sufficient evidentiary basis. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 860 (Fed. Cir. 2010). Moreover, ACI presented sufficient evidence to the jury regarding the objective prong of the willfulness standard. For example, St. Jude showed that established companies in the medical device field, such as Medtronic, Inc. and Abbot Laboratories, had identified patent infringement problems with the Mynx device. (Trial Tr. (12/15/2010) at 95:6-14; 96:21-24; and 97:12-17). Abbott Laboratories even suggested that ACI consider licensing the Janzen patents. (Trial Tr. (12/15/2010) at 96:25-97:5). Regarding the second prong of the willfulness standard (the subjective prong), St. Jude presented evidence that ACI was aware of the concerns

raised by Abbott and Medtronic, and ACI's own emails revealed that it had been expecting an infringement lawsuit for some time. The Court concludes that there was sufficient evidence for the jury to find that ACI's infringement was willful.

### III. CONCLUSION

For the reasons stated above, ACI's Motion for Judgment as a Matter of Law (ECF No. 311) is **DENIED**.

IT IS SO ORDERED, this 4th day of June, 2012.

/s/ Harry F. Barnes
Hon. Harry F. Barnes
U.S. District Judge

US005275616A

# United States Patent [19]

## Fowler

[11] Patent Number: **5,275,616**

[45] Date of Patent: **Jan. 4, 1994**

[54] **INSERTION ASSEMBLY AND METHOD OF INSERTING A VESSEL PLUG INTO THE BODY OF A PATIENT**

[75] Inventor: **Bradford C. Fowler**, Woodinville, Wash.

[73] Assignee: **Quinton Instrument Company**, Seattle, Wash.

[21] Appl. No.: **993,328**

[22] Filed: **Dec. 18, 1992**

### Related U.S. Application Data

[63] Continuation of Ser. No. 826,719, Jan. 28, 1992, Pat. No. 5,192,300, which is a continuation of Ser. No. 591,342, Jan. 1, 1990, Pat. No. 5,108,421.

[51] Int. Cl.⁵ ............................................. A61B 17/00
[52] U.S. Cl. ..................................... 606/213; 606/215; 604/15
[58] Field of Search ....................... 606/213, 215, 230; 604/15, 285, 286, 287, 288, 57, 59, 68–70

[56]          **References Cited**

#### U.S. PATENT DOCUMENTS

4,774,091  9/1988  Yamahira ............................ 424/426

| | | | |
|---|---|---|---|
| 4,890,612 | 1/1990 | Kensey | 606/213 |
| 5,021,059 | 6/1991 | Kensey et al. | 606/213 |
| 5,053,046 | 10/1991 | Janese | 606/230 |
| 5,061,274 | 10/1991 | Kensey | 606/215 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0493810 | 7/1992 | European Pat. Off. | 604/96 |
| 9222252 | 12/1992 | PCT Int'l Appl. | . |

*Primary Examiner*—Stephen C. Pellegrino
*Assistant Examiner*—Gary Jackson
*Attorney, Agent, or Firm*—Richard D. Allison; Andrew J. Beck; Montgomery W. Smith

[57]          **ABSTRACT**

A device and method of closing an incision or puncture in a patient by inserting a vessel plug into the incision or puncture until the distal end of the vessel plug is adjacent to the outer lumen of the blood vessel or target organ so that the vessel plug does not obstruct the flow of fluid through the blood vessel or target organ. The precise positioning of the vessel plug in the incision or puncture is accomplished through the use of a balloon catheter or a cylindrical insertion assembly having a proximal plunger member associated therewith.

**20 Claims, 4 Drawing Sheets**



Case: 12-1452     Document: 35     Page: 166     Filed: 08/13/2012



*Fig.1.*



*Fig.2.*



*Fig. 3.*

*Fig. 4.*

*Fig. 5.*



*Fig. 7.*



*Fig. 6.*



**U.S. Patent**     Jan. 4, 1994     Sheet 4 of 4     **5,275,616**



1

## INSERTION ASSEMBLY AND METHOD OF INSERTING A VESSEL PLUG INTO THE BODY OF A PATIENT

This is a continuation of copending application Ser. No. 07/826,719 filed on Jan. 28, 1992 now U.S. Pat. No. 5,192,300 which is a continuation of U.S. Ser. No. 07/591,342 field on Jan. 1, 1990 now U.S. Pat. No. 5,108,421.

### FIELD OF THE INVENTION

The present invention relates generally to hemostatic devices and more particularly to an insertion assembly and vessel plug which are insertable into an incision or puncture formed in the body of a patient.

### BACKGROUND OF THE INVENTION

During catheterization procedures, the nurse or physician will create an opening into an artery or other vessel with a conventional catheter introducer or dilator. The size of the opening will vary depending on the type of procedure and the size of the catheter which is used. For example, the diameter of the catheter and catheter sheath used in standard angiography procedures is typically between 5 to 8 French (1.67 mm and 2.67 mm, respectively). The diameter of the catheter and catheter sheath used in angioplasty procedures may be 8 (2.67 mm) or 9 (3.33 mm) French. The diameter of the catheter and catheter sheath used in intro-aortic balloon pump procedures is typically between 14 to 16 French (4.67 mm and 5.33 mm, respectively) and the diameter of the catheter and catheter sheath used with cardiopulmonary support systems is typically between 18 and 20 French (6.0 mm and 6.67 mm, respectively). Additionally, the catheter is often twisted or otherwise manipulated as it is advanced to the treatment site, thereby causing a further enlargement of the incision or puncture in the body of the patient.

When the medical procedure is completed and the catheter is removed from the artery or other blood vessel, conventional practice has been to apply external pressure to the entry site until clotting occurs. Because many of the patients undergoing these procedures have been medicated with an anticoagulant such as heparin, the nurse may be required to apply external pressure to the incision site for an extended period of time. The time required to stop bleeding at the incision is not an efficient use of the nurses time and a painful hematoma or unsightly bruise may still occur at the incision site because the artery will continue to bleed internally until clotting blocks the opening in the artery.

U.S. Pat. No. 4,829,994 granted to Kurth on May 16, 1989 attempts to resolve the above-described problem by providing an apron-like device consisting of a pelvic apron and a groin strap to apply a compressive force to the femoral vessel of the patient. Although this device effectively eliminates the need to have a nurse apply direct pressure to the incision site, the decrease in blood flow through the femoral artery caused by the use of this device may increase the likelihood of thrombosis formation in the compromised patient.

Another approach to resolving the above-identified problem is disclosed in U.S. Pat. No. 4,929,246 granted to Sinofsky on May 29, 1990. The method of using the device disclosed in this patent includes the steps of advancing a semi-rigid tube having an inflatable balloon at its distal end through the overlying tissue to a loca-

2

tion adjacent to the outer lumen of the punctured artery. The balloon is then inflated to apply pressure directly to the outer lumen of the artery. Laser energy is then directed to the outer lumen of the artery via an optical fiber centrally located in the semi-rigid tube such that the laser energy passes through the optical fiber and balloon of the semi-rigid tube to thermally weld the artery and seal the incision.

A further approach to resolving the above-identified problems is disclosed in U.S. Pat. No. 4,744,364 granted to Kensey on May 17, 1988 and related U.S. Pat. Nos. 4,852,568 and 4,890,612 granted to Kensey on Aug. 1, 1989 and Jan. 2, 1990, respectively. The first two Kensey patents disclose a device for sealing an opening in the wall of a blood vessel which consists of an elongate tubular body having an expandable closure member removably disposed therein. The tubular body also includes an ejecting device disposed within the tubular body for forcing the closure member from the tubular body into the interior of the blood vessel. A retraction filament is secured to the closure member so that the engagement surface of the closure member hemostatically engages the inner surface of the blood vessel contiguous with the puncture. The final Kensey patent discloses a device which includes a plug member having a holding portion which is adapted to engage portions of the tissue adjacent to the punctured vessel or organ to hold the plug member in place and a sealing portion formed of a foam material which extends into the punctured vessel or organ to engage the tissue contiguous therewith to seal the puncture.

None of the prior art devices teach the use of a simple and relatively inexpensive means for effecting the closure of a puncture or incision in the wall of a blood vessel, duct or lumen without extending into the affected blood vessel, duct or lumen.

### SUMMARY OF THE INVENTION

Accordingly, it is an object of the present invention to provide a device and method of use which overcomes the disadvantages of the prior art.

It is another object of the present invention to reduce the time required for sealing an incision in an artery and to decrease the likelihood that a hematoma will form after the catheter is removed from the incision.

These and other objects of the present invention are achieved by providing a device and a method for sealing an incision in a blood vessel, duct or lumen using the device as described hereinafter.

One form of the present invention preferably includes a relatively small diameter balloon catheter and a porous, absorbable vessel plug. The vessel plug includes a distal end which is sized and shaped so that the distal end of the vessel plug may be positioned adjacent to the outer surface of the blood vessel duct or lumen and will not cause a disruption in the flow of fluid past the incision. The method of using the preferred form of the present invention includes the steps of inserting the balloon catheter through the previously inserted catheter sheath and then removing the catheter sheath from the incision. The balloon is then inflated and positioned adjacent to the inner wall of the blood vessel, duct or lumen. Next, the vessel plug is inserted into the incision until the distal end of the vessel plug is positioned adjacent to the balloon on the distal end of the catheter. The balloon is then deflated and the catheter is removed from the incision. Finally, a dressing may be placed over the incision site to retain the vessel plug in the

3

incision until the vessel plug is incorporated into the surrounding tissue.

An advantage of the present invention is that the distal end of the vessel plug does not extend into the blood vessel duct or lumen and therefore, the flow of fluid through the vessel is not obstructed by the vessel plug and the likelihood that a thrombosis will form at the incision site is reduced.

A further advantage of the present invention is that it is relatively simple to use and the likelihood that a hematoma will form at the incision site is minimized.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a side elevational view, partially in cross section, showing the catheter sheath and balloon catheter of the present invention inserted in the patient;

FIG. 2 is a side elevational view, partially in cross section, showing the balloon of the balloon catheter inflated and positioned in the patient;

FIG. 3 is a side elevational view, partially in cross section, showing the vessel plug and balloon catheter inserted into the patient;

FIG. 4 is a side elevational view, partially in cross section, showing the vessel plug positioned in the patient with the balloon catheter removed;

FIG. 5 is a partial side view showing the distal end of the vessel plug of the present invention;

FIG. 6 is a side elevational view, partially in cross-section, showing an alternate form of the present invention once it has been initially inserted into the patient;

FIG. 7 is a side elevational view, partially in cross-section, showing the introducer assembly of FIG. 6 with the locating wings in the extended position;

FIG. 8 is a side elevational view, partially in cross section showing the introducer assembly of FIG. 6 with the extended locating wings positioned adjacent to the inner wall of the patient's blood vessel; and

FIG. 9 is a side elevational view, partially in cross section showing the introducer assembly of FIG. 6 after the plunger member and inner and outer sleeves of the introducer assembly have been partially removed from the patient while the plunger is held stationary to retain proper placement of the vessel plug.

## DETAILED DESCRIPTION OF THE PRESENT INVENTION

The present invention is described hereinafter with specific reference to the use of the present invention for sealing an incision or puncture in a blood vessel such as the femoral artery 10 of a patient. It is contemplated that the present invention may be used with nearly any catheterization or other medical procedure wherein it is desirable to seal an incision or puncture to prevent the loss of the patient's body fluid therethrough. As used herein, the distal end of an element is referred to as the end of the element nearest to the patient and the proximal end of an element is referred to as the element furthest away from the patient.

In order to more fully understand and appreciate the present invention, a brief description of a conventional angiographic catheterization procedure through the femoral artery of the patient is set forth herein. In such a procedure, an angiographic needle (not shown) is inserted percutaneously through the epidermal and dermal layer of the skin 12 of the patient at a preferred angle of approximately 25 to 45 degrees. The needle is inserted between 6 mm and 70 mm percutaneously into the skin of the patient until the needle pierces the femo-

4

ral artery. The puncture of the artery 10 by the needle is then confirmed by the physician and a small diameter guide wire (not shown) is inserted through the needle for approximately 15 to 20 cm. The needle is then withdrawn over the guidewire while pressure is applied to the artery 10 to limit the bleeding and prevent the formation of a hematoma at the incision site. The catheter (not shown) and an outer introducer or catheter sheath 14 are inserted over the guidewire and the guidewire is then removed from the inside of the catheter. Next, the catheter is advanced to the final location and the procedure is performed. Once the procedure has been completed, the catheter is removed and only the catheter sheath 14 remains in the incision to allow the vessel plug 20 of the present invention to be inserted into the incision as described hereinafter.

As shown in FIGS. 1–5, the preferred form of the present invention consists generally of a relatively small diameter balloon catheter 22 and the vessel plug 20. The balloon catheter preferably has an outer diameter of 1 mm or less and includes an inflatable balloon 24 on the distal end 26 thereof. The balloon catheter 22 may be constructed of nearly any semi-rigid material such as polyethylene or polyvinylchloride. The balloon catheter 22 includes a proximal end 28 having a syringe attachment 30 thereon. The syringe attachment 30 is designed to receive a liquid or a gas from a syringe 31 which is attachable thereto to allow for the inflation of the balloon as described more fully hereinafter.

As shown in FIGS. 3–5, the vessel plug 20 of the present invention is preferably a cylindrical rod-shaped member which is constructed of a porous, biodegradable and expandable hemostatic collagen sponge such as the collagen cuff sold by Vitaphore Corporation under the name VITACUFF, or a polymerized polylactic acid, or polyglycolic acid matrix. The distal end 32 of the vessel plug 20 is preferably oriented at an angle of approximately 25 to 45 degrees with respect to the lengthwise dimension of the vessel plug 20 and, as shown in FIG. 5, the distal end 32 of the vessel plug 20 is preferably contoured to conform to the outer lumen of the artery 10. The proximal end 34 of the vessel plug 20 may be excised after placement in the patient and positioned at or slightly below the epidermal layer of the patient's skin as described more fully hereinafter.

Once the angiographic or other medical procedure has been performed and the catheter is removed from the patient, the introducer or catheter sheath 14 remains in the incision as shown in FIG. 1. The catheter sheath 14 functions to maintain the incision open while the balloon catheter 22 is inserted therethrough. Once the balloon catheter 22 is properly positioned in the incision so that the distal end 26 of the balloon catheter 22 extends into the artery 10, the user may withdraw the catheter sheath 14 from around the balloon catheter 22 and out of the incision. The incision will then collapse around the shaft of the balloon catheter 22 and the user may attach a syringe to the syringe attachment 30 on the proximal end 28 of the balloon catheter 22 to inflate the balloon 24. Alternately, the balloon catheter 22 may include an inflation member (not shown) preattached to the proximal end thereof which may be squeezed or otherwise actuated to temporarily inflate the balloon 24. Once the balloon 24 is inflated, the balloon catheter 22 is withdrawn from the incision until the inflated balloon 24 is positioned adjacent to the incision site along the inner lumen of the artery 10. The vessel plug 20 is then inserted into the incision along the shaft of the balloon

5        6

catheter 22 until the distal end 32 of the vessel plug 20 contacts the inflated balloon 24 on the distal end 26 of the balloon catheter 22. In this position, the distal end 32 of the vessel plug 20 is aligned with the outer lumen of the artery 10 and the balloon 24 prevents the vessel plug 20 from extending into the artery 10. Once the vessel plug 20 is properly positioned in the incision, the balloon 24 is deflated and the balloon catheter 22 is removed from the incision. The user may apply a small amount of pressure to the incision as the balloon catheter 22 is removed to frictionally retain the vessel plug 20 in the incision. Once the vessel plug 20 is inserted in the incision, the vessel plug 20 will expand as fluids are drawn into the vessel plug 20 from the blood vessels and tissues surrounding the incision and therefore, the contraction of the tissue surrounding the vessel plug 20 along with the expansion of the vessel plug 20 in the incision will assist in retaining the vessel plug 20 in the predetermined position in the incision. The removal of the balloon catheter 22 from the incision will not adversely affect the positioning of the vessel plug 20 because the balloon catheter 22 prevents the portion of the vessel plug 20 adjacent to the balloon catheter 22 from softening and absorbing fluid from the surrounding tissue until the balloon catheter 22 is removed from the incision. As a final step in the insertion of the vessel plug 20 into the incision, the proximal end 34 of the vessel plug 20 which extends beyond the skin 12 of the patient may be excised so that the proximal end 34 of the vessel plug 20 is positioned near the lower portion of the epidermal layer of the skin 12. The opening in the skin 12 may then be sutured closed or have a dressing applied over the incision site.

As described briefly above, the vessel plug 20 of the preferred embodiment initially swells when it is placed in the incision to prevent the formation of a hematoma at the incision site. Additionally, the porosity of the vessel plug 20 may vary depending on the anticipated size of the incision so that the fluids from the surrounding tissue may be absorbed more rapidly if a larger incision is made or if it is necessary for the vessel plug 20 to expand more quickly. Additionally, the porosity of the vessel plug 20 provides the means for connective tissue cell infiltration into the vessel plug 20 so that the patient's tissue will ultimately fill the percutaneous incision at various rates according to the porosity of the vessel plug 20. By positioning the distal end 32 of the vessel plug 20 at or near the outer lumen of the artery 10, there is no disruption of the fluid flow through the artery 10 at the incision site and the risk of thrombosis is minimized as compared to prior devices which include a closure or sealing member which is positioned along the inner lumen of the artery 10. It is anticipated that the vessel plug 20 will degrade and be absorbed within a few weeks or months so that there is no need to remove the vessel plug 20 from the incision at a later date. Additionally, the vessel plug 20 may be formulated to include a conventional clotting agent, such as a tissue thromboplastin, which is incorporated in the collagenous material to accelerate local hemostasis and which will allow the physician to maintain the patient on an anticlotting agent such as heparin after the procedure has been performed. It is further anticipated that the vessel plug 20 may be formulated to include a radiopaque material longitudinally incorporated therein to allow the placement of the vessel plug 20 to be observed using conventional visualization methods.

FIGS. 6–10 illustrate an alternate form of the present invention which consists generally of a preloaded insertion assembly 50 having a vessel plug 52 associated therewith. The insertion assembly 50 of this embodiment consists of a syringe-like device with a plunger 54; a cylindrically shaped outer sleeve 56 and a cylindrically shaped inner sleeve 58. The plunger 54 is preferably sized so that a portion thereof slidably fits within the cylindrical inner sleeve 58. The outer sleeve 56 and the inner sleeve 58 include angled distal ends 62 and 63. The inner sleeve 58 includes a pair of outwardly biased and extending locating wings 64 positioned near the distal end of the inner sleeve 58. These locating wings 64 are biased outwardly and may be opened by withdrawing the outer sleeve 56 from around the distal end 63 of the inner sleeve 58, and closed by the return of the outer sleeve 56 to its original position around the distal end 63 of the inner sleeve 58. Alternately, it is anticipated that the present embodiment may be constructed of one or more cylindrical sleeve members having an actuation member located near the proximal end of the sleeve such that rotation of a lever, rotating handle or other actuation member near the proximal end of the sleeve will cause one or more of the locating wings on the distal end of the sleeve to project radially outwardly from the distal end of the sleeve to temporarily increase the radial circumference of the distal end of the sleeve as the vessel plug 52 is moved to the desired location in the incision.

The vessel plug 52 of the present embodiment preferably consists of a collagenous material which is formed as a relatively short rod-like member having an angled and contoured distal end 68 which is shaped to conform to the outer contour of the lumen of the blood vessel 70. The proximal end 72 of the vessel plug 52 may be excised after placement and positioned at or slightly below the epidermal layer of the patient's skin, as previously described. In the present embodiment, the vessel plug 52 is positioned in an initial, preloaded condition within the insertion assembly 50 so that the distal end 68 of the vessel plug 52 is located in a predetermined position within the outer and inner sleeves 56 and 58 and adjacent to the locating wings 64 as shown in FIGS. 6 and 7.

The plunger member 54 of the present embodiment is preferably a cylindrically-shaped member which is sized to slidably fit within the inner diameter of the inner sleeve 58. In the initial, preloaded condition, the proximal end of the plunger member 54 extends proximally beyond the proximal ends of the outer sleeve 56 and the inner sleeve 58. The proximal end of the plunger member 54 includes a proximal member 74 thereon which is designed to allow the user to retain the position of the plunger member 54 and the vessel plug 52 in the preferred position within the incision as the inner and outer sleeves 56 and 58 are withdrawn from the incision as described more fully hereinafter.

As with the preferred embodiment shown in FIGS. 1–5, the alternate embodiment shown in FIGS. 6–10 is used after the medical procedure has been performed. In this embodiment, the previously inserted catheter sheath (not shown) is initially removed while external pressure is applied to the incision to prevent blood loss. The preloaded insertion assembly 50 is then inserted into the incision and blood vessel as shown in FIG. 6. Alternatively, this exchange of catheter assemblies may be facilitated by the use of a guidewire (not shown) which is placed through the catheter sheath prior to its

7

removal from the incision. The insertion assembly 50 may then be subsequently inserted into the incision along or over the guidewire. Once the user verifies that the insertion assembly 50 is fully inserted within the incision and blood vessel 70 as shown in FIG. 6, the user may withdraw the outer sleeve 56 slightly with respect to the inner sleeve 58 to extend the locating wings 64 laterally outwardly from the distal end 63 of the inner sleeve 58. The user may then withdraw the insertion assembly 50 from the incision until the locating wings 64 contact a predetermined portion of the inner lumen of the blood vessel 70 as shown in FIG. 8. The distal end 68 of the vessel plug 52 is particularly positioned in the outer and inner sleeves 56 and 58 and adjacent to the locating wings 64 so that when the locating wings 64 contact the inner lumen of the blood vessel 70, the distal end 68 of the vessel plug 52 is properly alinged in the incision. Next, while holding the plunger member 54 in a fixed position with respect to the patient, the user returns the outer sleeve 56 to its original position around the inner sleeve 58 to retract the locating wings 64 on the distal end 63 of the inner sleeve 58. While continuing to hold the plunger 54 in a fixed position relative to the incision to retain the vessel plug 52 at the desired depth, the outer and inner sleeves 56 and 58 of the insertion assembly 50 are withdrawn from the incision and from around the vessel plug 52 as shown in FIGS. 9 and 10. The overall length of the plunger member 54 and the vessel plug 52 are chosen so that as the proximal end of the inner sleeve 54 reaches the proximal member 74 on the plunger member 54, a sufficient amount of the vessel plug 52 will extend distally beyond the insertion assembly 50 so that the insertion assembly 50 may then be withdrawn from the incision while the distal end 68 of the vessel plug 52 is frictionally retained in the desired position in the incision.

The locating wings 64 of the present embodiment serve to provide a minimal amount of resistance as the insertion assembly 50 is moved to the desired location along the inner lumen of the blood vessel 70. It is anticipated that the locating wings 64 may be actuated by nearly any actuation mechanism as long as the locating wings 64 are retractable and provide sufficient resistance at the inner lumen of the blood vessel 70 to signal the user that the insertion assembly 50 is in the proper position for the insertion of the vessel plug 52 into the incision.

As with the prior embodiment, the distal end 68 of the vessel plug 52 is positioned in the incision at or adjacent to the outer lumen of the blood vessel 70 so that none of the vessel plug 52 extends into the blood vessel 70 to disrupt the flow of blood therethrough. The porosity of the vessel plug 52 is chosen so that the vessel plug 52 will expand as it absorbs fluids from the surrounding tissue and so that the vessel plug 52 will degrade in a matter of weeks or months. Because the vessel plug 52 does not extend into the lumen of the blood vessel 70, the vessel plug 52 of the present embodiment may include a clotting agent incorporated therein to promote localized hemostasis in the incision without increasing the likelihood of thrombosis formation in the blood vessel 70.

While the preferred forms of the present invention are described and illustrated herein, it will be obvious to those skilled in the art that various changes and modifications may be made thereto without departing from the scope of the present invention as defined by the following claims.

8

What is claimed is:

1. A closure device for sealing an incision formed in the body of a patient wherein the incision extends from the skin of the patient through the lumen of a blood vessel and into a blood vessel of the patient, said closure device including a plug means comprising:

an elongate and generally cylindrical vessel plug having distal and proximal ends, and said vessel plug has a length sufficient to be received in the incision such that said distal end is positioned at a first predetermined position in the incision proximally of the lumen of the blood vessel of the patient, and said proximal end is positioned adjacent to the outer surface skin of the patient to obstruct the flow of blood from the blood vessel into the incision; and

wherein said distal end of said vessel plug is oriented at an angle of approximately 25 to 45 degrees with respect to the lengthwise dimension of said vessel plug.

2. The closure device of claim 1 wherein said vessel plug is constructed of a biodegradable material having a radiopaque material therein.

3. The closure device of claim 1 wherein said vessel plug is constructed of a biodegradable material having a clotting agent therein.

4. The closure device of claim 1 further including en elongate tubular member and said tubular member includes an open distal end and a proximal end wherein said proximal end includes a plunger member operatively associated therewith and said vessel plug is dimensioned to be expelled through said distal end of said tubular member into the incision.

5. A closure device for sealing an incision formed in the body of a patient wherein the incision extends from the skin of the patient through the lumen of a blood vessel and into a blood vessel of the patient, said closure device including a plug means comprising:

an elongate and generally cylindrical vessel plug having distal and proximal ends and said vessel plug has a length sufficient to be received in the. incision such that said distal end is positioned at a first predetermined position in the incision proximally of the lumen of the blood vessel of the patient and said proximal end is positioned adjacent to the outer surface skin of the patient to obstruct the flow of blood from the blood vessel into the incision; and

further including a tubular member and wherein at least a portion of said tubular member is dimensioned to be received through the incision to identify the location of the blood vessel adjacent to the incision and an expulsion means is movable with respect to said tubular member to expel said vessel plug from said tubular member such that said distal end of said vessel plug is positioned in said first predetermined position in the incision proximally of the blood vessel of the patient.

6. An insertion assembly for sealing an incision formed in the body of a patient wherein the incision extends generally from the skin of the patient through the lumen of the blood vessel and into a blood vessel of the patient, said insertion assembly comprising in combination:

a vessel plug having distal and proximal ends and being formed of a material which is absorbable in the body of the patient, said vessel plug being dimensioned to be inserted into the incision of the

9

10

patient such that sad distal end of said vessel plug is positioned along the outer surface of the blood vessel of the patient and said proximal end is positioned generally adjacent to the outer surface of the skin of the patient;

a removable insertion member having proximal and distal ends wherein said distal end is dimensioned to facilitate the identification of the location of the lumen of the blood vessel adjacent to the incision and assist in the placement of said distal end of said vessel plug along the outer surface of the blood vessel; and

wherein said vessel plug is an elongate and generally cylindrical member, and said distal end of said vessel plug is oriented at an angle of approximately 25 to 45 degrees with respect to the lengthwise dimension of said vessel plug.

7. The insertion assembly of claim 6 wherein said insertion member is an elongate member having sufficient length so that said proximal end of said insertion member extends proximally of the skin of the patient adjacent to the incision as said distal end of said insertion member contacts the inner lumen of the blood vessel.

8. The insertion assembly of claim 7 wherein said vessel plug is dimensioned to conform to the incision between the outer lumen of the blood vessel and the outer surface of the skin of the patient.

9. A method of sealing an incision formed in the body of a patient wherein the incision extends generally from the skin of the patient; through the lumen of a blood vessel and into the blood vessel of a patient, the method including the steps of:

forming a vessel plug of a material which is absorbable in the body of the patient and wherein the vessel plug is formed to include distal and proximal ends therein and is dimensioned to be received in the incision; and

positioning the vessel plug in the incision such that the distal end of the vessel plug is located proximally of the blood vessel to seal the incision from the flow of blood passing through the blood vessel.

10. The method of claim 9 further including the step of expelling the vessel plug from an elongate and generally tubular member having an open distal end which is dimensioned to allow the vessel plug to pass therethrough and into the incision such that the distal end of the vessel plug is positioned adjacent to and proximally of the blood vessel of the patient in the incision.

11. The method of claim 9 further including the step of identifying the location of the blood vessel adjacent to the incision to facilitate the placement of the distal end of the vessel plug proximally of the blood vessel.

12. The method of claim 11 further including the step of positioning the vessel plug in the incision according to the identified location of the blood vessel such that the flow of blood through the blood vessel is unobstructed by the vessel plug and obstructed in the incision.

13. The method of claim 9 further including the step of expanding location means on an insertion member to identify the location of the blood vessel adjacent to the incision.

14. The method of claim 9 further including the step of inflating a member on an insertion member to identify the location of the blood vessel adjacent to the incision.

15. The method of claim 9 further including the step of radially expanding a portion of an insertion member to identify the location of the blood vessel adjacent to the incision.

16. A method of sealing an incision formed in the body of a patient wherein the incision extends generally from the skin of a patient into a selected blood vessel or organ of the patient, the method comprising:

inserting a positioning means into the incision,

expanding a balloon member along the distal end portion of the positioning means;

inserting a means for sealing the incision into the incision such that the flow of blood through the incision is obstructed by the means for sealing; and

removing the positioning means from the incision.

17. The method of claim 16 wherein the positioning means is provided as an elongate member having a lumen extending between a proximal end portion thereof and the balloon member and the method includes the step of inflating the balloon member generally along the incision.

18. The method of claim 16 wherein said means for clotting is provided as a sponge-like member having a clotting agent therein.

19. An insertion assembly for sealing an incision in the body of a patient wherein the incision extends from the skin of the patient into a blood vessel of the patient, said insertion assembly comprising in combination:

a vessel plug which is constructed of a material that is absorbable within the body of a patient and which seals the incision from the flow of blood therethrough; and

an elongate positioning member having a passageway therein for the receipt of said vessel plug therein, and at least a portion of said positioning member has an outer diameter in use which is greater than the diameter of the incision to facilitate the placement of said vessel plug at a predetermined position in the incision proximally of the blood vessel.

20. The insertion assembly of claim 19 wherein said vessel plug is sized to be received in said positioning member prior to use and is expelled therefrom to said predetermined position in the incision by a plunger member which is operatively associated with said positioning member.

\* \* \* \* \*

60

65

# CERTIFICATE OF CORRECTION

PATENT NO. : 5,275,616
DATED : January 4, 1994
INVENTOR(S) : Bradford C. Fowler

It is certified that error appears in the above-indentified patent and that said Letters Patent is hereby corrected as shown below:

On the Title page, after item [73], Assignee: insert—[*]Notice:  The portion of the term of this patent subsequent to April 28, 2009, has been disclaimed—.
Title page, item [63], line 3, under "Related U.S. Application Data," delete "jan." and insert —October—.
Column 8, line 27, delete the typographical error "en" and insert —an—.
Column 9, line 1, delete the typographical error "sad" and insert— said—.

Signed and Sealed this

Twentieth Day of September, 1994

*Attest:*

*[signature]*

**BRUCE LEHMAN**

*Attesting Officer*          *Commissioner of Patents and Trademarks*

# REEXAMINATION CERTIFICATE (2786th)

## United States Patent [19]

**Fowler**

[11] **B1 5,275,616**

[45] Certificate Issued **Jan. 23, 1996**

[54] **INSERTION ASSEMBLY AND METHOD OF INSERTING A VESSEL PLUG INTO THE BODY OF A PATIENT**

[75] Inventor: **Bradford C. Fowler**, Woodinville, Wash.

[73] Assignee: **Quinton Instruments Company**, Seattle, Wash.

**Reexamination Request:**
No. 90/003,529, Aug. 12, 1994

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **5,275,616** |
| Issued: | **Jan. 4, 1994** |
| Appl. No.: | **993,328** |
| Filed: | **Dec. 18, 1992** |

### Related U.S. Application Data

[63] Continuation of Ser. No. 826,719, Jan. 28, 1992, Pat. No. 5,192,300, which is a continuation of Ser. No. 591,342, Jan. 1, 1990, Pat. No. 5,108,421.

[51] Int. Cl.⁶ .................................................... **A61B 17/04**
[52] **U.S. Cl.** ............................. **606/213**; 606/215; 604/15
[58] **Field of Search** ........................ 606/213, 15; 604/15, 604/285–288, 57, 59, 68–70

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 581,235 | 4/1897 | Kenyon . |
| 1,191,736 | 7/1916 | Roberson . |
| 1,794,221 | 2/1931 | Washburn et al. . |
| 2,898,913 | 8/1959 | Ritter et al. .............................. 128/296 |
| 3,016,895 | 1/1962 | Sein . |
| 3,056,408 | 10/1962 | Brown ........................................ 128/325 |
| 3,447,533 | 6/1969 | Spicer ........................................ 128/1 |
| 3,516,403 | 6/1970 | Cournut ..................................... 128/130 |
| 3,572,335 | 3/1971 | Robinson . |
| 3,675,639 | 7/1972 | Cimber ..................................... 128/1 |
| 3,804,097 | 4/1974 | Rudic ........................................ 604/51 |
| 3,874,388 | 4/1975 | King et al. ............................. 128/334 R |
| 4,007,743 | 2/1977 | Blake ..................................... 128/334 R |
| 4,154,226 | 5/1979 | Hennig et al. ........................... 128/1 R |

| | | |
|---|---|---|
| 4,182,339 | 1/1980 | Hardy, Jr. ............................. 128/334 R |
| 4,390,018 | 6/1983 | Zukowski ............................. 128/303 R |
| 4,577,631 | 3/1986 | Kreamer ............................. 128/334 R |
| 4,578,061 | 3/1986 | Lemelson ............................... 604/164 |
| 4,587,969 | 5/1986 | Gillis ................................. 128/334 R |
| 4,588,395 | 5/1986 | Lemelson ................................ 604/59 |
| 4,610,248 | 9/1986 | Rosenberg ............................... 128/325 |
| 4,619,261 | 10/1986 | Guerriero . |
| 4,638,803 | 1/1987 | Rand . |
| 4,645,488 | 2/1987 | Matukas .................................. 604/59 |
| 4,669,474 | 6/1987 | Barrows ............................. 128/334 C |
| 4,708,718 | 11/1987 | Daniels .................................. 604/53 |
| 4,710,192 | 12/1987 | Liotta et al. ........................... 623/1 |
| 4,744,364 | 5/1988 | Kensey ............................... 128/334 R |
| 4,749,689 | 6/1988 | Miyata et al. .......................... 514/21 |
| 4,790,819 | 12/1988 | Li et al. ................................. 604/59 |
| 4,829,994 | 5/1989 | Kurth .................................. 128/96.1 |
| 4,832,688 | 5/1989 | Sagae et al. ............................ 604/53 |
| 4,838,280 | 6/1989 | Haaga .................................. 128/751 |
| 4,850,960 | 7/1989 | Grayzel ................................. 604/158 |

(List continued on next page.)

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 476178 | 3/1992 | European Pat. Off. . |
| 482350 | 4/1992 | European Pat. Off. . |
| 2641692 | 7/1990 | France . |
| 8907370 | 8/1989 | Germany . |
| 782814 | 11/1980 | U.S.S.R. . |
| 1088709 | 4/1984 | U.S.S.R. . |
| 1509023 | 4/1978 | United Kingdom . |
| 1569660 | 6/1980 | United Kingdom ...................... 604/57 |
| 9109641 | 7/1991 | WIPO ....................................... 604/49 |

*Primary Examiner*—Gary Jackson

[57] **ABSTRACT**

A device and method of closing an incision or puncture in a patient by inserting a vessel plug into the incision or puncture until the distal end of the vessel plug is adjacent to the outer lumen of the blood vessel or target organ so that the vessel plug does not obstruct the flow of fluid through the blood vessel or target organ. The precise positioning of the vessel plug in the incision or puncture is accomplished through the use of a balloon catheter or a cylindrical insertion assembly having a proximal plunger member associated therewith.



**B1 5,275,616**
Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,852,568 | 8/1989 | Kensey | 128/325 |
| 4,871,094 | 10/1989 | Gall et al. | 222/386 |
| 4,878,906 | 11/1989 | Lindemann et al. | 623/1 |
| 4,895,564 | 1/1990 | Farrel | 604/164 |
| 4,900,303 | 2/1990 | Lemelson | 604/54 |
| 4,929,246 | 5/1990 | Sinofsky | 606/8 |
| 4,936,835 | 6/1990 | Haaga | 604/265 |
| 4,941,874 | 7/1990 | Sandow et al. | 604/60 |
| 4,950,234 | 8/1990 | Fujioka et al. | 604/60 |
| 4,994,028 | 2/1991 | Leonard et al. | 604/60 |
| 5,041,090 | 8/1991 | Scheglov et al. | 606/195 |
| 5,080,655 | 1/1992 | Haaga | 604/265 |
| 5,108,407 | 4/1992 | Geremia et al. | 606/1 |
| 5,195,988 | 3/1993 | Haaga | 604/265 |
| 5,254,105 | 10/1993 | Haaga | 604/265 |

B1 5,275,616

**1**

## REEXAMINATION CERTIFICATE
## ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.                                                   5

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**                                                   10

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentability of claims **1–8** and **16–20** is confirmed.   15

Claim **9** is determined to be patentable as amended.

Claims **10–15**, dependent on an amended claim, are determined to be patentable.

**2**

**9**. A method of sealing an incision formed in the body of a patient wherein the incision extends generally from the skin of the patient; through the lumen of a blood vessel and into the blood vessel of a patient, the method including the steps of:

forming a vessel plug of a material which is absorbable in the body of the patient and wherein the vessel plug is formed to include distal and proximal ends therein and is dimensioned to be received in the incision; and

positioning the vessel plug in the incision *with an elongate member to position the vessel plug in the incision* such that the distal end of vessel plug is located proximally of the blood vessel *without extending into the blood vessel* to seal the incision from the flow of blood passing through the blood vessel, *such that the blood vessel is free of obstruction.*

\*   \*   \*   \*   \*

# United States Patent [19]

**Fowler**

[11] **Patent Number:** 5,716,375

[45] **Date of Patent:** *Feb. 10, 1998

[54] **INSERTION ASSEMBLY AND METHOD OF INSERTING A VESSEL PLUG INTO THE BODY OF A PATIENT**

[75] Inventor: **Bradford C. Fowler**, Woodinville, Wash.

[73] Assignee: **Quinton Instrument Company**, Bothell, Wash.

[ * ] Notice: The term of this patent shall not extend beyond the expiration date of Pat. No. 5,108,421.

[21] Appl. No.: **604,203**

[22] Filed: **Feb. 21, 1996**

### Related U.S. Application Data

[63] Continuation of Ser. No. 340,507, Nov. 16, 1994, which is a continuation of Ser. No. 163,496, Dec. 6, 1993, Pat. No. 5,478,352, which is a continuation of Ser. No. 993,328, Dec. 18, 1992, Pat. No. 5,275,616, which is a continuation of Ser. No. 826,719, Jan. 28, 1992, Pat. No. 5,192,300, which is a continuation of Ser. No. 591,342, Oct. 1, 1990, Pat. No. 5,108,421.

[51] Int. Cl.$^6$ ..................................................... **A61B 17/08**

[52] U.S. Cl. .............................. **606/213**; 606/139; 604/15; 604/60; 604/265; 604/93

[58] Field of Search ...................................... 606/220, 232, 606/139; 604/15, 60, 265, 93, 96, 181

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| Re. 34,866 | 2/1995 | Kensey et al. | 606/213 |
| 3,016,895 | 1/1962 | Sein | 128/217 |
| 3,572,335 | 3/1971 | Robinson | 128/217 |
| 4,317,445 | 3/1982 | Robinson | 128/214.4 |
| 4,390,018 | 6/1983 | Zukowski | 128/303 R |
| 4,525,157 | 6/1985 | Vaillancourt | 604/52 |
| 4,578,061 | 3/1986 | Lemelson | 604/164 |
| 4,587,969 | 5/1986 | Gillis | 128/334 R |
| 4,588,395 | 5/1986 | Lemelson | 604/59 |
| 4,619,261 | 10/1986 | Guerriero | 128/325 |

| | | | |
|---|---|---|---|
| 4,638,803 | 1/1987 | Rand | 128/325 |
| 4,645,488 | 2/1987 | Matukas | 604/59 |
| 4,655,750 | 4/1987 | Vaillancourt | 604/165 |
| 4,744,364 | 5/1988 | Kensey | 128/334 R |
| 4,749,689 | 6/1988 | Miyata et al. | 514/21 |
| 4,772,264 | 9/1988 | Cragg | 604/158 |
| 4,774,091 | 9/1988 | Yamahira et al. | 424/426 |
| 4,790,819 | 12/1988 | Li et al. | 604/59 |
| 4,829,994 | 5/1989 | Kurth | 128/96.1 |
| 4,832,688 | 5/1989 | Sagae et al. | 605/53 |
| 4,838,280 | 6/1989 | Haaga | 128/751 |

(List continued on next page.)

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 651595 | 11/1994 | Australia . |
| 1322922 | 10/1993 | Canada . |
| 0139091 | 5/1985 | European Pat. Off. . |
| 0401525 | 12/1990 | European Pat. Off. . |
| 0476178 | 3/1992 | European Pat. Off. . |
| 0482350 | 4/1992 | European Pat. Off. . |
| 0493810 | 7/1992 | European Pat. Off. . |
| 0527923 | 3/1995 | European Pat. Off. . |
| 0474752 | 6/1995 | European Pat. Off. . |
| 0422046 | 7/1995 | European Pat. Off. . |
| 782814 | 11/1980 | U.S.S.R. . |
| 9109641 | 7/1991 | WIPO . |
| 9222252 | 12/1992 | WIPO . |

*Primary Examiner*—Michael Buiz
*Assistant Examiner*—Daphja Shai
*Attorney, Agent, or Firm*—Montgomery W. Smith; Richard D. Allison

[57] **ABSTRACT**

A device and method of closing an incision or puncture in a patient by inserting a vessel plug into the incision or puncture until the distal end of the vessel plug is adjacent to the outer lumen of the blood vessel or target organ so that the vessel plug does not obstruct the flow of fluid through the blood vessel or target organ. The precise positioning of the vessel plug in the incision or puncture is accomplished through the use of a balloon catheter or a cylindrical insertion assembly having a proximal plunger member associated therewith.

**32 Claims, 4 Drawing Sheets**



**5,716,375**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,852,568 | 8/1989 | Kensey | 128/325 |
| 4,863,431 | 9/1989 | Vaillancourt | 604/168 |
| 4,871,094 | 10/1989 | Gall et al. | 222/386 |
| 4,878,906 | 11/1989 | Lindemann et al. | 623/1 |
| 4,895,564 | 1/1990 | Farrell | 604/164 |
| 4,900,303 | 2/1990 | Lemelson | 604/54 |
| 4,904,240 | 2/1990 | Hoover | 604/53 |
| 4,929,246 | 5/1990 | Sinofsky | 606/8 |
| 4,936,835 | 6/1990 | Haaga | 604/265 |
| 4,941,874 | 7/1990 | Sandow et al. | 604/60 |
| 4,950,234 | 8/1990 | Fujioka et al. | 604/60 |
| 4,961,729 | 10/1990 | Vaillancourt | 604/164 |
| 4,994,028 | 2/1991 | Leonard et al. | 604/60 |
| 5,021,059 | 6/1991 | Kensey et al. | 606/213 |
| 5,053,046 | 10/1991 | Janese | 606/213 |
| 5,061,274 | 10/1991 | Kensey | 606/213 |
| 5,080,655 | 1/1992 | Haaga | 604/265 |
| 5,108,421 | 4/1992 | Fowler | 606/213 |
| 5,129,882 | 7/1992 | Weldon et al. | 604/96 |
| 5,192,302 | 3/1993 | Kensey et al. | 606/213 |
| 5,195,988 | 3/1993 | Haaga | 604/265 |
| 5,222,974 | 6/1993 | Kensey et al. | 606/213 |
| 5,254,105 | 10/1993 | Haaga | 604/265 |
| 5,282,827 | 2/1994 | Kensey et al. | 606/215 |
| 5,306,254 | 4/1994 | Nash et al. | 604/168 |
| 5,312,435 | 5/1994 | Nash et al. | 606/213 |
| 5,392,918 | 2/1995 | Harrison | 206/571 |
| 5,411,520 | 5/1995 | Nash et al. | 606/213 |
| 5,441,517 | 8/1995 | Kensey et al. | 606/213 |



*Fig. 1.*



*Fig. 2.*



*Fig.3.*

*Fig.4.*

*Fig.5.*



*Fig. 7.*



*Fig. 6.*



*Fig. 8.*

*Fig. 9.*

1

## INSERTION ASSEMBLY AND METHOD OF INSERTING A VESSEL PLUG INTO THE BODY OF A PATIENT

This is a continuation of application(s) Ser. No. 08/340,507 filed on Nov. 16, 1994 which is a continuation of U.S. Ser. No. 08/163,496 filed on Dec. 6, 1993, now U.S. Pat. No. 5,478,352; which is a continuation of U.S. Ser. No. 07/993,328 filed on Dec. 18, 1992, now U.S. Pat. No. 5,275,616; which is a continuation of U.S. Ser. No. 07/826,719 filed on Jan. 28, 1992, now U.S. Pat. No. 5,192,300; which is a continuation of U.S. Ser. No. 07/591,342 filed on Jan. 1, 1990, now U.S. Pat. No. 5,108,421.

### FIELD OF THE INVENTION

The present invention relates generally to hemostatic devices and more particularly to an insertion assembly and vessel plug which are insertable into an incision or puncture formed in the body of a patient.

### BACKGROUND OF THE INVENTION

During catheterization procedures, the nurse or physician will create an opening into an artery or other vessel with a conventional catheter introducer or dilator. The size of the opening will vary depending on the type of procedure and the size of the catheter which is used. For example, the diameter of the catheter and catheter sheath used in standard angiography procedures is typically between 5 to 8 French (1.67 mm and 2.67 mm, respectively). The diameter of the catheter and catheter sheath used in angioplasty procedures may be 8 (2.67 mm) or 9 (3.33 mm) French. The diameter of the catheter and catheter sheath used in intro-aortic balloon pump procedures is typically between 14 to 16 French (4.67 mm and 5.33 mm, respectively) and the diameter of the catheter and catheter sheath used with cardiopulmonary support systems is typically between 18 and 20 French (6.0 mm and 6.67 mm, respectively). Additionally, the catheter is often twisted or otherwise manipulated as it is advanced to the treatment site, thereby causing a further enlargement of the incision or puncture in the body of the patient.

When the medical procedure is completed and the catheter is removed from the artery or other blood vessel, conventional practice has been to apply external pressure to the entry site until clotting occurs. Because many of the patients undergoing these procedures have been medicated with an anticoagulant such as heparin, the nurse may be required to apply external pressure to the incision site for an extended period of time. The time required to stop bleeding at the incision is not an efficient use of the nurses time and a painful hematoma or unsightly bruise may still occur at the incision site because the artery will continue to bleed internally until clotting blocks the opening in the artery.

U.S. Pat. No. 4,829,994 granted to Kurth on May 16, 1989 attempts to resolve the above-described problem by providing an apron-like device consisting of a pelvic apron and a groin strap to apply a compressive force to the femoral vessel of the patient. Although this device effectively eliminates the need to have a nurse apply direct pressure to the incision site, the decrease in blood flow through the femoral artery caused by the use of this device may increase the likelihood of thrombosis formation in the compromised patient.

Another approach to resolving the above-identified problem is disclosed in U.S. Pat. No. 4,929,246 granted to Sinofsky on May 29, 1990. The method of using the device

2

disclosed in this patent includes the steps of advancing a semi-rigid tube having an inflatable balloon at its distal end through the overlying tissue to a location adjacent to the outer lumen of the punctured artery. The balloon is then inflated to apply pressure directly to the outer lumen of the artery. Laser energy is then directed to the outer lumen of the artery via an optical fiber centrally located in the semi-rigid tube such that the laser energy passes through the optical fiber and balloon of the semi-rigid tube to thermally weld the artery and seal the incision.

A further approach to resolving the above-identified problems is disclosed in U.S. Pat. No. 4,744,364 granted to Kensey on May 17, 1988 and related U.S. Pat. Nos. 4,852,568 and 4,890,612 granted to Kensey on Aug. 1, 1989 and Jan. 2, 1990, respectively. The first two Kensey patents disclose a device for sealing an opening in the wall of a blood vessel which consists of an elongate tubular body having an expandable closure member removably disposed therein. The tubular body also includes an ejecting device disposed within the tubular body for forcing the closure member from the tubular body into the interior of the blood vessel. A retraction filament is secured to the closure member so that the engagement surface of the closure member hemostatically engages the inner surface of the blood vessel contiguous with the puncture. The final Kensey patent discloses a device which includes a plug member having a holding portion which is adapted to engage portions of the tissue adjacent to the punctured vessel or organ to hold the plug member in place and a sealing portion formed of a foam material which extends into the punctured vessel or organ to engage the tissue contiguous therewith to seal the puncture.

None of the prior art devices teach the use of a simple and relatively inexpensive means for effecting the closure of a puncture or incision in the wall of a blood vessel, duct or lumen without extending into the affected blood vessel, duct or lumen.

### SUMMARY OF THE INVENTION

Accordingly, it is an object of the present invention to provide a device and method of use which overcomes the disadvantages of the prior art.

It is another object of the present invention to reduce the time required for sealing an incision in an artery and to decrease the likelihood that a hematoma will form after the catheter is removed from the incision.

These and other objects of the present invention are achieved by providing a device and a method for sealing an incision in a blood vessel, duct or lumen using the device as described hereinafter.

One form of the present invention preferably includes a relatively small diameter balloon catheter and a porous, absorbable vessel plug. The vessel plug includes a distal end which is sized and shaped so that the distal end of the vessel plug may be positioned adjacent to the outer surface of the blood vessel duct or lumen and will not cause a disruption in the flow of fluid past the incision. The method of using the preferred form of the present invention includes the steps of inserting the balloon catheter through the previously inserted catheter sheath and then removing the catheter sheath from the incision. The balloon is then inflated and positioned adjacent to the inner wall of the blood vessel, duct or lumen. Next, the vessel plug is inserted into the incision until the distal end of the vessel plug is positioned adjacent to the balloon on the distal end of the catheter. The balloon is then deflated and the catheter is removed from the incision. Finally, a dressing may be placed over the incision site to

3

retain the vessel plug in the incision until the vessel plug is incorporated into the surrounding tissue.

An advantage of the present invention is that the distal end of the vessel plug does not extend into the blood vessel duct or lumen and therefore, the flow of fluid through the vessel is not obstructed by the vessel plug and the likelihood that a thrombosis will form at the incision site is reduced.

A further advantage of the present invention is that it is relatively simple to use and the likelihood that a hematoma will form at the incision site is minimized.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a side elevational view, partially in cross section, showing the catheter sheath and balloon catheter of the present invention inserted in the patient;

FIG. 2 is a side elevational view, partially in cross section, showing the balloon of the balloon catheter inflated and positioned in the patient;

FIG. 3 is a side elevational view, partially in cross section, showing the vessel plug and balloon catheter inserted into the patient;

FIG. 4 is a side elevational view, partially in cross section, showing the vessel plug positioned in the patient with the balloon catheter removed;

FIG. 5 is a partial side view showing the distal end of the vessel plug of the present invention;

FIG. 6 is a side elevational view, partially in cross-section, showing an alternate form of the present invention once it has been initially inserted into the patient;

FIG. 7 is a side elevational view, partially in cross-section, showing the introducer assembly of FIG. 6 with the locating wings in the extended position;

FIG. 8 is a side elevational view, partially in cross-section showing the introducer assembly of FIG. 6 with the extended locating wings positioned adjacent to the inner wall of the patient's blood vessel; and

FIG. 9 is a side elevational view, partially in cross section showing the introducer assembly of FIG. 6 after the plunger member and inner and outer sleeves of the introducer assembly have been partially removed from the patient while the plunger is held stationary to retain proper placement of the vessel plug.

DETAILED DESCRIPTION OF THE PRESENT INVENTION

The present invention is described hereinafter with specific reference to the use of the present invention for sealing an incision or puncture in a blood vessel such as the femoral artery 10 of a patient. It is contemplated that the present invention may be used with nearly any catheterization or other medical procedure wherein it is desirable to seal an incision or puncture to prevent the loss of the patient's body fluid therethrough. As used herein, the distal end of an element is referred to as the end of the element nearest to the patient and the proximal end of an element is referred to as the element furthest away from the patient.

In order to more fully understand and appreciate the present invention, a brief description of a conventional angiographic catheterization procedure through the femoral artery of the patient is set forth herein. In such a procedure, an angiographic needle (not shown) is inserted percutaneously through the epidermal and dermal layer of the skin 12 of the patient at a preferred angle of approximately 25 to 45 degrees. The needle is inserted between 6 mm and 70 mm

4

percutaneously into the skin of the patient until the needle pierces the femoral artery. The puncture of the artery 10 by the needle is then confirmed by the physician and a small diameter guide wire (not shown) is inserted through the needle for approximately 15 to 20 cm. The needle is then withdrawn over the guidewire while pressure is applied to the artery 10 to limit the bleeding and prevent the formation of a hematoma at the incision site. The catheter (not shown) and an outer introducer or catheter sheath 14 are inserted over the guidewire and the guidewire is then removed from the inside of the catheter. Next, the catheter is advanced to the final location and the procedure is performed. Once the procedure has been completed, the catheter is removed and only the catheter sheath 14 remains in the incision to allow the vessel plug 20 of the present invention to be inserted into the incision as described hereinafter.

As shown in FIGS. 1–5, the preferred form of the present invention consists generally of a relatively small diameter balloon catheter 22 and the vessel plug 20. The balloon catheter preferably has an outer diameter of 1 mm or less and includes an inflatable balloon 24 on the distal end 26 thereof. The balloon catheter 22 may be constructed of nearly any semi-rigid material such as polyethylene or polyvinylchloride. The balloon catheter 22 includes a proximal end 28 having a syringe attachment 30 thereon. The syringe attachment 30 is designed to receive a liquid or a gas from a syringe 31 which is attachable thereto to allow for the inflation of the balloon as described more fully hereinafter. As shown in FIGS. 3–5, the vessel plug 20 of the present invention is preferably a cylindrical rod-shaped member which is constructed of a porous, biodegradable and expandable hemostatic collagen sponge such as the collagen cuff sold by Vitaphore Corporation under the name VITACUFF, or a polymerized polylactic acid, or polyglycolic acid matrix. The distal end 32 of the vessel plug 20 is preferably oriented at an angle of approximately 25 to 45 degrees with respect to the lengthwise dimension of the vessel plug 20 and, as shown in FIG. 5, the distal end 32 of the vessel plug 20 is preferably contoured to conform to the outer lumen of the artery 10. The proximal end 34 of the vessel plug 20 may be excised after placement in the patient and positioned at or slightly below the epidermal layer of the patient's skin as described more fully hereinafter.

Once the angiographic or other medical procedure has been performed and the catheter is removed from the patient, the introducer or catheter sheath 14 remains in the incision as shown in FIG. 1. The catheter sheath 14 functions to maintain the incision open while the balloon catheter 22 is inserted therethrough. Once the balloon catheter 22 is properly positioned in the incision so that the distal end 26 of the balloon catheter 22 extends into the artery 10, the user may withdraw the catheter sheath 14 from around the balloon catheter 22 and out of the incision. The incision will then collapse around the shaft of the balloon catheter 22 and the user may attach a syringe to the syringe attachment 30 on the proximal end 28 of the balloon catheter 22 to inflate the balloon 24. Alternately, the balloon catheter 22 may include an inflation member (not shown) preattached to the proximal end thereof which may be squeezed or otherwise actuated to temporarily inflate the balloon 24. Once the balloon 24 is inflated, the balloon catheter 22 is withdrawn from the incision until the inflated balloon 24 is positioned adjacent to the incision site along the inner lumen of the artery 10. The vessel plug 20 is then inserted into the incision along the shaft of the balloon catheter 22 until the distal end 32 of the vessel plug 20 contacts the inflated balloon 24 on the distal end 26 of the balloon catheter 22. In this position, the distal

5

end 32 of the vessel plug 20 is aligned with the outer lumen of the artery 10 and the balloon 24 prevents the vessel plug 20 from extending into the artery 10. Once the vessel plug 20 is properly positioned in the incision, the balloon 24 is deflated and the balloon catheter 22 is removed from the incision. The user may apply a small amount of pressure to the incision as the balloon catheter 22 is removed to frictionally retain the vessel plug 20 in the incision. Once the vessel plug 20 is inserted in the incision, the vessel plug 20 will expand as fluids are drawn into the vessel plug 20 from the blood vessels and tissues surrounding the incision and therefore, the contraction of the tissue surrounding the vessel plug 20 along with the expansion of the vessel plug 20 in the incision will assist in retaining the vessel plug 20 in the predetermined position in the incision. The removal of the balloon catheter 22 from the incision will not adversely affect the positioning of the vessel plug 20 because the balloon catheter 22 prevents the portion of the vessel plug 20 adjacent to the balloon catheter 22 from softening and absorbing fluid from the surrounding tissue until the balloon catheter 22 is removed from the incision. As a final step in the insertion of the vessel plug 20 into the incision, the proximal end 34 of the vessel plug 20 which extends beyond the skin 12 of the patient may be excised so that the proximal end 34 of the vessel plug 20 is positioned near the lower portion of the epidermal layer of the skin 12. The opening in the skin 12 may then be sutured closed or have a dressing applied over the incision site.

As described briefly above, the vessel plug 20 of the preferred embodiment initially swells when it is placed in the incision to prevent the formation of a hematoma at the incision site. Additionally, the porosity of the vessel plug 20 may vary depending on the anticipated size of the incision so that the fluids from the surrounding tissue may be absorbed more rapidly if a larger incision is made or if it is necessary for the vessel plug 20 to expand more quickly. Additionally, the porosity of the vessel plug 20 provides the means for connective tissue cell infiltration into the vessel plug 20 so that the patient's tissue will ultimately fill the percutaneous incision at various rates according to the porosity of the vessel plug 20. By positioning the distal end 32 of the vessel plug 20 at or near the outer lumen of the artery 10, there is no disruption of the fluid flow through the artery 10 at the incision site and the risk of thrombosis is minimized as compared to prior devices which include a closure or sealing member which is positioned along the inner lumen of the artery 10. It is anticipated that the vessel plug 20 will degrade and be absorbed within a few weeks or months so that there is no need to remove the vessel plug 20 from the incision at a later date. Additionally, the vessel plug 20 may be formulated to include a conventional clotting agent, such as a tissue thromboplastin, which is incorporated in the collagenous material to accelerate local hemostasis and which will allow the physician to maintain the patient on an anticlotting agent such as heparin after the procedure has been performed. It is further anticipated that the vessel plug 20 may be formulated to include a radiopaque material longitudinally incorporated therein to allow the placement of the vessel plug 20 to be observed using conventional visualization methods.

FIGS. 6–10 illustrate an alternate form of the present invention which consists generally of a preloaded insertion assembly 50 having a vessel plug 52 associated therewith. The insertion assembly 50 of this embodiment consists of a syringe-like device with a plunger 54; a cylindrically shaped outer sleeve 56 and a cylindrically shaped inner sleeve 58. The plunger 54 is preferably sized so that a portion thereof

6

slidably fits within the cylindrical inner sleeve 58. The outer sleeve 56 and the inner sleeve 58 include angled distal ends 62 and 63. The inner sleeve 58 includes a pair of outwardly biased and extending locating wings 64 positioned near the distal end 63 of the inner sleeve 58. These locating wings 64 are biased outwardly and may be opened by withdrawing the outer sleeve 56 from around the distal end 63 of the inner sleeve 58, and closed by the return of the outer sleeve 56 to its original position around the distal end 63 of the inner sleeve 58. Alternately, it is anticipated that the present embodiment may be constructed of one or more cylindrical sleeve members having an actuation member located near the proximal end of the sleeve such that rotation of a lever, rotating handle or other actuation member near the proximal end of the sleeve will cause one or more of the locating wings on the distal end of the sleeve to project radially outwardly from the distal end of the sleeve to temporarily increase the radial circumference of the distal end of the sleeve as the vessel plug 52 is moved to the desired location in the incision.

The vessel plug 52 of the present embodiment preferably consists of a collagenous material which is formed as a relatively short rod-like member having an angled and contoured distal end 68 which is shaped to conform to the outer contour of the lumen of the blood vessel 70. The proximal end 72 of the vessel plug 52 may be excised after placement and positioned at or slightly below the epidermal layer of the patient's skin, as previously described. In the present embodiment, the vessel plug 52 is positioned in an initial, preloaded condition within the insertion assembly 50 so that the distal end 68 of the vessel plug 52 is located in a predetermined position within the outer and inner sleeves 56 and 58 and adjacent to the locating wings 64 as shown in FIGS. 6 and 7.

The plunger member 54 of the present embodiment is preferably a cylindrically-shaped member which is sized to slidably fit within the inner diameter of the inner sleeve 58. In the initial, preloaded condition, the proximal end of the plunger member 54 extends proximally beyond the proximal ends of the outer sleeve 56 and the inner sleeve 58. The proximal end of the plunger member 54 includes a proximal member 74 thereon which is designed to allow the user to retain the position of the plunger member 54 and the vessel plug 52 in the preferred position within the incision as the inner and outer sleeves 56 and 58 are withdrawn from the incision as described more fully hereinafter.

As with the preferred embodiment shown in FIGS. 1–5, the alternate embodiment shown in FIGS. 6–10 is used after the medical procedure has been performed. In this embodiment, the previously inserted catheter sheath (not shown) is initially removed while external pressure is applied to the incision to prevent blood loss. The preloaded insertion assembly 50 is then inserted into the incision and blood vessel as shown in FIG. 6. Alternatively, this exchange of catheter assemblies may be facilitated by the use of a guidewire (not shown) which is placed through the catheter sheath prior to its removal from the incision. The insertion assembly 50 may then be subsequently inserted into the incision along or over the guidewire. Once the user verifies that the insertion assembly 50 is fully inserted within the incision and blood vessel 70 as shown in FIG. 6, the user may withdraw the outer sleeve 56 slightly with respect to the inner sleeve 58 to extend the locating wings 64 laterally outwardly from the distal end 63 of the inner sleeve 58. The user may then withdraw the insertion assembly 50 from the incision until the locating wings 64 contact a predetermined portion of the inner lumen of the blood vessel 70 as shown

7

in FIG. 8. The distal end 68 of the vessel plug 52 is particularly positioned in the outer and inner sleeves 56 and 58 and adjacent to the locating wings 64 so that when the locating wings 64 contact the inner lumen of the blood vessel 70, the distal end 68 of the vessel plug 52 is properly aligned in the incision. Next, while holding the plunger member 54 in a fixed position with respect to the patient, the user returns the outer sleeve 56 to its original position around the inner sleeve 58 to retract the locating wings 64 on the distal end 63 of the inner sleeve 58. While continuing to hold the plunger 54 in a fixed position relative to the incision to retain the vessel plug 52 at the desired depth, the outer and inner sleeves 56 and 58 of the insertion assembly 50 are withdrawn from the incision and from around the vessel plug 52 as shown in FIGS. 9 and 10. The overall length of the plunger member 54 and the vessel plug 52 are chosen so that as the proximal end of the inner sleeve 58 reaches the proximal member 74 on the plunger member 54, a sufficient amount of the vessel plug 52 will extend distally beyond the insertion assembly 50 so that the insertion assembly 50 may then be withdrawn from the incision while the distal end 68 of the vessel plug 52 is frictionally retained in the desired position in the incision.

The locating wings 64 of the present embodiment serve to provide a minimal amount of resistance as the insertion assembly 50 is moved to the desired location along the inner lumen of the blood vessel 70. It is anticipated that the locating wings 64 may be actuated by nearly any actuation mechanism as long as the locating wings 64 are retractable and provide sufficient resistance at the inner lumen of the blood vessel 70 to signal the user that the insertion assembly 50 is in the proper position for the insertion of the vessel plug 52 into the incision.

As with the prior embodiment, the distal end 68 of the vessel plug 52 is positioned in the incision at or adjacent to the outer lumen of the blood vessel 70 so that none of the vessel plug 52 extends into the blood vessel 70 to disrupt the flow of blood therethrough. The porosity of the vessel plug 52 is chosen so that the vessel plug 52 will expand as it absorbs fluids from the surrounding tissue and so that the vessel plug 52 will degrade in a matter of weeks or months. Because the vessel plug 52 does not extend into the lumen of the blood vessel 70, the vessel plug 52 of the present embodiment may include a clotting agent incorporated therein to promote localized hemostasis in the incision without increasing the likelihood of thrombosis formation in the blood vessel 70.

While the preferred forms of the present invention are described and illustrated herein, it will be obvious to those skilled in the art that various changes and modifications may be made thereto without departing from the scope of the present invention as defined by the following claims.

What is claimed is:

1. A method of sealing an incision formed in the body of a patient wherein the incision extends generally from the skin of the patient into a blood vessel of the patient, the method comprising:

inserting a relatively small diameter balloon catheter through the previously formed incision in the patient;

inflating a balloon on the distal end of the balloon catheter;

withdrawing the balloon catheter from the incision until the balloon contacts a predetermined portion of the inner lumen of the blood vessel; and

deflating the balloon on the balloon catheter and removing the balloon catheter from the incision.

8

2. A method of sealing an incision formed in the body of a patient wherein the incision extends generally from the skin of the patient, through the wall of a blood vessel and into a blood vessel of the patient, the method comprising:

inserting an elongate member having distal and proximal end portions and an actuatable member thereon into the incision in the patient;

actuating the actuatable member on the elongate member to cause the movement of the actuatable member from a first position with respect to the elongate member to a second position wherein the actuatable member extends laterally of the distal end portion of the elongate member when the actuatable member is in the second position;

moving the elongate member to a position in the blood vessel in the patient until the actuatable member contacts a predetermined portion of the blood vessel in the patient to enable the user to determine the location of the blood vessel; and

removing the elongate member from the incision and blood vessel.

3. The method according to claim 2, further including the step of actuating the movement of the actuatable member from the second position to the first position prior to removing the elongate member from the incision.

4. The method according to claim 3, further including the step of causing the radial expansion of the actuatable member as the actuatable member is moved from the first to the second position.

5. The method according to claim 3, further including the step of causing the lateral extension of one or more members of the actuatable member as the actuatable member is moved from the first to the second position.

6. The method according to claim 2, further including actuating a member associated with the proximal end portion of the elongate member to cause the movement of the actuatable member from the first position to the second position to position the elongate member in the incision and blood vessel determined by the contact between the elongate member and the blood vessel.

7. The method according to claim 2, further including the step of withdrawing the elongate member in the incision until the actuatable member contacts at least a portion of the wall of the blood vessel of the patient.

8. The method according to claim 2, further including the step of withdrawing the elongate member in the incision until the actuatable member contacts at least a portion of the wall of the blood vessel of the patient which is adjacent to the incision.

9. A method of sealing an incision formed in the body of a patient wherein the incision extends generally from the skin of the patient into a blood vessel of the patient, the method comprising the steps of:

inserting an elongate member having distal and proximal ends with at least one laterally extendable member along the distal end portion thereof and a movement causing member associated with the proximal end portion thereof into the incision in the patient;

causing the movement of the extendable member laterally along the distal end portion of the elongate member to increase the radius of the distal end portion of the elongate member; and

withdrawing the elongate member from the incision until the extendable member contacts the inner lumen of the blood vessel.

10. The method of claim 9, further including the step of returning the locating member to a reduced radius and withdrawing the elongate member from the incision.

9

10

**11**. The method of claim **9**, further including the step of actuating the movement causing member on the proximal end portion of the elongate member to return the locating member to a reduced radius to enable the elongate member to be withdrawn from the incision and past the wall of the blood vessel.

**12**. A method of sealing an incision formed in the body of a patient wherein the incision extends generally from the skin of the patient, through the wall of a blood vessel and into a blood vessel of the patient, the method comprising:

inserting an elongate member having distal and proximal end portions into the incision and blood vessel of the patient and moving the elongate member to a position in the incision and blood vessel in the patient to enable the user to determine the location of the blood vessel; and

sealing the incision in accordance with the location determined by the elongate member to create a seal in the incision without extending th seal into the blood vessel such that the flow of blood through the blood vessel is unobstructed and the flow of blood through the incision is prevented.

**13**. The method according to claim **12**, further including the step of actuating the movement of an actuatable member which is operatively interconnected with the elongate member from a first position to a second laterally extended position with respect to the elongate member to locate the blood vessel of the patient.

**14**. The method according to claim **13**, further including the step of causing the lateral extension of the actuatable member as the actuatable member is moved from the first to the second position to contact the wall of the blood vessel of the patient.

**15**. The method according to claim **12**, further including the step of causing the lateral extension of one or more members of an actuatable member which is operatively interconnected with the elongate member as the actuatable member is moved from a first to a second position with respect to the elongate member.

**16**. The method according to claim **12**, further including actuating a member which is operatively interconnected with the proximal end portion of the elongate member to cause a bioabsorbable material to be located at a desired location in the incision to obstruct the flow of blood through the incision.

**17**. The method according to claim **16**, further including the step of withdrawing the elongate member from the incision after the bioabsorbable material is positioned in the incision.

**18**. The method according to claim **12**, further including the step of withdrawing the elongate member in the incision until an actuatable member associated with the elongate member contacts at least a portion of the wall of the blood vessel of the patient which is adjacent to the incision.

**19**. The method according to claim **12**, further including the step of inserting a bioabsorbable material into the incision in accordance with the location of the blood vessel determined by the contact between the actuatable member and the wall of the blood vessel.

**20**. A method of sealing an incision formed in the body of a patient wherein the incision extends generally from the skin of the patient, past the wall of the blood vessel and into a blood vessel of the patient, the method comprising the steps of:

inserting an elongate member having distal and proximal ends into the incision and blood vessel of the patient;

withdrawing the elongate member in the incision and blood vessel to identify the location of the wall of the blood vessel;

sealing the incision in accordance with the location of the wall of the blood vessel determined by the elongate member to create a seal in the incision without extending the seal into the blood vessel and so that the flow of blood through the blood vessel is unobstructed; and

withdrawing the elongate member from the incision and the blood vessel.

**21**. An insertion assembly for sealing an incision in the body of a patient wherein the incision extends from the skin of the patient into a blood vessel of the patient, said insertion assembly comprising in combination:

a vessel plug which is constructed of a material that is absorbable within the body of a patient and which seals the incision from the flow of blood therethrough; and

an elongate positioning member having a passage way therein for the receipt of said vessel plug therein, and at least a portion of said positioning member is expandable so that it has an outer diameter in use which is greater than the diameter of the incision to position said vessel plug in the incision proximally of the blood vessel such that said vessel plug obstructs the flow of blood through the incision without extending into the blood vessel.

**22**. The insertion assembly of claim **21**, wherein said vessel plug is expelled from said elongate member to said predetermined position in the incision by a plunger member which is operatively associated with said positioning member.

**23**. An insertion assembly for sealing an incision formed in the body of a patient wherein the incision extends from the skin of the patient into a blood vessel of the patient, said insertion assembly comprising:

an elongate member having a length sufficient to extend from the skin of the patient through the incision and into the blood vessel of the patient to identify the location of the blood vessel through the incision; and

a vessel plug formed of a hemostasis promoting material and having distal and proximal portions and said vessel plug sized to be received in the incision such that said distal portion is located at a first predetermined position in the incision proximally of the outer surface of the blood vessel of the patient as identified by said elongate member and said proximal portion is located at a second predetermined position proximally of said first predetermined position in the incision and proximally of the blood vessel of the patient.

**24**. The insertion assembly of claim **23**, wherein said vessel plug is formed of said hemostasis promoting material and is absorbable within the body of the patient and is sized to extend in the incision between the outer skin surface of the patient and the proximal outer surface of the blood vessel.

**25**. The insertion assembly of claim **24**, wherein said elongate member is a cylindrical member.

**26**. The insertion assembly of claim **25**, wherein said elongate member includes a passageway extending therethrough.

**27**. The insertion assembly of claim **26**, wherein said elongate member includes distal and proximal end portions and said proximal end portion thereof includes a plunger member operatively associated therewith.

**28**. A method of sealing an incision formed in the body of a patient wherein the incision extends generally from the skin of a patient into a selected blood vessel of the patient, the method comprising:

inserting a positioning member into the incision and blood vessel to determine the location of the blood vessel through the incision; and

5,716,375

11

inserting a bioabsorbable vessel plug into the incision such that the vessel plug is positioned in the incision in accordance with the location determined by the positioning member to seal the incision from the flow of blood passing through the blood vessel without extending into the blood vessel.

29. The method of claim 28. further including the step of causing the positioning member to contact the wall of the blood vessel as the positioning member is moved in the incision and blood vessel.

30. The method of claim 28. further including the step of withdrawing the positioning member from the incision.

31. A method of sealing an incision formed in the body of a patient wherein the incision extends generally from the skin of the patient into a blood vessel of the patient. the method comprising the steps of:

inserting an assembly having a cylindrical member with distal and proximal ends and a vessel plug therein

12

having distal and proximal ends and a plunger member associated with the proximal end of the vessel plug into the incision and blood vessel to a predetermined position in the incision wherein the distal end of the vessel plug is located proximally of the blood vessel; and

withdrawing the cylindrical member of the assembly from the incision and blood vessel while retaining the plunger member in a fixed position relative to the incision to maintain the vessel plug in the predetermined position in the incision.

32. The method of claim 31 further including the step of completely withdrawing the cylindrical member and the plunger member from the incision as the distal end of the vessel plug is retained in the incision.

*  *  *  *  *

(12) **United States Patent**
Janzen et al.

(10) Patent No.: **US 7,008,439 B1**
(45) Date of Patent: **Mar. 7, 2006**

(54) **DEVICE AND METHOD FOR SEALING PUNCTURE WOUNDS**

(75) Inventors: **Ernst Janzen**, Laren (NL); **Gunter Ruttgers**, Stolberg (DE); **Lawrence Saper**, New York, NY (US)

(73) Assignee: **Datascope Investments Corp.**, Montvale, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **08/399,535**

(22) Filed: **Mar. 7, 1995**

**Related U.S. Application Data**

(60) Continuation of application No. 08/318,380, filed on Oct. 5, 1994, now Pat. No. 5,830,130, which is a division of application No. 07/746,339, filed on Aug. 16, 1991, now Pat. No. 5,391,183, which is a continuation-in-part of application No. 07/634,478, filed on Dec. 27, 1990, now abandoned.

(30) **Foreign Application Priority Data**

Sep. 21, 1990 (EP) ................................. 90 118 186

(51) **Int. Cl.**
*A61B 17/04* (2006.01)

(52) **U.S. Cl.** ....................................................... **606/213**

(58) **Field of Classification Search** ............... 606/232, 606/213
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 3,016,895 A | * | 1/1962 | Sein | ............................. | 604/60 |
| 3,572,335 A | * | 3/1971 | Robinson | ..................... | 604/515 |
| 4,578,061 A | * | 3/1986 | Lemelson | .............. | 604/170.01 |
| 4,588,395 A | * | 5/1986 | Lemelson | .................... | 604/59 |
| 4,619,261 A | * | 10/1986 | Guerriero | ................... | 606/194 |
| 4,638,803 A | * | 1/1987 | Rand | .......................... | 606/192 |
| 4,744,364 A | * | 5/1988 | Kensey | ....................... | 606/213 |
| 4,749,689 A | * | 6/1988 | Miyata et al. | ............... | 514/21 |
| 4,790,819 A | * | 12/1988 | Li et al. | ....................... | 604/59 |
| 4,838,280 A | * | 6/1989 | Haaga | ........................ | 600/564 |
| 4,852,568 A | * | 8/1989 | Kensey | ....................... | 606/213 |
| 4,878,906 A | * | 11/1989 | Lindemann et al. | ....... | 623/3.18 |
| 4,890,612 A | * | 1/1990 | Kensey | ....................... | 606/213 |
| 4,895,564 A | * | 1/1990 | Farrell | ..................... | 604/164.1 |
| 4,900,303 A | * | 2/1990 | Lemelson | ................... | 604/514 |
| 4,929,246 A | * | 5/1990 | Sinofsky | ...................... | 606/8 |
| 4,941,874 A | * | 7/1990 | Sandow et al. | ............... | 604/60 |
| 4,950,234 A | * | 8/1990 | Fujioka et al. | ............... | 604/60 |
| 4,994,028 A | * | 2/1991 | Leonard et al. | ............... | 604/60 |
| 5,021,059 A | * | 6/1991 | Kensey et al. | ............... | 606/213 |
| 5,053,046 A | * | 10/1991 | Janese | ....................... | 606/215 |
| 5,061,274 A | * | 10/1991 | Kensey | ....................... | 606/213 |
| 5,108,421 A | * | 4/1992 | Fowler | ....................... | 606/213 |

(Continued)

FOREIGN PATENT DOCUMENTS

DE          8907370          *   9/1989

(Continued)

*Primary Examiner*—Gary Jackson
(74) *Attorney, Agent, or Firm*—Lerner, David, Littenberg, Krumholz & Mentlik, LLP

(57) **ABSTRACT**

A device is proposed for inserting hemostatic material through a tissue channel and against the outside wall of a blood vessel of a patient, wherein the blood vessel wall has a puncture therein adjacent the tissue channel. The device includes a charge of hemostatic material and a hollow sheath adapted to pass through the tissue channel, the sheath having a cross sectional profile larger than the puncture. The device places the hemostatic material in the hollow sheath and advances the hemostatic material through the sheath to the outside of the vessel wall around the puncture.

**10 Claims, 14 Drawing Sheets**



**US 7,008,439 B1**

Page 2

---

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,129,882 | A | * | 7/1992 | Weldon et al. ............ 604/93.01 |
| 5,275,616 | A | * | 1/1994 | Fowler ...................... 606/213 |
| 5,292,332 | A | * | 3/1994 | Lee ........................... 606/213 |
| 5,310,407 | A | * | 5/1994 | Casale ...................... 604/506 |
| RE34,866 | E | * | 2/1995 | Kensey et al. .............. 606/213 |
| 5,478,352 | A | * | 12/1995 | Fowler ...................... 606/213 |
| 5,275,616 | A | | 1/1996 | Fowler |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 8907370.3 | | 9/1989 |
| FR | 2641692 | * | 7/1990 |
| GB | 1509023 | * | 4/1978 |
| WO | 89-11301 | | 11/1989 |
| WO | WO 8911301 | * | 11/1989 |

* cited by examiner



*FIG. 1*

*FIG. 4*





FIG. 5

FIG. 6

*FIG. 7*



*FIG. 8*





FIG. 9

FIG. 10

*FIG. 11*



*FIG. 12A*

*FIG. 12B*

*FIG. 12C*

*FIG. 12D*

*FIG. 12E*





*FIG. 14*

*FIG. 14A*

*FIG. 15*



*FIG. 15A*



*FIG. 17*



*FIG. 17A*





*FIG. 18*





*FIG. 23*



US 7,008,439 B1

1

# DEVICE AND METHOD FOR SEALING PUNCTURE WOUNDS

This application is a continuation of application Ser. No. 08/318,380 filed Oct. 5, 1994, now U.S. Pat. No. 5,830,130, which is a divisional of application Ser. No. 07/746,339, filed Aug. 16, 1991, and now U.S. Pat. No. 5,391,183, which is a continuation-in-part of application Ser. No. 07/634,478, filed on Dec. 27, 1990, and now abandoned.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to a method for sealing a puncture wound in a blood vessel and a device for practicing said method.

2. Related Background

In certain medical procedures, such as cardiac catheterization, dilatation and counterpulsation, a catheter or other device is inserted into an artery, most commonly by percutaneous methods, and then fed through the arterial tree to the site where needed, frequently, the region of the heart. The site usually selected for insertion is the groin, because the femoral artery in that region is relatively easy to locate.

These procedures are normally initiated by insertion of an angiographic needle, followed by passing a guide wire through that needle into the artery. The needle is then removed leaving the guide wire in place. Next, a sheath-dilator set is passed over the guide wire into the artery in order to enlarge the opening sufficiently to permit entry of the catheter or other device. The dilator is then removed, leaving the sheath or guide cannula in place. The catheter or other device can then be inserted through the cannula with full confidence that when it emerges from the distal end it will be within the lumen of the artery.

It should be understood that the subject invention is independent of the nature of the medical device being used to treat the patient. Accordingly, the term "catheter" will be used here in a very generic and broad way to include not only "catheters" in the strict sense, but any device that is inserted into a blood vessel of the body.

Similarly, the subject invention is independent of the blood vessel involved. While it is anticipated that the femoral artery will be the most commonly used blood vessel, other arteries as well as veins might just as easily be involved.

After a procedure, for example, counterpulsation, has been completed, the sheath must be removed and the wound closed. Often, this can be accomplished simply by the application of digital pressure, generally augmented by the use of a pressure dressing. Customarily, pressure must be applied for at least ½ hour, and frequently for much longer than that. While pressure dressings often suffice, it is not uncommon for additional devices, such as sandbags, to be needed. In addition, during this period the patient must be immobilized, lest movement interfere with the closing process. Because of the pressure required, the time during which it must be applied and the need for immobilization, the procedure is painful and uncomfortable. It also requires prolonged personal attention of a health care professional. Finally, wound closures accomplished in this manner are prone to reopen unexpectedly long after closure appears to have been completed. Patients are therefore often required to remain in the hospital for 24 hours or longer.

Because sealing can be such a problem, cardiologists tend to use the smallest calibre catheters when performing catheterization procedures. Larger calibre catheters, however,

2

are far preferable. An improved sealing procedure whereby larger catheters can be used without increasing the sealing difficulties would greatly facilitate cardiac catheterization.

A series of related devices which were designed to address some of these problems is described in U.S. Pat. Nos. 4,744,364, 4,852,568 and 4,890,612. These three patents describe a mushroom or umbrella shaped device which is used to seal the artery from the inside. The head of the device is placed within the arterial lumen and means are provided to pull and hold the underside of the head against the inside wall of the lumen. It is believed, however, that sealing from the inside can be the source of its own problems, including the promotion of clot formation inside the vessel.

Another method for sealing a puncture wound is described in U.S. Pat. No. 4,929,246. The approach taken there is to insert a balloon-tipped catheter into the tissue wound, inflate the balloon against the hole in the artery and then use a laser to thermally weld the wound closed.

The present invention is believed to overcome most of the drawbacks of the traditional method, without creating any new difficulties. This is accomplished by using a plug, preferably a collagen plug or plug of some other resorbable material, to seal the artery along its outside wall.

## SUMMARY OF THE INVENTION

In its most simplified form, the instant invention involves the placing of hemostatic material against the outside wall of a punctured artery. The hemostatic material covers the entire puncture site and a hemostatic seal is formed so as to stop bleeding from the puncture wound.

In one embodiment, the subject invention teaches the use of a plug, preferably of fibrous collagen material. The plug is inserted into the tissue wound and is held against the outside of the artery wall so as to overlap the puncture wound. Before plug insertion, the artery is preferably clamped by the use of external digital pressure, at a point slightly upstream of the wound site. After the plug has been inserted, the upstream clamping pressure is maintained for a very short period of time, and then gently removed. Slight pressure may be maintained on the plug to hold it against the artery wall until a good seal has been established.

In order to insert the plug in accordance with the procedure outlined above, a special device has been designed. It is comprised of two basic components, a sheath and a plug pusher or piston. The sheath is inserted through the tissue until its leading end is near to or abuts the outer wall of the artery. Thereafter, the plug is advanced through the sheath by use of the plug pusher until the plug abuts the artery wall and overlaps the arterial puncture on all sides. Finally, after a good seal has been established, the sheath and pusher are removed.

## BRIEF DESCRIPTION OF THE DRAWING

FIG. **1** is an exploded view of one embodiment of an insertion apparatus in accordance with the instant invention.

FIG. **2** depicts, in cross section, one embodiment of an insertion apparatus in accordance with the instant invention.

FIG. **3** depicts, in cross section, a second embodiment of an insertion device in accordance with the instant invention.

FIG. **4** depicts, in cross section, an exploded view of a third embodiment of an insertion apparatus in accordance with the instant invention.

US 7,008,439 B1

3

FIG. **5** is an enlarged, schematic drawing, in cross section, of an insertion site, showing a balloon catheter, having passed over a guide wire through a guide cannula into the femoral artery of a patient.

FIG. **6** shows the insertion site of FIG. **5** after the catheter and cannula have been removed.

FIG. **7** shows the insertion site of FIG. **6** after insertion of a tissue dilator in accordance with the instant invention.

FIG. **8** shows the insertion site of FIG. **7** after insertion of a sheath over the tissue dilator in accordance with the instant invention.

FIG. **9** shows the insertion site of FIG. **8** after removal of the tissue dilator and guide wire and after partial insertion of a hemostatic plug and plug pusher.

FIG. **10** shows the insertion site of FIG. **9** after the hemostatic plug has been pushed out of the sheath and while it is being held in intimate contact with the arterial puncture.

FIG. **11** shows an alternative embodiment of the instant invention wherein a collagen balloon is used to seal an arterial puncture.

FIGS. **12***a, b, c, d* and *e* show alternative forms of plug which are useful in practicing the instant invention.

FIGS. **13** through **23** show the steps of an alternate procedure for practicing the instant invention.

## DETAILED DESCRIPTION

In certain procedures, for example, intra-aortic balloon pumping ("IABP"), percutaneous transluminal coronary angioplasty ("PTCA") and angiography, as best seen in FIG. **5**, a catheter or other device **7** is inserted, often over a guide wire **15**, through a guide cannula **3** into an artery **11**, most frequently, the common femoral artery in the groin area of the patient's leg **1**. When the procedure (e.g., counterpulsation) has been completed, the device (e.g., the catheter), the guide wire and the guide cannula must be removed and the wound closed.

In accordance with one embodiment of the instant invention, wounds of this type are closed by inserting a plug into tissue wound or channel **9**, and holding it against the outside of the artery wall over arterial puncture **13** for a short period of time until a good self-sustaining hemostatic seal is established. Although punctures of the sort made by percutaneous procedures will generally, after removal of all cannulas and catheters, be in the nature of slits, for ease of understanding, they are depicted in the drawings herein more as holes. The shape of the puncture, however, is not critical.

In order to insert the plug to assure that it is properly located and to be able to hold it in place until a good seal is established, a special insertion apparatus has been designed. One embodiment (FIG. **1**) of an insertion apparatus according to the instant invention is comprised of a sheath assembly **23**, a plug holder **29** and a plug pusher **33**. Sheath assembly **23**, in turn, is comprised of an elongated tubular sheath **45** and a collar **35**. At its rear end, collar **35** is provided with an external thread **37**. In addition, sheath assembly **23** is provided with a sheath channel **27**, which runs through the entire assembly, from front end **25**, through sheath **45** and through collar **35**.

Plug holder **29** is comprised of an elongated rear tubular portion **47** and a coupling **39** which has an internal thread **41**. Plug holder **29** also has a channel **31** running throughout its entire length. Coupling thread **41** is designed to mate with collar thread **37** so that when collar **35** is screwed into coupling **39**, channels **31** and **27**, which preferably are of the same cross sectional size and configuration, are aligned.

4

Like the other two components, the plug pusher **33** is also comprised of two parts, an elongated piston **49**, and a stud knob **43**. Piston **49** has a cross sectional size and configuration so as to permit sliding passage into channels **31** and **27** with only minimal clearance. The length of piston **49** is such that when sheath assembly **23** and plug holder **29** are screwed tightly together, shoulder **51** of knob **43** will abut rear end **53** of plug holder **29** as front end **55** of piston **49** is aligned with front end **25** of sheath **45**.

It should be noted that pusher **33** is provided with its own channel **19**. This is to permit passage therethrough of a guide wire and hence to enable pusher **33** to serve dual functions, as a tissue dilator and as a plug pusher.

In accordance with the method of the instant invention, first the device **7** (e.g., the IAB) and the guide cannula **3** are removed, leaving the guide wire **15** in place (as seen in FIG. **6**). If no guide wire has been employed, prior to removal of the catheter and cannula, a guide wire may be inserted. As the cannula is withdrawn, in order to prevent bleeding, the artery is clamped, usually by pressing a finger **2** over the femoral artery upstream of the wound site. Because of this clamping, there is no significant blood pressure inside the artery at the site of the puncture (other than some small retrograde pressure) and the artery tends to collapse.

Although it is believed preferable to employ a guide wire, it is possible to practice the invention without one. It is also possible to practice the instant invention by eliminating the dilator, but this too is not the preferred approach.

The artery is clamped at least in part to prevent tissue channel **9** from filling with a pool of blood. When loose fibrous collagen encounters a pool of blood it tends to disintegrate almost immediately. Obviously, once disintegrated it cannot function properly to seal the arterial puncture. Hence, when collagen in loose fibrous form is employed, clamping of the artery is important. It is less important, but still generally advantageous, if the loose fibrous material has been tamped down or otherwise compressed. As used herein, the term "loose" includes material which has been compressed or tamped down.

Collagen that is more densely packed does not disintegrate upon encountering blood nearly as quickly as loose fibrous collagen. Therefore, clamping of the artery is not nearly as important when the hemostatic material is in the form of a densely packed material, as it is when a loose fleece-type hemostatic material is employed. Thus, although clamping is believed to be desireable, it is not, in all cases essential.

While the artery remains clamped, the proximal end of guide wire **15** is fed through lumen **20** of tissue dilator **17**. The physician can then slide the dilator down along the guide wire into tissue channel **9** until it reaches the wall of artery **11** (as depicted in FIG. **7**).

The size and shape of the tissue dilator are such as to ensure that the body thereof will not enter the artery. In terms of size, preferably a dilator is selected which is significantly larger than the original guide cannula **3**. With respect to its shape, unlike more traditional dilators which often have long tapered forward ends, the tissue dilator **17** of the instant invention has a blunt forward end **21**. Although end **21** may be slightly rounded or chamfered in order to facilitate smooth passage through tissue channel **9**, it is preferable not to reduce it in size sufficiently to permit entry through the arterial puncture **13** into the lumen of the artery.

As noted above, during this phase of the procedure, there is no significant blood pressure in the region of artery **11** adjacent puncture **13**. As a result, when end **21** of dilator **17** reaches artery **11**, the wall of the artery tends to collapse

US 7,008,439 B1

5

further (as depicted in FIG. 7). The physician knows that the dilator has reached the artery because a noticeable increase in resistance is felt.

According to the procedure of the instant invention, once increased resistance is encountered, axial pressure is maintained so as to hold end 21 of dilator 17 against artery 11. Next, a sheath 45 is passed over dilator 17 and advanced along the dilator again until increased resistance is encountered. As with the dilator, increased resistance indicates that front end 25 is against artery 11 (as depicted in FIG. 8). In addition, a marker can be placed around the circumference of the dilator to signal when the distal end of the sheath is aligned with the distal end of the dilator.

Because end 25 of sheath 45 is larger than arterial puncture 9, the sheath cannot enter the arterial puncture. Although the precise dimensions of dilator 17 and sheath 45 are not critical, it is believed desirable that the sheath 45 be 30% to 50% or more larger than the previously removed guide cannula 3. In clinical trials done to date, when the guide cannula was 9 Fr., a 13 Fr. tissue dilator and a 14 Fr. sheath were used. It should be understood, however, that cannulae which are oversized by as little as 10% may also be suitable.

Once the guide or procedure cannula has been removed, tissue channel 9 tends to collapse. Also, once the procedure cannula and the procedure catheter have been removed, arterial puncture 13 has a tendency to close up. It may therefore be possible or even preferable to use a sheath that is the same size as or even smaller than the previously removed procedure cannula.

With the front end 25 of sheath 45 held snugly against the wall of artery 11, plug 57 is slid down through lumen 27 of sheath 45 (as shown in FIG. 9) until it reaches end 25 of sheath 45 where it encounters artery 11. If an insertion apparatus like that shown in FIG. 1 is used, plug 57 is initially housed in plug holder 29. When it is time for plug insertion, holder 29 is screwed onto sheath assembly 23 by means of threads 37 and 41, and piston 49 is inserted into channel 31. Advancement of the piston then forces plug 57 from holder 29 into sheath 45 and through lumen 27 to the artery wall.

Once resistance is felt, the physician slowly withdraws the sheath while continuing to maintain pressure against the piston so that plug 57 remains pressed against artery 11. When shoulder 51 of knob 43 abuts rear end 53 of holder 29, the physician knows that plug 57 has been pushed entirely out of lumen 27 (as shown in FIG. 10). Axial pressure is maintained for a short period of time, perhaps as little as one minute or as long as five minutes, depending upon the circumstances, to allow plug 57 to seat in tissue channel 9 and against arterial puncture 13. Minimal axial pressure is thereafter continued while clamping pressure is slowly released until a good self-sustaining hemostatic seal has been confirmed. The sheath, holder, and pusher can all then be removed.

While it is believed that the preferable procedure is to permit both piston and sheath to remain in place until a self-sustaining hemostatic seal has been achieved, this is not absolutely necessary. Some physicians may prefer, once the pressure of the plug against the artery wall has produced hemostasis, to withdraw the sheath so that the tissue wound may begin to close down, while maintaining pressure on the plug by use of the piston alone. Alternatively, the piston might be withdrawn and reliance placed upon the outer rim of the sheath to hold the plug against the artery wall and assure hemostasis in that manner.

6

In addition, removal of the piston without removal of the sheath permits insertion of a second plug. This might be necessary where the first plug, perhaps of a loose fibrous material, disintegrates upon encountering a pool of blood. A second plug, this one of more densely packed material having greater physical integrity and less of a tendency toward immediate disintegration, is inserted in the sheath and the piston reinserted behind it.

An apparatus similar to that of FIG. 1 is depicted in FIG. 4. The primary difference between the two is that the plug pusher of the FIG. 4 embodiment does not serve a dual function. Instead, the embodiments FIG. 4 has a separate tissue dilator 17 with channel 20 running throughout its length.

Another, somewhat different embodiment of an apparatus for inserting a plug in accordance with the instant invention is depicted in FIG. 2. The insertion apparatus 59 of that embodiment is made in the form of a Y, with a common or sheath leg 61, a plug leg 63 and a dilator leg 65.

In one method of using the apparatus of FIG. 2, tissue dilator 17 and insertion apparatus 59 are preassembled by passing the dilator through legs 65 and 61 until enough of dilator 17 extends beyond the forward end of leg 61 to assure that end 21 will abut artery 11 before front end 26 of leg 61 reaches the surface of the patient's leg. The proximal end of the guide wire is then fed through dilator channel 20 and the dilator is slid down the guide wire into tissue wound 9 until end 21 of dilator 17 reaches the wall of artery 11. While holding the dilator against the artery wall, the physician slides insertion apparatus 59 along dilator 17 until end 26 of leg 61 reaches artery 11.

With end 26 held snugly against artery 11, dilator 17 is withdrawn, but only far enough so as to uncover channel 67 of plug leg 63. Plug pusher 69 is then moved down through channel 67 until plug 57 has entered common leg 61 and pusher 69 is then withdrawn so that it will not interfere with dilator 17 as it passes from leg 65 into leg 61.

Once plug 57 has entered leg 61 and pusher 69 has been retracted, dilator 17 is again advanced into leg 61. When resistance is encountered, the physician knows that plug 57 has reached the artery. While maintaining axial pressure on dilator 17, apparatus 59 is slowly withdrawn until proximal end 73 of leg 65 reaches indicator mark 71. The distance between indicator 71 and dilator end 21 is the same as the distance between proximal end 73 and forward end 26. Therefore, the physician knows that when mark 71 reaches end 73, all of plug 57 has exited from end of leg 61. As was described in connection with the embodiment of FIG. 1, pressure is then maintained until a good self-sustaining hemostatic seal has been established.

The embodiment of FIG. 3 is very similar to that of FIG. 1, except that the dilator and plug legs have been transposed. In the FIG. 3 embodiment, plug leg 74 is coaxial with common leg 61 and dilator leg 75 is at an angle, whereas in the FIG. 2 embodiment the reverse is true.

Although it is believed that the preferred method for using the embodiment of FIG. 2 is to preassemble dilator 17 in apparatus 59, that is by no means necessary. If the physician prefers, he can just as well insert dilator 17 into tissue channel 9 as was described above in connection with the embodiment of FIG. 1. He can then pass leg 61 over it. With the embodiment of FIGS. 4 and 1, while it is believed preferable to insert dilator 17 first, the physician, if he prefers, can preassemble the dilator in the sheath before passing the dilator over the guide wire.

While plug 57 may be made of any resorbable material, collagen is believed to be most suitable. The physical form

of the plug may vary widely, with the one selected by the physician being dependent upon the circumstances of the case. For example, where the puncture wound is relatively small and the patient has not been on high doses of antico-agulant and heparin, a plug, like that depicted in FIG. 12a, of loose fibrous material, somewhat like fleece or absorbent cotton or oxygenated cellulose, would serve quite well. Alternatively, for larger wounds in patients who have been on anticoagulants and heparin, it may be necessary that the plug be able to maintain some structural integrity for a longer period of time. Under those circumstances, a plug of more densely packed material, as depicted in FIG. 12b, might be preferred.

A third embodiment of a suitable plug is depicted in FIG. 12c. In that embodiment, the front end 77 of the plug might be of loose fibrous material, like that depicted in FIG. 12a, whereas the remainder 79 could be made of a more densely packed material.

Yet another type of plug is shown in FIG. 12d. In this configuration, the front end 81 is a collagen membrane and the remainder 83 is an expandable collagen sponge.

It is believed that when a collagen sponge or a densely packed collagen material are employed, very little if any pressure need be applied after the initial seating of the plug. This is believed to be true because the physical character-istics of the sponge-like or densely packed plug and the expansion thereof, as well as its interaction with body fluids in the tissue channel will be adequate to hold the front end against the artery wall.

It is also believed that, initially, when the plug is pressed against the artery, hemostasis is achieved by mechanical means, i.e., by application of mechanical pressure all around the arterial puncture. Shortly thereafter, however, the hemo-static material begins to bind to the arterial tissue and biochemical hemostasis takes over. Once biochemical hemostasis becomes sufficiently strong to withstand the normal blood pressure within the artery, and therefore self-sustaining, external mechanical pressure can be removed.

FIG. 12e shows yet another form of plug, similar to the plug of FIG. 12d, but with a lumen 85. This form of plug is designed for use by physicians who prefer not to remove the guide wire immediately after a procedure. The proximal end of the guide wire 15 can be fed through lumen 85 and through the collagen membrane 81. The plug is slid down along the guide wire through tissue channel 9 until its front end reaches the wall of the femoral artery. Indeed, the plug of FIG. 12e could even be inserted without the use of a sheath. When the wire 15 is withdrawn, the collagen mem-brane automatically reseals itself.

As noted earlier, the sheath is substantially larger in cross section than is arterial puncture 13. Consequently, when plug 57, which fills the entire cross section of the sheath channel, reaches the artery, even in its compressed state it overlaps puncture 13 on all sides. Obviously, then, when it exits the sheath and is permitted to expand, a full bandage-like covering over puncture 13 is assured.

In practice it has been found that when using a collagen plug in accordance with the subject invention, a good hemostatic seal can be achieved in five minutes or less. With larger wounds, for example, ones left after removal of 14 Fr. or larger catheters, or after the use of anticoagulants and heparin, sealing may take somewhat longer.

FIG. 11 depicts another means for practicing the instant invention. In this embodiment a piston 18 pushes ahead of its front end a closed balloon 87 formed of a collagen membrane and only partially filled with a collagen substance

and a saline solution. The piston has an injection needle 18a on its front end which pierces the balloon during the pushing action.

After the balloon 87 exits from the sheath 23 and is pressed against the wall of the artery 11, an inflation fluid is injected via the needle 18a to fill and expand the balloon, as shown in FIG. 11, so that the balloon covers the arterial puncture 13 and fills the region of tissue channel 9 imme-diately adjacent the arterial puncture 13. The piston 18 is thereafter retracted to withdraw the injection needle 18a from the balloon 87. The membrane which forms the balloon 87 then automatically reseals itself to hold the balloon in the inflated condition shown in FIG. 11. The sheath 23 and piston 18 may then be withdrawn. When using this embodi-ment, the inflation fluid itself should be resorbable, prefer-ably a saline solution or saline mixed with collagen in solution.

As noted above, when the procedure cannula is removed, both the arterial puncture 13 and the tissue channel 9 tend to close up somewhat. The method depicted in FIGS. 13 through 22 is designed to take advantage of this tendency. In the FIGS. 13–22 method, neither the hemostasis sheath 45 nor the dilator 17 are pushed through channel 9 all the way to arterial puncture 13. Instead, as shown at 89 in FIGS. 14, 14A, 15 and 15A they are inserted no further than to within about ¾ cm. of the artery.

First, digital pressure (see arrows 105 in FIGS. 13–21) is applied upstream of the wound so as to close down the artery (see arrows 106). In this way the pressure in the artery at the puncture site 13 is no more than about atmospheric pressure. Although the method of this invention could be practiced without applying digital pressure, that would likely result in more profuse bleeding.

Then, as shown in FIG. 13, the dilator 17 is inserted over guide wire 15 to about ¾ cm from puncture 13. It will generally be inserted so that between about 3 and about 6 cm. of its length is beneath the surface of the skin.

One method for assuring that the sheath is inserted to the proper depth is as follows. Once the artery 107 has been punctured and the guide wire is in place, a needle clamp 108, as is depicted in FIG. 23, is placed on the needle 109 at the skin line 110. With the clamp in place, the needle is removed from the patient. The needle can then be placed along side the sheath and a mark made on the sheath to indicate the distance from needle tip to needle clamp. Alternatively, a mark can be made ½ or ¾ cm. closer to the distal end of the sheath. As yet another alternative, a kit can be provided of variable length sheaths, each having a hub at one end, and from that kit a sheath of the proper length, i.e., one having a total length, from hub to distal end, of ½ or ¾ cm. less than the distance from needle tip to needle clamp can be selected.

Next, as is best seen in FIG. 14, the sheath 45 is slid down over the dilator, again stopping when its distal tip is about ¾cm. from the arterial puncture 13. The sheath and dilator can be inserted separately, i.e., in two steps, or together as a unit, in one step.

As can be seen in FIGS. 14a and 15a, the partially collapsed section of tissue channel 9 which is immediately adjacent puncture 13 is not reexpanded. Instead, it remains undisturbed.

The next step is to withdraw dilator 17 (as is indicated by arrow A on FIG. 15) with guide wire 15 (see FIG. 15), leaving only sheath 45 in tissue channel 9. As depicted in FIG. 16, a preloaded holder or cartridge 91 with plug 93 therein is inserted (see arrow B) into sheath chamber 97. As cartridge 91 is fully seated within chamber 97, a plunger 95 is used to push (see arrow C) plug 93 into and through sheath

US 7,008,439 B1

9 | 10

45 until the plug exits the sheath so as to cover puncture 13 and fill that section of channel 9 which is adjacent puncture 13 (see FIGS. 17 and 17a). Simultaneously, sheath 45 is slightly withdrawn (indicated by arrows D on FIG. 17) to permit plug 93 to be fully discharged from the sheath.

Plunger 95 is then withdrawn, leaving sheath 45 to maintain pressure on plug 93. Sheath 45 can then be used to hold plug 93 in place over puncture 13 until self sustaining hemostasis has been achieved. Alternatively, as depicted in FIG. 18, a second preloaded holder or cartridge 99 can then be inserted (see arrow E) into chamber 97. Once again, a plunger, 103 is used to push (see arrow F) plug 101 through the sheath. Preferably, plug 101 should be long enough so that when fully discharged from the sheath (as depicted in FIG. 21), it will fill substantially all of channel 9, reaching almost to the surface of the skin.

When the front end of plug 101 reaches the end of sheath 45 it abuts plug 93. Plunger 103 is then used to force about 1 cm. of plug 101 out of the sheath (107 on FIG. 19). In this way, plug 101 takes over the function of holding plug 93 in place against puncture 13. While plunger 103 continues to hold plug 101 in place (see arrow H), sheath 45 is withdrawn from channel 9 (see arrows G on FIG. 20). As can be seen in FIG. 22, when sheath 45 is fully withdrawn, plugs 93 and 101 fill substantially all of channel 9.

It is believed to be most desirable that the front plug 93 be of loosely packed material, while rear plug 101 be of a more densely packed material. Also, as presently contemplated, in its natural, unrestrained state, plug 101 has a cross section larger than that of cartridge 99. Therefore, in order to get it into the cartridge, it must be compressed. It then stays in this compressed state while in cartridge 99 as well as while passing through sheath 45. However, after exiting from sheath 45 it naturally expands and presses against the walls of channel 9. The interaction then between plug 101 and the walls of channel 9 tends to hold the plug in place. As a result, very little if any external pressure is required.

Accordingly, after only a very short period of time, perhaps almost immediately, the plunger can be removed, leaving only the two plugs in the wound (see FIG. 21). Pressure on the artery (see arrows 105 in FIGS. 13–21) can then be released, permitting normal flow through the artery to resume.

Although it is not necessary, in the practice of the method of the instant invention, for plugs 93 and 101 to fill all of channel 9 from artery to skin line, it is believed preferable that they do so. Alternatively, plug 101 can be made longer than necessary to reach the skin line, in which case it could then be cut off flush with the skin. As yet another alternative, a single plug, the size of plugs 93 and 101 combined could be used instead of two separate plugs.

While it is believed most advantageous to remove the procedure cannula and then insert a new sheath, it would be within the scope of the instant invention to use the procedure cannula as the delivery sheath through which the hemostatic material is passed.

It should also be understood that the hemostatic material employed may take many forms. For example, it may be in the form of a liquid or it may have a more viscous paste-like consistency. When using liquid or paste-like materials, the delivery sheath, the hemostatic charge holder and the piston might most advantageously be combined together in a single syringe-like device.

While the method and apparatus of this invention have been described in connection with several specific embodiments, it should be understood that numerous modifications could be made by persons of skill in this art without departing from the scope of this invention. Accordingly, the above description is intended to be merely illustrative and not limiting. The scope of the invention claimed should be understood as including all those alternatives and modifications which the above specification would readily suggest or which would readily occur or be apparent to one skilled in the art upon reading the above.

What is claimed is:

1. A device for closing a puncture in a wall of an artery comprising:

an elongated member having a distal end, said elongated member sized to be fitted through a passageway leading to said puncture so that said distal end is disposed near said puncture in said artery,

separable plug means for plugging said puncture being disposed in said elongated member,

movable guide means extending longitudinally through said elongated member and said plug means for extension through said puncture for guiding said plug means to said puncture, and

means for ejecting said plug means from said distal end of said elongated member so as to place said plug means in blocking relation with said puncture, so as to seal said puncture.

2. A device as claimed in claim 1, wherein said movable guide means is a guide wire.

3. A device as claimed in claim 1, further including a guide tube, said guide tube being extended through an adjacent skin area through the body containing the artery, through the puncture in the wall of the artery and into the artery enabling a cardiac catheter to be guidingly moved through said guide tube and into the artery, said guide tube and cardiac catheter being removed from the puncture prior to placing said plug means into blocking relation with said puncture.

4. A device as claimed in claim 1, wherein said plug means is comprised of hemostatic, thrombogenic, bio-absorbable material.

5. A device as claimed in claim 1, wherein said elongated member is a tubular member having a longitudinal axis and wherein said ejecting means is a pusher element being movable along said longitudinal axis for expelling said plug means.

6. A device as claimed in claim 5, wherein said pusher element includes means for engaging a person's thumb, and wherein said tubular member includes means for engaging a person's fingers so that said pusher element may be moved along said longitudinal axis.

7. A device as claimed in claim 1, wherein said plug means includes an orifice therethrough, said guide means being disposed through said orifice, said orifice automatically closing when said guide means is removed therefrom.

8. A device for closing a puncture in a wall of an artery comprising:

an elongated member having a distal end, said elongated member sized to be fitted through a passageway leading to said puncture so that said distal end is disposed near said puncture in said artery,

a separable plug member for plugging said puncture being disposed in said elongated member,

a movable guide element extending longitudinally through said elongated member and said plug member for extension through said puncture for guiding said plug member to said puncture, and

an ejecting mechanism for ejecting said plug member from said distal end of said elongated member so as to

US 7,008,439 B1

11

place said plug member in blocking relation with said puncture, so as to seal said puncture.

9. A method of closing a puncture in a wall of an artery made for the purpose of moving an elongated cardiac catheter into the artery in which an exterior guide tube is extended through a passage leading to the puncture and through the puncture in the wall of the artery and into the artery so a to enable the catheter to be guidingly moved through the guide tube and into the artery, the method comprising the steps of:

  withdrawing the cardiac catheter and moving the guide tube outwardly so that it no longer extends within the puncture,

  extending a plug having a removable guide wire extending longitudinally therethrough so that the guide wire extends from the plug through said puncture,

12

  moving the plug inwardly along the guide wire into blocking relation with said puncture, and

  withdrawing the guide wire from the plug so as to leave the plug sealed in blocking relation with said puncture.

10. A method of closing a puncture in a wall of an artery comprising the steps of:

  inserting a removable guide wire through said puncture into the artery;

  threading a plug over said guide wire so that the guide wire extends from the plug through said puncture,

  moving the plug inwardly along the guide wire into blocking relation with said puncture, and

  withdrawing the guide wire from the plug so as to leave the plug sealed in blocking relation with said puncture.

* * * * *

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 7,008,439 B1                                    Page 1 of 1
APPLICATION NO. : 08/399535
DATED                   : March 7, 2006
INVENTOR(S)        : Ernst Janzen, Gunter Ruttgers and Lawrence Saper

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 6,
Line 47, after "end" (second occurrence) insert -- **26** --.

Column 8,
Line 1, after "piston" insert -- **18** --.

Column 11,
Line 8, delete "a" and insert -- as --.

Signed and Sealed this

Twenty-seventh Day of June, 2006

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

**JA 224**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 13, 2012, **DEFENDANT-APPELLANT ACCESS CLOSURE, INC.'S OPENING BRIEF** was filed electronically using the CM/ECF system and served by CM/ECF system on counsel for Plaintiffs-Appellees St. Jude Medical, Inc. and St. Jude Medical Puerto Rico, LLC and co-counsel for Access Closure, Inc. as follows:

Morgan Chu
mchu@irell.com
Andrei Iancu
aiancu@irell.com
Alan Heinrich
aheinrich@irell.com
Keith Orso
korso@irell.com
Eric B. Hanson
ehanson@irell.com
C. Maclain Wells
mwells@irell.com
Laura E. Evans
levans@irell.com
Irell & Manella LLP
1800 Avenue of the Stars
Suite 900
Los Angeles, CA  90067

*Counsel for St. Jude Medical, Inc. and St. Jude Medical Puerto Rico, LLC*

Charles K. Verhoeven
charlesverhoeven@quinnemanuel.com
David Eiseman
davideiseman@quinnemmanuel.com
Matthew Cannon
matthewcannon@quinnemmanuel.com
Quinn Emanuel Urquhart & Sullivan, LLP
50 California Street, 22nd Floor
San Francisco, CA  94111

*Counsel for Access Closure, Inc.*

*/s/ Joseph R. Re*
Joseph R. Re
KNOBBE MARTENS OLSON & BEAR LLP
2040 Main Street, 14th Floor
Irvine, CA  92614

13683138